FILED

2019 Jul-18  PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

GLORIA FERGUSON,          )
CASSANDRA MCCLINTON,   )
individually and on behalf of    )
others similarly situated,       )
                               )
Plaintiffs,              )    COMPLAINT
                               )    CLASS ACTION
                               )
                               )    Case No._____
                               )
BBVA COMPASS            )
BANCSHARES, INC.,       )
COMPASS BANCSHARES, INC., and )
BBVA USA BANCSHARES, INC.,  )
                               )    Jury Trial Demanded
Defendants.              )

# CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................2

II.  PARTIES, JURISDICTION AND VENUE.....................................................3

    A.  PARTIES AND ENTITIES.................................................................................3

    B.  JURISDICTION AND VENUE.........................................................................5

III.  FACTUAL ALLEGATIONS............................................................................5

    A.  BBVA'S DUTIES UNDER ERISA ...............................................................5

    B.  THE PLAN.........................................................................................................8

    C.  THE MONEY MARKET FUND .................................................................. 10

    D.  BBVA'S FAILURE TO MONITOR HIGH-COST FUNDS. ...................... 19

        1. Why Fees Matter.......................................................................................... 20

        2. The Perils of High-Cost Funds. ................................................................. 23

        3. The Fool's Game. ......................................................................................... 27

        4.  BBVA's Imprudent High Cost Funds........................................................ 30

        5. The Underperforming Funds.  .................................................................... 36

        6. The Specific Funds....................................................................................... 39

        7. The Price Participants Paid. ....................................................................... 63

    E.  THE COST OF BBVA'S IMPRUDENT PROCESS TO PLAN PARTICIPANTS.............. 66

IV.  CLASS ACTION ALLEGATIONS ................................................................69

V.  PLAN WIDE RELIEF .....................................................................................74

VI.  COUNT ONE...................................................................................................74

VII.  JURY TRIAL DEMAND ............................................................................................77

VIII.  PRAYER FOR RELIEF ............................................................................................77

INDEX TO FIGURES ....................................................................................................80

TABLE OF AUTHORITIES ............................................................................................82

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| GLORIA FERGUSON | ) | |
| CASSANDRA MCCLINTON, | ) | |
| individually and on behalf of | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | COMPLAINT |
| | ) | CLASS ACTION |
| | ) | |
| | ) | Case No._____ |
| | ) | |
| BBVA COMPASS | ) | |
| BANCSHARES, INC., | ) | |
| COMPASS BANCSHARES, INC., and | ) | |
| BBVA USA BANCSHARES, INC., | ) | |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Gloria G. Ferguson and Cassandra McClinton individually and as

representative of a class of participants in and beneficiaries of the Compass

SmartInvestor 401(k) Plan (the "Plan") pursuant to 29 U.S.C. §§ 1132(a)(2) and

1132(a)(3) state their Complaint against Defendants BBVA Compass Bancshares, Inc.,

Compass Bancshares, Inc., and BBVA USA Bancshares, Inc., all *d/b/a* BBVA

(collectively, "BBVA" or "Defendant")[1] for breach of fiduciary duty under the

Employee Retirement Income Security Act of 1974, as amended, ("ERISA") 29

U.S.C. §§ 1001-1461:

## I.  INTRODUCTION

1.     ERISA's purpose is to provide special protections for the interests of

participants and beneficiaries in defined contribution and defined benefit plans. These

duties are often described as the "highest known to the law."  *Donovan v. Bierwirth*, 680

F.2d 263, 271, 272 n. 8 (2d Cir. 1982) (*citing* Restatement (Second) of Trusts § 2, cmt.

b (1959) and *SEC v. Chenery Corp.,* 318 U.S. 80, 85-86 (1943) (Frankfurter, J.)).  An

ERISA fiduciary is obligated to act for the *exclusive* purpose of providing benefits to

participants and defraying only reasonable expenses with the "care, skill, prudence,

and diligence" required of a trustee.  29 U.S.C. § 1104(a)(1) (emphasis added).

2.     BBVA acknowledged its duties in its Summary Plan Description[2] stating:

"The people who administer the plan, called 'fiduciaries' of the plan, have a duty to do

---

[1] Reference is made to the Form 5500 Reports filed by the Plan with the U.S. Department of Labor for the plan years ending December 31, 2010 through December 31, 2017. BBVA has filed inconsistent documents with the U.S. Dept. of Labor naming both "BBVA Compass Bancshares, Inc." and "Compass Bancshares, Inc." as the plan sponsor.  BBVA describes the same entity as BBVA USA Bancshares, Inc. in filings with the Alabama Secretary of State. All do business as "BBVA".

[2] Reference is made to the Summary Plan Description (current) at page 30. Named Plaintiffs (as defined herein) have exhausted all available administrative remedies pursuant to 29 U.S.C § 1133, prior to the filing of this Complaint (there are none).  There are no provisions or procedures in the

so prudently and in the interests of all plan participants and beneficiaries."  Despite acknowledging its fiduciary duties, BBVA breached its duties by, among other things:

a.      Mismanaging a $100 million money market fund that was the investment equivalent of stuffing cash into a mattress.  *See Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 31 (1st Cir. 2018) ("[] a trustee who decides to stuff cash in a mattress cannot assure that there is no loss merely by holding onto the mattress."); and,

b.      "[F]ailing to properly monitor investments and remove imprudent ones," *Tibble v. Edison Intern.*, 135 S. Ct. 1823, 1829 (2015), including high-cost mutual funds whose performance did not justify their increased costs.

## II.  PARTIES, JURISDICTION AND VENUE

### A. PARTIES AND ENTITIES

3.      The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §§ 1002(2)(A) and 1002(34).  The Plan was established and is maintained under a written document in accordance with 29 U.S.C. § 1102(a).

---

plan documents to make or appeal the decisions of the Defendant in regard to breach of fiduciary duty claims. The designated remedy for a breach of fiduciary duty claim is a suit filed in federal court. *Id.* at 19. Counsel for the named Plaintiffs requested access to any administrative procedures and none were provided.  Thus, Named Plaintiffs exhausted all administrative remedies prior to filing, having confirmed there are none; to the extent Defendant alleges that some other procedure exists, based upon the information available to the Named Plaintiffs, it is clear such procedures and process are futile.

The Plan provides for the retirement savings and income of employees of BBVA and its subsidiaries.  As of December 31, 2017, the Plan had more than Nine Hundred Thirty-One Million Two Hundred Eighty-Two Thousand Seven Hundred and Two Dollars ($931,282,702) in assets and 13,145 participants with account balances.

4.     BBVA is the Plan Administrator under 29 U.S.C. § 1002 (16)(A)(i) and is the named fiduciary under the Plan and 29 U.S.C. § 1102(a).  In this capacity, BBVA is responsible as a fiduciary for selecting, monitoring, evaluating, and replacing the Plan's investment options.

5.     Fidelity Management Trust Company ("Fidelity") serves as trustee and recordkeeper for the Plan.  Fidelity provides the investment platform for the Plan, but invests the assets of the Plan only as directed by BBVA.

6.     Plaintiff Ferguson resides in the Northern District of Alabama and is domiciled in Alabama.  Ferguson was a participant in the Plan during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan. 29 U.S.C. § 1002(7).

7.      Plaintiff McClinton resides in the Northern District of Alabama and is domiciled in Alabama.  She was and is a participant in the Plan during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan.  29 U.S.C. § 1002(7).

B. **Jurisdiction and Venue**

8.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

9.     This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the defendant may be found.

## III.  FACTUAL ALLEGATIONS

A. **BBVA's Duties Under ERISA**

10.     Among the duties BBVA owes Plan participants as an ERISA fiduciary is to act for the *exclusive* benefit of participants in ensuring the Plan's investment management and administrative expenses are reasonable, and BBVA must discharge those duties "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use.  29 U.S.C. § 1104(a)(1).

11.     "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."  *Tibble*, 135 S. Ct. at 1828.  With regard to investments, the U.S. Supreme Court has instructed lower courts to look to the

Restatement (Third) of Trusts § 90 (2007) *General Standard of Prudent Investment* and the *Uniform Prudent Investor Act* § 2, 7B U.L.A. 21 (1995), among other authorities.  *Id.*

12.    "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection."  *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).  Thus, even with respect to the trust-like fiduciary standards ERISA imposes, Congress expects courts to develop a common law of rights and obligations bearing in mind the special nature and purpose of ERISA plans.  *Id.*

13.    "A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged according to the standards of others 'acting in a like capacity and familiar with such matters.'"  *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (interpreting 29 U.S.C. § 1104(a)(1)(B)).

14.    Large plans such as the BBVA plan, responsible for $931 million in retirement savings of over 13,000 employees, have ready access to high-quality administrative and investment management services from reputable providers at a reasonable cost.  *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[] a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.").  Thus, fiduciaries of

large plans such as the Plan here are held to the standard of financial experts in the field of investment management. *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 388 (6th Cir. 2015); *see also Katsaros*, 744 F.2d at 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296-97 (S.D.N.Y. 1998).

15.     BBVA has a duty both of impartiality and to "[] produce income that is reasonably appropriate to the purposes of the trust and to the diverse present and future interests of its beneficiaries." Restatement (Third) of Trust § 79.  BBVA has an affirmative obligation to generate income from trust assets.  *See id.*  The Plan may not hoard cash in the name of capital preservation.  As the First Circuit Court of Appeals held in *Brotherston*, "[] a trustee who decides to stuff cash in a mattress cannot assure that there is no loss merely by holding onto the mattress." 907 F.3d at 31.

16.     Additionally, the performance of an ERISA plan's investment options must be evaluated *net of costs*.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs." *Unif. Prudent Investor Act* § 7.

17.     The United States Supreme Court recently held, "Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 135 S. Ct. at 1828. "The trustee must systematically

7

consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Id.*[3]

18.     When an employer mismanages a defined contribution plan, a claim for breach of fiduciary duty is the primary if not the only effective remedy for employees that would otherwise bear the cost of the employer's improvident financial decisions. "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . ." 29 U.S.C. 1109(a).

**B. THE PLAN**

19.     26 U.S.C. § 401(k) defined contribution plans such as the BBVA Plan have become America's primary means of saving for retirement. This is the result of a gradual shift from the traditional, <u>defined benefit</u> "pension" plans to <u>defined contribution</u> "401(k)" plans.[4]  In the case of a traditional defined benefit "pension" plan, an employer has an incentive to make prudent investment decisions and to incur only reasonable costs because the employer is directly responsible for the financial

---

[3] *A. Hess, G. Bogert, & G. Bogert*, Law of Trusts and Trustees § 684, pp. 145–148 (3d ed. 2009) (Bogert 3d).
[4]  *Alicia Haydock Munnell and Annika Sunden*, "Coming Up Short: The Challenge of 401(k) plans", The Brookings Institution Press 2005.

consequences of mismanaging the plan.  In the case of a defined contribution "401k" plan, participants bear the costs of the employer's financial decisions.  Their retirement benefits are limited to the value of their individual accounts net of such costs.  29 U.S.C. § 1002(34).  Thus, Participants must rely on their employer to carry out its fiduciary duties "with the care, skill, prudence, and diligence" that ERISA requires.  29 U.S.C. § 1104(a)(1).

20.    The Plan is a cafeteria type plan in which participants choose investment options for their individual accounts from the Plan's investment menu.  BBVA, as a fiduciary to the Plan, is responsible for selecting and monitoring the investment options in the menu.  Participants are captive investors whose choices are limited to the investment options in the menu.  BBVA with its access to professional advice and plan level information  is obligated to monitor the Plan's investment options and its fees and expenses.

21.    The options for the Plan's investment menu over the Class Period (defined below) consisted of company stock; a money market fund; a series of target date (blended) mutual funds; a single bond mutual fund; and, international, large-cap, large-cap growth, and small-cap growth and value mutual funds.  During the Class Period, Plaintiff Ferguson had investments in the target date option; international, small-cap,  large-cap, and large-cap growth stock options; the bond option; and, the

short-term money market option.  Plaintiff McClinton had investments in the money market and target date options.

22.    Participants in the Plan select investments from this menu for their individual retirement accounts based upon their own individual risk tolerances and return objectives. Participants in plans such as this are captive investors—that is, their choices are limited to the options in the investment menu. BBVA, which has access to plan level information, accountants, lawyers, and professional investment advisors, has a duty to prudently select and monitor the investment options, and ensure that the fees and expenses of the Plan are reasonable. Thus, while the Plan was a "cafeteria plan," it was a "cafeteria" in which BBVA controlled the menu.

## C. THE MONEY MARKET FUND

23.    During most of the Class Period, the Plan investment menu included the Vanguard Money Market Fund as the Plan's <u>only</u> short-term bond investment option. A money market fund such as the Vanguard Money Market Fund is effective when used for its intended purpose – short term capital preservation and income generation – in suitable interest rate environments.  In a low interest rate environment, such a fund is useless as a long-term investment option because it does not generate

10

sufficient income.  Its purpose and its limitations are well-known to every competent ERISA fiduciary.[5]

24.     Under circumstances prevailing during the Class Period – a period where ultra-short-term rates were at historic lows – the use of a money market fund, any money market fund, as an income producing option was imprudent because the return on money market funds was near zero; in fact, at some points the return net of costs was negative.  Thus, reliance on a money market fund to generate income in a low-interest rate environment was inconsistent with an investment fiduciary's duty to "[] produce income that is reasonably appropriate to the purposes of the trust and to the diverse present and future interests of its beneficiaries." Restatement (Third) of Trust § 79.

25.     ERISA retirement plans exist both to preserve principal and to generate income.  The letter "I" in ERISA refers to "Income."  Trustees have an obligation to generate income from trust assets. *See id.*  They may not hoard cash in the name of capital preservation.  As the First Circuit Court of Appeals observed in *Brotherston*, "[] a trustee who decides to stuff cash in a mattress cannot assure that there is no loss

---

[5] *See Chris Tobe*, CFA, "Do Money Market Funds Belong in 401k Plans," *MarketWatch* (August 30, 2013) ("While near 0% money-market rates have skewed recent comparisons, the 10-years numbers are meaningful and show serious fiduciary liability for plan sponsors who force their participants into a money-market fund.").

merely by holding onto the mattress." 907 F.3d at 31.  During the Class Period around $100 million of the participants' retirement savings was essentially stuffed in the Plan's "mattress."  This occurred because BBVA failed to have a process, or failed to adhere to such process, to monitor the Plan's investment menu and failed to recognize its duty to offer sufficient income producing bond options during a period of time when money market returns were near zero.

26.    A fiduciary that monitored the performance of the Plan would have been aware that the money market fund was not suitable as an income producing investment.  The duration of the Vanguard Money Market Fund was about 40 days, making it suitable for use as the retirement plan equivalent of a checking account.  A participant's investment horizon can be as long as 35 years with differing levels of expected returns depending on the circumstances of the participant.  Persons saving for retirement must achieve investment returns substantially greater than zero to enjoy even a modest retirement.  For them, the Vanguard Money Market Fund was suitable for short-term cash management, but was of no use for long-term retirement investment.

27.    Had BBVA monitored the Plan with any care or diligence, BBVA would have realized that the returns of the money market fund during the Class Period were woefully inadequate for long-term retirement investments.  For the six years

preceding the filing of this lawsuit, the Plan's money market funds returned <u>0.01%</u> or less per year, close to nothing.  Indeed, accounting for inflation, participants invested in these options actually lost money.

28.     Had BBVA been diligent in monitoring the Plan, BBVA would have realized that the participants in this Plan were in fact using the money market fund, not for its intended cash management purpose, but as an income generating option. During the Class Period, $87 to $108 million of the participants' retirement savings, as much as one-fifth (1/5) of their assets, was invested in a money market fund that was clearly unsuitable for retirement investing.  The $100 million amount would have alerted a prudent plan sponsor that the participants were using the money market fund as an income producing investment and were not merely using the money market fund as a checking account.  A diligent plan sponsor, monitoring the Plan, would have realized that there was a serious problem with the structure of the Plan's options based upon the participants' behavior.  No rational investor presented with sufficient short-term capital preservation options would make an investment that earned no income.  The participants in the BBVA Plan, lacking sufficient short-term bond fund options, were forced to place their retirement savings in the BBVA Plan's mattress.

13

29.     A diligent plan sponsor, upon reviewing the Plan's investment menu, would immediately have understood the reason for participants' behavior: the Plan did not have an adequate menu of income producing bond options.  BBVA did not have to scour the market place for additional options, there were any number of high-quality bond funds, stable value funds, and total return funds available, from any number of reputable providers.  The following chart depicts the returns of a few the readily available alternatives:

*Figure 1.* *Cumulative Returns of Alternatives to Money Market Fund.*



30.     The following table shows the cumulative returns of the funds for the

Period 2013-2018:

**Figure 2.** *Returns BBVA Money Market Fund and  Readily Available Alternatives.*

| Fund | Cumulative Return | v Money Market |
|------|-------------------|----------------|
| *Vanguard Money Market* | *3.91 %* | - |
| Fidelity-Short Term | 6.07 | 2.16 |
| Vanguard Short Term Bond Index | 6.54 | 2.64 |
| Fidelity GNMA | 9.42 | 5.51 |
| Vanguard Short-Term Investment Grade | 9.72 | 5.82 |
| Vanguard Short Corporate Bond | 11.02 | 7.11 |
| PIMCO Total Return | 11.28 | 7.37 |
| Hueler Index | 11.82 | 7.92 |

Period: 2013-2018

31.     The returns shown are short and medium term bond funds available

from Vanguard,[6] Fidelity,[7] and PIMCO,[8] and also the Hueler Stable Value Index (an

equal weighted average of reporting stable value funds).[9]  From all the options

available, the BBVA selected the Vanguard Money Market Fund as the <u>only</u> short-

term option.

---

[6] Vanguard Retirement Group ("Vanguard) was and remains the world's largest provider of mutual funds.

[7] Funds from Fidelity Investments, Inc. ("Fidelity"), one of the world's largest asset managers, as the plan recordkeeper, were readily available.

[8] The Pacific Investment Management Company, LLC ("PIMCO") PIMCO Total Return fund, a bond fund with the goal of income and capital preservation, was the largest bond fund at the time.

[9] Stable value funds, represented by the index, were readily available from any number of reputable providers.

32.     ERISA does not require a fiduciary to offer any particular investment option.  BBVA could have offered short-term bonds, medium-term bonds, inflation protection bonds, total return funds, or a stable value fund that offered both capital preservation and income production.[10]  But, a fiduciary with a prudent process had to do <u>something</u> other than "hold on to the mattress."

33.     The loss resulting from BBVA's breach was substantial. The amount participants lost can be determined by comparing the amounts that participants earned from the money market fund to the amount participants would have earned had they been given the choice of investing in a prudent fixed-income investment such as an income-producing bond or stable value funds.  The following chart compares the performance of BBVA's money market fund to the performance of stable value funds:

---

[10] *Thaler, R. H., & Sunstein, C. R.,* Nudge: Improving Decisions About Health, Wealth and Happiness 130 (2008).  R.H. Thaler received the Nobel Prize in Economics in 2017.

**Figure 3.** *Calendar Year Returns of BBVA Money Market Fund and Benchmark (in percent)*



| Fund \ Year | *2011* | *2012* | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Average |
|---|---|---|---|---|---|---|---|---|---|
| Money Market Fund | *0.14%* | *0.11* | 0.06 | 0.05 | 0.11 | 0.55 | 1.08 | 2.01 | 0.64 |
| Hueler Index | *2.69%* | *2.26* | 1.84 | 1.69 | 1.77 | 1.79 | 1.96 | 2.23 | 1.88 |
| Difference | *-2.55%* | *-2.15* | -1.78 | -1.64 | -1.66 | -1.24 | -0.88 | -0.22 | -1.24 |

Sample Mean: '13-18

34.     BBVA, as a banking institution with intimate familiarity with short-term interest rates knew, or should have known, without the benefit of hindsight, that this

was occurring.  The magnitude of the loss is readily apparent.  A fiduciary with a

prudent process would not have allowed this to happen.

35.    The comparison between a money market fund and a stable value fund

is appropriate because both funds preserve capital (by allowing participants to transact

at book value) and produce income.  A comparison between the money market fund

and a bond fund benchmark, such as an aggregate bond index, also would be

appropriate, and yields the same result.  The magnitude of the loss is roughly

equivalent using either benchmark.

36.    The following table estimates[11] the amount of the loss in dollars by

participants:

---

[11] For purposes of estimation, the assets of the Vanguard Treasury Money Market Fund introduced
in 2017 (with a relatively small amount of assets) are lumped in with the assets of the Vanguard
Prime Money Market Fund.

***Figure 4.*** *Loss Due to Mismanagement of Money Market Fund*

| Year | Vanguard MM % | Hueler % | Difference % | MM Assets $ | Loss $ |
|---|---|---|---|---|---|
| 2008 | | | | | |
| 2009 | 0.68 | | | | |
| 2010 | 0.20 | | | | |
| 2011 | 0.14 | | | | |
| 2012 | 0.11 | 2.26 | -2.15 | | |
| 2013 | 0.06 | 1.84 | -1.78 | 121,641,069 | 2,165,211 |
| 2014 | 0.05 | 1.69 | -1.64 | 108,700,708 | 1,782,692 |
| 2015 | 0.11 | 1.77 | -1.66 | 97,689,463 | 1,621,645 |
| 2016 | 0.55 | 1.79 | -1.24 | 101,431,241 | 1,257,747 |
| 2017 | 1.08 | 1.96 | -0.88 | 87,510,471 | 770,092 |
| 2018 | 2.01 | 2.23 | -0.22 | 87,510,471 | 192,523 |
| Average/Total* | 0.64% | 1.88% | -1.24% | $ 604,483,423 | $ 7,789,910 |

*Average for 2013-2018

37.     The total loss suffered by participants, before compounding, is approximately $7.79 million.

38.     To this day BBVA has not corrected this defect.  Short term rates have risen in recent years, narrowing the gap between money market funds and other fixed-income investments; however, if short-term rates fall again this gap will widen resulting in additional, unnecessary losses.

**D.  B̲B̲V̲A̲'̲S̲ ̲F̲A̲I̲L̲U̲R̲E̲ ̲T̲O̲ ̲M̲O̲N̲I̲T̲O̲R̲ ̲H̲I̲G̲H̲-̲C̲O̲S̲T̲ ̲F̲U̲N̲D̲S̲.̲**

39.     ERISA requires fiduciaries not only to act for the *exclusive benefit* of participants and beneficiaries, but also to make *only* prudent investments and to incur *only* reasonable expenses.  29 U.S.C. § 1104(a)(1).  "Understanding and evaluating [retirement] plan fees and expenses associated with plan investments, investment

19

options, and services are an important part of a fiduciary's responsibility."

*Understanding Retirement Plan Fees and Expenses*, U.S. Department of Labor Employee

Benefits Security Administration (December 2011).[12]

40.    "Wasting beneficiaries' money is imprudent.  In devising and

implementing strategies for the investment and management of trust assets, trustees

are obliged to minimize costs."  *Unif. Prudent Investor Act* § 7 cmt.

### 1. Why Fees Matter.

41.    The most significant expense for most retirement plans, the BBVA Plan

included, are the investment management fees paid to mutual fund providers.  These

often make up as much as 80% of the cost of administering a defined contribution

plan. Most but not all investment expenses are reported as "expense ratios." The

expense ratio represents the total of a fund's annual fund operating expenses,

expressed as a percentage of the fund's average net assets.  Expense ratios are

deducted by the mutual fund provider from the investor's returns.

42.    It is indisputable that the higher the fees charged to a beneficiary the

more the beneficiary's investment shrinks.  The magnitude of the effect that fees have

on the financial performance of retirement accounts is far greater than many realize

---

[12] Available at: https://www.dol.gov/sites/dolgov/files/legacy-files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

because of the effect of compounding.  The U.S. Department of Labor estimates that over 35 years a 1% difference in fees and expenses can reduce a participant's account balance at retirement by as much as 28%.  U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, 1-2 (Aug. 2013).[13]

43.     The differences between fees of 0.25% (25 bps), 0.50% (50 bps), and 1.00% (100 bps) are material, as shown in the following chart published by the SEC.[14]

**Figure 5.** *Chart from SEC Bulletin, "How Fees and Expenses Affect Your Investment Portfolio"*

---

[13] This article is available at the following web address: https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[14] *Investor Bulletin*, "How Fees and Expenses Affect Your Investment Portfolio," *U.S. Securities and Exchange Commission ("SEC") Office of Investor Education and Advocacy.*

44.   The best way to control the costs of the management expenses often is to maintain an investment menu of low-cost index funds.  As Warren Buffet[15] advised in a 1996 letter to shareholders, "Most investors, both institutional and individual, will find the best way to own common stock is through an index fund that charges minimal fees. Those following this path are sure to beat the net results (after fees and expenses) delivered by the great majority of investment professionals."[16]

45.   An index fund is a type of mutual fund with a portfolio constructed to match or track the components of a financial market index, such as the Standard & Poor's 500 Index (S&P 500).  Index funds deliver consistent performance according to their benchmarks because they follow their benchmark index no matter the state of the markets.  Index funds diversify by providing broad, market exposure to the securities that comprise the index.  Index funds are ideal for controlling costs because they have low operating expenses and low portfolio turnover.

46.   The index fund approach to investing and controlling costs is sound from a trust law perspective.  Restatement (Third) of Trusts § 90, cmt. h(1) ("Investing in index funds that track major stock exchanges or widely published

---

[15] Warren Buffet is widely regarded as the most successful investor in the world today.

[16] *Warren Buffet,* 1996 - Berkshire Hathaway Shareholder Letter.

listings of publicly traded stocks is illustrative of an essentially passive but practical investment alternative to be considered by trustees seeking to include corporate equity in their portfolios.").

47.    BBVA did not have to scour the market to find low-cost index fund products.  There are thousands of high-quality, low-cost index funds with broad market exposure for every asset class in which the BBVA Plan invested or could have invested.   Reputable investment providers such as Fidelity, the Plan's recordkeeper, and Vanguard, the world's largest mutual fund provider, offer high-quality, low-cost funds for each of the asset categories in the Plan's investment menu.  In these competitive markets, fees are measured in basis points, one one-hundredth of a percent, and every basis point matters.

### 2.  The Perils of High-Cost Funds.

48.    This does not mean, however, that BBVA was restricted from selecting higher-fee mutual funds seeking to generate excess returns in excess of those generated by index funds.  Trust law investment principles allow the use of management strategies that seek to beat the market, such as searching for advantageous segments of a market, or for individual bargains in the form of under-priced securities.  Restatement (Third) of Trusts § 90, cmt. h(2).

49.     From a fiduciary perspective, however, there are at least two major difficulties with strategies seeking to deliver excess returns. The first is that active management strategies which seek to beat the market involve significant added costs.[17]  These additional costs include additional investigation and analysis expenses disclosed in the fund's "expense ratio" and "invisible" trading costs[18] such as brokerage commissions, the bid-ask spread, and price impact.  Although these costs are not included in a fund's expense ratio, the SEC does require a fund to disclose its commission and "turnover ratio," a measure of how frequently a fund's assets are bought and sold.   Average trading costs are in the range of 80-95 bps per 100% of fund turnover,[19] which in many cases is material to the fund's performance over time.

---

[17] *See John C. Bogle,* "The Arithmetic of 'All-In' Investment Expenses," *Financial Analysts Journal* (2014).  Bogle created the world's first index fund and founded Vanguard, the largest mutual fund company today.

[18] *Securities and Exchange Commision*, "Concept Release: Request for Comments on Measures to Improve Disclosure of Mutual Fund Transaction Costs," Release Nos. 33-8349; 34-48952; IC-26313; File No. S7-29-03.  The release contains an in-depth discussion of trading/transaction costs, including commissions, the bid-ask spread, and market/price impact costs. The SEC ultimately decided to require disclosure of commissions paid by the fund and the fund's annual turnover ratio, from which transaction costs can be estimated, but these are not part of the fund's expense ratio. Thus, a fiduciary must consider these factors, separate and apart from the expense ratio, in selecting and monitoring mutual fund investments.

[19] *Roger Edelen, Richard Evans, and Gregory Kadlec,* "Shedding Light on 'Invisible' Costs: Trading Costs and Mutual Fund performance," *Financial Analysis Journal* 68:1 (CFA Institute 2013); *see also Mark M. Carhart*, "On Persistence in Mutual Fund Performance," *The Journal of Finance* (March 1997) (estimating -95 basis points per 100% of turnover).  No competent investment professional would dispute that funds with higher turnover ratios generally are more costly.  Estimates vary based on the time period in question and the type of fund.

50.     An ERISA fiduciary has an obligation under trust law to evaluate whether the additional costs are justified by the prospect of excess returns *net of costs*. "If the extra costs and risks of an investment program are substantial, these added costs and risks must be justified by realistically evaluated return expectations." Restatement (Third) of Trusts § 90, cmt. h(2).

51.     There are actively-managed funds with additional costs that can be justified by realistically evaluated return expectations.  In these cases, the additional costs are justified by above-market returns[20]—that is, the fund's returns after all costs exceed the returns of the index and low-cost index fund benchmarks.[21]

52.     There also are funds with additional costs that cannot be justified by realistically evaluated return expectations.  There is strong evidence that the mutual

---

[20] *See, e.g., Ken Kam*, "Top 3 Funds that Beat Their Benchmarks the Most Over a Decade," *Forbes* (Jul 5, 2019) (evaluating the past performance of various S&P mutual funds that [by luck or skill] out-performed benchmarks indices and index funds *after all fees*).

[21] There is an important distinction between a *benchmark index* and an index fund *benchmark*. A fund's benchmark index (primary or secondary) is the index designated by the fund manager in the prospectus. But, benchmark index returns do not include fees.  Index fund returns, though based on the performance of the same assets as the benchmark index, do include fees. As a result, index funds, with the same benchmark index as the fund (or one very similar) make an appropriate *benchmark* for the evaluation of a fund's returns *net of fees*. An investor cannot buy a *benchmark index*, but can buy an index fund *benchmark*.

funds with the worst returns, which result from high fees, often continue to underperform over long periods of time.[22]

53.     The great weight of authority, including the work of a series of winners of the Nobel Prize in economics, is that identifying a high-cost fund whose additional fees and costs are justified by realistically evaluated return expectations is a very difficult task.  The best active managers are barely able to cover their extra fees, the majority underperform by approximately the amount of their fees and the worst do not even cover their fees.[23]  Standard & Poors, which produces many of the most widely-used indexes, maintains a scorecard published semi-annually of whether the actively-managed funds beat their indexes. *See* S&P Indices Versus Active Funds (SPIVA) U.S. Scorecards (2013-2018).[24]  The scorecards published before and during the Class Period show overwhelmingly that the majority of the active managers failed to deliver returns higher than their benchmark indices.  *Id.*

---

[22] *Mark M. Carhart*, "On Persistence in Mutual Fund Performance," *The Journal of Finance* (March 1997) ("The only significant persistence not explained is concentrated in strong underperformance by the worst-return mutual funds.").

[23] *Carhart* (1997) at p. 58, "Thus, the best past-performance funds appear to earn back their expenses and transaction costs even though the majority underperform by approximately their investment costs."

[24] Available at:
https://us.spindices.com/resource-center/thought-leadership/spiva/

54.     The expense ratio of a mutual fund is often the best indicator of how well a mutual fund will perform. In the marketplace of mutual funds, expenses matter. Expenses are not just an important factor in mutual fund selection.  They are the most important factor—that is, the best indication whether a fund is a good or a bad fund in most cases is its expense ratio.[25]  As the director of fund research at Morningstar, a leading provider of mutual fund data and analysis, noted:

> If there's anything in the whole world of mutual funds that you can take to the bank, it's that expense ratios help you make a better decision.  In every single time period and data point tested, low-cost funds beat high-cost funds. . . . Investors should make expense ratios a primary test in fund selection.  They are still the most dependable predictor of performance.

*Russell Kinnel,* "How Expenses and Stars Predict Success" (Morningstar 2010).[26]

### 3.  The Fool's Game.

55.     The second problem from a fiduciary perspective with actively managed funds is that it is very difficult to identify funds with the skill to outperform their benchmarks on a consistent basis.  The problem as a practical matter for the fiduciary is that it is difficult to identify mutual funds that have the ability to generate excess

---

[25] *Carhart* (1997) at p. 57, "Persistence in mutual fund  performance does not reflect superior stock-picking skill.  Rather, common factors in stock returns and persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns."

[26] *Carhart* (1997) at 70, "Overall, my results suggest that short-run mutual fund returns persist strongly, and that most of the persistence is explained by common-factor sensitivities, expenses, and transaction costs."

returns *in the future*.[27]  Over the long term, there generally is no relationship between past performance and future performance.[28]  Although skilled managers exist, beating the market is often the result of luck, as opposed to skill.[29]  It turns out to be exceedingly difficult to distinguish the managers that actually have the skill to beat the market net of costs from the ones that are merely lucky.[30] As Warren Buffet observed in a 2014 letter to shareholders, "There are a few investment managers, of course, who are very good – though in the short run, it's difficult to determine whether a great record is due to luck or talent. Most advisors, however, are far better at generating high fees than they are at generating high returns. In truth, their core competence is salesmanship."[31]

---

[27] *William F. Sharpe,* "The Arithmetic of Investment Management," *Fin. Anal. J.* (2013) ("Managers with extraordinary skills may exist, but . . . such managers are in the minority .  .  . they are very hard indeed to identify in advance. *Caveat emptor*.").  Sharpe was the winner of the 1990 Nobel Prize in Economics.

[28] *Alex Bryan and James Li,* "Performance Persistence Among U.S. Mutual Funds, " *Morningstar Manager Research* (January 2016).

[29] *Carhart* (1997) at p. 71, "Thus, while the ranks of a few of the top and many of the bottom funds persist, the year-to-year rankings on most funds appear largely random."

[30]  *Eugene F. Fama and Kenneth R. French,* "Luck versus Skill in Mutual Fund Returns," *The Journal of Finance* 1933 (October 2010) ("This suggests that buried in the results are fund managers with more than enough skill to cover costs, and the lucky among them pull up the extreme right tail of the net return t($\alpha$) estimates. Unfortunately, these good funds are indistinguishable from the lucky bad funds that land in the top percentiles of the t($\alpha$) estimates but have negative true $\alpha$.").  Fama received the 2013 Nobel Prize in Economics.

[31] *Warren Buffett*, 2014 - Berkshire Hathaway Shareholder Letter, p.19.

56.     A fiduciary seeking to implement an active strategy has a difficult task. The fiduciary has ready access to cost and performance information in the mutual fund prospectus, but great difficulty in identifying an actively managed fund whose high-costs are actually justified by skill in generating excess returns.  Then, even if the fiduciary truly has found a manager with a "hot hand," the fiduciary must monitor the performance of the fund at regular intervals to make sure that the manager's streak does not run cold.  Otherwise, the plan can be left with a menu of high-fee funds that consistently underperform the market, the worst of all possible outcomes.

57.     A fiduciary that neglects its duty to monitor its investments and fails to remove funds that fail to demonstrate skill at beating the market may be held liable for the resulting loss when the funds underperform.  *Johns v. Herbert*, 2 App. D.C. 485, 499 (1894) (holding trustee liable for failure to discharge his "duty to watch the investment with reasonable care and diligence").  An ERISA fiduciary must have a prudent process to identify underperforming, high-fee funds and to timely remove them from the retirement plan. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 599 (8th Cir. 2009).

58.     Some investors are able to execute such a strategy successfully on a consistent basis.  Most are better off investing in safe, low-cost index funds than investing in high-cost actively-managed funds chasing excess returns.  As Warren

Buffet explained in a 2014 letter to shareholders, there are simply too many ways for investors, institutional and individual alike, to make critical mistakes: market timing, inadequate diversification, payment of high and unnecessary fees to consultants and advisors, and leverage, among others.  Buffet noted, "The commission of the investment sins listed above is not limited to 'the little guy'.  Huge institutional investors, viewed as a group, have long underperformed the unsophisticated index-fund investor who simply sits tight for decades.  A major reason has been fees: Many institutions pay substantial sums to consultants who, in turn, recommend high-fee managers. And that is a fool's game."[32]

### 4.   BBVA's Imprudent High Cost Funds.

59.    BBVA could have chosen safe investments such as low-fee index funds or even low-fee index funds with high-fee actively managed alternative.  BBVA chose instead to play the much riskier game of maintaining an investment menu that used *only* high-fee actively managed funds for most asset classes of investments.  BBVA's investment menu was comprised of target date funds, a constellation of high-fee

---

[32] *Warren Buffet,* 2014 - Berkshire Hathaway Shareholder Letter, p.19.

actively managed funds covering each of the major asset classes, and a single low-fee index fund covering the S&P 500 asset class.[33]

60.    BBVA doubled down on this risky strategy when BBVA's high-cost, actively managed funds failed to meet their benchmarks.  BBVA not only failed to remove underperforming, high-cost funds, but also failed to offer participants a low-cost index fund alternatives for the high-fee funds that underperformed and failed to cover their fees and costs.  This failure of process tainted not just particular funds or asset classes but the menu as a whole.

61.    The high-fee funds BBVA maintained consistently underperformed both their benchmarks and low-cost index fund alternatives during the Class Period. BBVA mismanaged the process by failing to recognize the changes in the performance of the investment options and make appropriate corrections.  Unable to make a realistic assessment of the ability of the funds to generate excess returns *net of costs*, BBVA repeatedly failed to remove the underperforming funds or to offer low-cost index fund alternatives.

62.    During the Class Period, BBVA maintained an investment platform that contained 14 different mutual funds, none of which was a low-cost index fund.  The

---

[33] There were changes in the investment menu in later years not relevant to the allegations made in this Complaint.

funds consisted of actively-managed funds which charged substantially higher fees than low-cost index fund alternatives in the same asset class.  On average, BBVA's investment menu was more than 4 times the cost of a menu of comparable low-cost index funds from a reputable provider.[34]

63.     The following chart compares the cost on the underperforming mutual funds to the cost of low-fee index alternatives BBVA declined to offer:

---

[34] The benchmark for the low-fee index funds in this comparison is Vanguard, the largest and best known index fund provider. Vanguard is one of many reputable providers of low-cost index funds against which to benchmark the performance of high-cost mutual funds seeking to beat the market.

*Figure 6.* Range[35] *of Expense Ratios of BBVA Funds and Benchmark Funds*

| BBVA Fund | Range | Index | Benchmark Fund | Range |
|---|---|---|---|---|
| Aston/TAMRO Small Cap | 1.03 - 1.06% | Russell 2000 Growth | Vanguard Small Cap Growth | 0.09 - 0.10% |
| *Vanguard Institutional Index* | *0.02* | *S&P 500 Index* | *Vanguard Institutional Index Fund* | *0.02* |
| *Dodge & Cox Stock* | *0.52* | *S&P 500 Index* | *Vanguard Institutional Index Fund* | *0.02* |
| American Century Diversified Bond | 0.4 | Barclays U.S. Aggregate Bond Index | Vanguard Total Bond Market Index F | 0.15 - 0.20 |
| Principal Mid Cap Value | 0.88 - 0.99 | Russell Mid Cap Value | Vanguard Mid-Cap Value Index | 0.07 - 0.10 |
| Principal Lifetime 2015 | 0.67 - 0.70 | S&P Target Date 2015 | Vanguard Target Retirement 2015 | 0.13 - 0.16 |
| Principal Lifetime 2020 | 0.69 - 0.73 | S&P Target Date 2020 | Vanguard Target Retirement 2020 | 0.14 - 0.16 |
| Principal Lifetime 2025 | 0.71 - 0.75 | S&P Target Date 2025 | Vanguard Target Retirement 2025 | 0.15 - 0.17 |
| Principal Lifetime 2030 | 0.72 - 0.77 | S&P Target Date 2030 | Vanguard Target Retirement 2030 | 0.15 - 0.17 |
| Principal Lifetime 2035 | 0.74 - 0.78 | S&P Target Date 2035 | Vanguard Target Retirement 2035 | 0.15 - 0.18 |
| Principal Lifetime 2040 | 0.74 - 0.79 | S&P Target Date 2040 | Vanguard Target Retirement 2040 | 0.16 - 0.18 |
| Principal Lifetime 2045 | 0.76 - 0.80 | S&P Target Date 2045 | Vanguard Target Retirement 2045 | 0.16 - 0.18 |
| Principal Lifetime 2050 | 0.76 - 0.80 | S&P Target Date 2050 | Vanguard Target Retirement 2050 | 0.16 - 0.18 |
| Principal Lifetime 2055 | 0.78 - 0.85 | S&P Target Date 2055 | Vanguard Target Retirement 2055 | 0.16 - 0.18 |
| Principal Lifetime Strategic Income | 0.60 - 0.64 | S&P Retirement Income | Vanguard Equity-Income | 0.26 - 0.30 |
| Thornburg International Value | 0.86 - 0.88 | MSCI EAFE Index | Vanguard International Value | 0.41 - 0.43 |
| *JP Morgan Mid Cap Growth* | *0.74* | *Russell Mid Cap Growth* | *Vanguard Mid-Cap Growth Index Fund* | *0.07 - 0.10* |
| Invesco International Growth | 0.89 - 0.91 | MSCI All Country World ex-U.S. | Vanguard International Growth | 0.32 - 0.34 |
| **AVERAGE** | **0.68%** | | | **0.16%** |

64.     Each of the BBVA funds on the left-hand side of the chart is an actively managed fund that, to justify its additional fees and costs, had to beat the market and generate excess returns.  Each of the Vanguard funds on the right hand side of the chart is a low-cost index fund, for the same index, that merely seeks to mirror the

---

[35] The range for the Principal LifeTime funds is for the 2013-2016 period, as BBVA substituted Vanguard target date funds for Principal target date funds in 2017.

market.  The funds themselves invest in the same class of assets -- that is, the same

stocks -- represented by the common index.  The primary difference is the investment

strategy (active vs. index) and the cost of implementing that strategy (high vs. low)

including transaction costs.[36]

65.     The difference between the money that BBVA spent on investment

management fees on these funds compared to the amount BBVA would have spent

had BBVA merely chosen a low-fee index fund alternative, invested in the same asset

class, is the amount BBVA spent chasing excess returns. The following chart

estimates the difference:

---

[36]  No such claim is made as to the Dodge & Cox Stock Fund (DODGX) for which the Plan offered
the Vanguard Institutional Index Fund (VIIIX) as a low-cost  alternative.

**Figure 7.** *Investment Management Fees Chasing Excess Returns*[37]



| Fees          Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|
| BBVA Funds | $ 2,707,093 | 2,970,233 | 3,345,628 | 3,066,454 | 1,865,599 | 1,882,058 | 15,837,065 |
| Benchmark | 714,686 | 748,521 | 754,191 | 690,183 | 405,278 | 405,278 | 3,718,136 |
| **Fees Chasing Excess Returns** | 1,992,407 | 2,221,712 | 2,591,437 | 2,376,272 | 1,460,321 | 1,476,780 | **$ 12,118,929** |

66.     BBVA wasted over $12 million (before compounding) of plan

participants' retirement money chasing excess returns.

---

[37] This chart covers all of the mutual funds for which BBVA failed to offer a low-cost index fund alternative.  There were asset classes – such as large cap (S&P 500) – for which the Plan did offer a low-cost alternative. Participants were offered the choice of a low cost fund for these asset classes, which are not included in the "Investment Management Fees Chasing Excess Returns" chart.

67.     ERISA did not prohibit BBVA from selecting high-cost funds that sought to generate excess returns.  But, ERISA's prudent investor standard absolutely required BBVA to monitor the performance of these funds *net of costs* and to remove funds that failed to demonstrate the ability to generate excess returns.  "This standard requires the exercise of reasonable care, skill, and *caution*." Restatement (Third) of Trusts § 90 (emphasis added).  To be clear, BBVA could have given the participants a *choice* between high-cost actively managed funds and low-cost index funds for each of the asset classes.  However, BBVA *forced* participants to play the "fool's game" by offering only high-cost actively-managed funds.  A plan sponsor such as BBVA that has deliberately chosen such a high-risk, excess return strategy owed participants the highest duty of competence, skill, loyalty, and caution in monitoring these investments and in timely removing high-cost investments that fail to achieve their investment objectives.

## 5.  The Underperforming Funds.

68.     The problem with the selection and retention of the funds by BBVA was not just that they were expensive, but that the expenses were not justified based on their performance.  Though ERISA does not establish bright line rules, it is difficult to imagine any circumstance in which a fiduciary with a prudent process would force plan participants seeking equity exposure to invest in high-costs funds that

36

consistently missed their benchmarks as BBVA here.  BBVA failed time and time again to monitor the performance of the high-cost funds that demonstrated no skill in beating their benchmarks.

69.    The following chart tracks the positive performance (in black) and underperformance (in red) of BBVA high-cost equity funds relative to the performance of low-cost Vanguard index funds:

*Figure 8.* Relative Performance of Underperforming BBVA Funds
Compared to Benchmarks (in basis points)[38]

| BBVA | Vanguard | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| ATSIX | VSGAX | - | (4.5) | (68.2) | (29.4) | (57.6) | - |
| PVMIX | VMVAX | (44.2) | 29.6 | (7.5) | (3.8) | (15.6) | 2.0 |
| LTINX | VTXVX | (1.8) | 1.9 | 2.6 | (5.4) | (1.8) | (0.8) |
| PLWIX | VTWNX | (2.1) | 3.2 | 0.1 | (3.1) | (1.6) | (3.6) |
| LTSTX | VTTVX | (1.9) | 2.8 | 2.0 | (8.4) | (1.6) | (6.4) |
| PMTIX | VTHRX | (1.3) | 2.1 | (1.6) | (14.3) | (0.2) | (7.7) |
| LTIUX | VTTHX | (0.9) | 1.8 | 0.2 | (7.2) | 1.2 | (13.1) |
| PTDIX | VFORX | (1.3) | 1.7 | (2.8) | 0.9 | 2.7 | (15.9) |
| LTRIX | VTIVX | (1.5) | 2.1 | 0.8 | (8.2) | 1.1 | (11.4) |
| LTFIX | VFFVX | (0.4) | 0.1 | 0.2 | (0.9) | 0.6 | (2.6) |
| PPLIX | VFIFX | (1.0) | 1.5 | (0.3) | (1.2) | 1.5 | (7.3) |
| PLSIX | VEIPX | (2.1) | (1.2) | (6.4) | (2.9) | (1.3) | (6.0) |
| TGVIX | VTRIX | 27.8 | (63.2) | (85.0) | 12.8 | 0.0 | 0.0 |
| IGFRX | VWILX | - | - | - | - | (20.8) | (22.2) |
| **Weighted Average** | | (30.7) | (22.0) | (165.8) | (71.2) | (93.6) | (95.1) |

*Weighted average* based on balance of fund at end of each plan year; *Return Data*: Yahoo Finance

70.      In a plan with a prudent process for monitoring equity funds,

performance figures should be in the "black" not the "red."[39]  In a well-managed plan,

underperforming funds would have been removed.  Even in a badly-managed plan,

---

[38] The returns shown are based on the total return price information from Yahoo Finance. The price information from Yahoo Finance, Morningstar, and Bloomberg often differ slightly, particularly at the end of the year, depending on the manner in which the prices are adjusted for dividends, stock splits, and other factors.

[39] The high-fee funds, in the aggregate, did not beat their benchmarks in any year from 2011 to 2016. None of the funds beat its benchmark over this Period on average.

with a full menu of low-cost index funds, participants would have had the chance to address the performance of the high-fee funds themselves, by substituting low-cost index funds. No prudent fiduciary in these circumstances would have forced participants seeking equity exposure to invest in the BBVA funds without offering them the choice of a low-cost index fund alternative.[40]

### 6. The Specific Funds.

71. The specific underperforming funds that BBVA selected, then failed to adequately monitor, included the following funds: Aston/TAMRO Small Cap I; Principal Mid-Cap Value; the ten Principal Target Date Funds; Invesco International Growth Fund; and, Thornburg International Value Fund.[41]

72. BBVA's process for evaluating and monitoring these funds was deficient because BBVA failed to adequately monitor: whether the funds' investment managers had the skill to beat the market; whether the funds actually did beat their benchmarks; whether the expense ratios of funds were excessive compared to peer funds and

---

[40] Determining the time when BBVA should have removed the underperforming funds from the Plan will require additional discovery. Based upon the information available, this likely occurred sometime at the beginning of the Class Period when, as a result of the poor performance of the subject mutual funds during preceding periods, an investor with a prudent process would have recognized the funds as underperforming and promptly removed them from the Plan's investment menu.

[41] At this time, no underperformance claim is made as to the JP Morgan Mid Cap Growth, the American Century Bond, and the Harbor Capital Appreciation funds.

lower-cost benchmark fund alternatives; the risk and return characteristics of the individual funds; the transaction costs and other costs not included in the expense ratio; the flow of money out of the funds indicating the market's lack of confidence in the funds; and, the share classes of the funds.  The manner in which BBVA managed the investment menu was grossly deficient because, despite clear evidence of underperformance by the high-fee funds, BBVA failed and refused to offer participants low-fee index fund alternatives.

### a. Aston/TAMRO Small Cap Fund (ASTIX).

73.     BBVA breached its fiduciary duties to Plan participants by failing to monitor the Aston/TAMRO Small Cap I (ATSIX) fund.  The Plan's investment in ATSIX ranged from $44.4 million in 2013 to $32.4 million in 2015.[42]

74.     The fund was an actively-managed stock picking type fund that sought to outperform the market.  The fund had an expense ratio of 1.03% to 1.06%, more than 10 times the expense ratio of a reasonable low-cost index fund benchmark, and also suffered a significant turnover ratio (70%), which added to the overall cost of the fund.  To justify its cost the fund had to demonstrate an ability to generate excess returns, net of costs.

---

[42] These numbers are taken from the Form 5500s filed with the Dept. of Labor. The numbers can be further refined once BBVA makes the mid-year asset information available.

75.     The fund designated in its prospectus the Russell 2000 Index as its primary benchmark index. The fund, according to its own prospectuses, also demonstrated no ability to outperform its benchmark index, before or during the Class Period.  The performance of the fund also was inferior to the performance of lower-cost index fund alternatives, such as the Vanguard Small Cap Growth Index Fund (VSGAX).

76.     The fund's consistent underperformance is clearly shown in the following chart, which compares the performance of the fund to the low-cost index fund benchmark prior to and during the Class Period:



**Figure 9.** *Calendar Year Total Returns of BBVA Fund (ATSIX) and Benchmark (VSGAX)*

| Fund \ Year | *2012* | 2013 | 2014 | 2015 | Average* |
|---|---|---|---|---|---|
| Aston/TAMRO Small Cap | *16.81* | 28.03 | 0.40 | -12.51 | 5.31 |
| Vanguard Small Cap Growth Index | *17.65* | 38.23 | 5.07 | -2.52 | 13.59 |
| **Excess / Loss** | *-0.84* | -10.2 | -4.67 | -9.99 | **-8.28** |

*Average taken for Class Period

77.    The loss suffered by the participants during the Class Period was substantial as shown by the following table comparing the cumulative returns of the funds:

42

**Figure 10.** *Cumulative Returns of BBVA Fund (ATSIX) and Benchmark (VSGAX)*

BBVA Fund v Benchmark
Cumulative Return: Jan 2013/Dec 2015

| BBVA Fund | Aston/TAMRO Small Cap I (ATSIX) |
| Index | Russell 2000 |
| Benchmark | Vanguard Small Cap Growth Index (VSGAX) |
| Period | Jan '13 - Dec '15 |
| Fund Return | 35.69% |
| Benchmark Return | 98.01% |
| Relative Performance | -62.32% |

BBVA also failed to monitor the flow of funds into and out of the mutual fund, which outward flow indicated the market's confidence, or lack thereof, in the performance of the fund.  BBVA would have known from reports filed by the fund with the SEC that the fund was experiencing a significant loss of assets demonstrating the market's lack of confidence in its performance.  The following chart, summarizing SEC data, indicates that there was a substantial flow or money out of the fund between 2013 and 2015:

43

**Figure 11.** *Net Fund Flows Aston/TAMRO Small Cap I (ATSIX).*[43]



* BrightScope's primary source for fund flow data is the SEC Form N-SAR filing.

78.     A competent, careful, and diligent fiduciary, reading the prospectus, would have realized that the high cost of such a fund was not justified and removed the fund from the plan.  No prudent fiduciary would force participants seeking equity exposure to the small-cap asset class to invest in this funds without offering them the choice of a low-cost index fund alternative.

79.     In 2016, following this poor performance, the fund's board terminated its business relationship with the fund sub-manager TAMRO and reorganized the

---

[43] *https://www.brightscope.com/fund-pages/shareclass/aston-asset-management-llc/31380/ATSIX/*

fund.  The Plan also eventually terminated its position in this fund, but not before unnecessarily wasting a participants' money by paying the underperforming fund's excessive fees.

### b. Principal Mid-Cap Value (PVMIX).

80.     BBVA breached its fiduciary duties to Plan participants by failing to monitor the Principal Mid Cap Value Fund (PVMIX).  The Plan's investment in PVMIX ranged from $14 million to $23 million during the Class Period.

81.     The fund was an actively-managed stock picking type fund with the goal of outperforming the market.  The fund had an expense ratio of .88% to .93%, more than 10 times the expense ratio of a reasonable low-cost index fund benchmark, and also a significant turnover ratio (60%), which added to the overall cost of the fund. To justify the cost of such fund, the fund had to demonstrate an ability to generate excess returns of 1.3% or more.

82.     The fund designated in its prospectus the Russell MidCap Value Index as its primary benchmark. The fund, according to its own prospectuses, did not achieve its goal of outperforming its benchmark index, before or during the Class Period.  The performance of the fund also was inferior to the performance of lower-cost index fund alternatives, such as the Vanguard Mid Cap Value Index Fund (VSGAX).

45

83.    The fund's consistent underperformance is clearly shown in the following chart, which compares the performance of the fund to the low-cost index fund benchmark prior to and during the Class Period:

**Figure 12.** *Calendar Returns for Principal Mid-Cap Value; R6 (PVMIX) v Vanguard Mid-Cap Value Index (VMVIX) (in percent)*



returns: Yahoo Finance

| Fund \ Year | *2011* | *2012* | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Average* |
|---|---|---|---|---|---|---|---|---|---|
| Principal Mid-Cap Value III; R6 | *-3.93* | *17.8* | 34.16 | 14.45 | -7.29 | 15.25 | 14.64 | -11.07 | 10.02 |
| Vanguard Mid Cap Value Index | *-0.42* | *15.9* | 37.43 | 15.59 | -1.92 | 15.10 | 16.91 | -12.6 | 11.75 |
| **Excess / Loss** | *-3.51* | *1.95* | **-3.27** | **-1.14** | **-5.37** | 0.15 | **-2.27** | 1.50 | **-1.73** |

* Average taken for Class Period

84.     The loss suffered by the participants during the Class Period was substantial, as shown by the following table comparing the cumulative returns of the funds:

*Figure 13. Cumulative Returns of BBVA PVMIX v Vanguard VMVIX*

| BBVA Fund | Principal Mid Cap Value III R6 (PVIMX) |
|---|---|
| Index | Russell Mid Cap Value |
| Benchmark | Vanguard Mid Cap Value Index (VMVIX) |
| Period | Jan '13 - Dec '18 |
| Fund Return | 67.25% |
| Benchmark Return | 83.30% |
| Relative Performance | -16.05% |

85.     A competent, careful, and diligent fiduciary, reading the prospectus, would have realized that the high cost of such a fund was not justified and removed the fund from the plan.  No prudent fiduciary would force participants seeking equity exposure to the mid-cap value asset class to invest in these funds without offering them the choice of a low-cost index fund alternative.

### c.  Thornburg International Value Fund (TGVIX).

86.     BBVA breached its fiduciary duties to Plan participants by failing to monitor the Thornburg International Value Fund (TGVIX).  The Plan's investment in TGVIX ranged from $79.3 million in 2013 to $65.6 million in 2014.[44]

87.     The fund was an actively-managed stock picking type fund that, because of its use of derivatives and its exposure to international markets, is risky and volatile. It had the goal of outperforming the market.  The fund had an expense ratio of .86% to .88%, twice the expense ratio of reasonable low-cost index fund benchmark, and a turnover ratio of about 45%, which added to the overall cost of the fund.  To justify the cost of such an expensive and risky fund, the fund had to demonstrate an ability to excess returns net of costs of as much as 1.2% or more.

88.     The fund designated in its prospectus the MSCI EAFE Index as its primary benchmark. The fund, according to its own prospectuses, did not outperform its benchmark index and was inferior to the performance of lower-cost index fund alternatives, such as the Vanguard International Value Fund (VTRIX).

89.     The fund's consistent underperformance is clearly shown in the following chart, which compares the performance of the fund to the low-cost index fund benchmark prior to and during the Class Period:

---

[44] The Thornburg fund was replaced in 2015.

**Figure 14.** *Calendar Returns of Thornburg International Value Fund (TGVIX); v Vanguard International Value Fund (VTRIX)*



returns: Yahoo Finance

| Fund \ Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Average |
|---|---|---|---|---|---|---|---|
| Thornburg International Value | 31.99 | 14.23 | -12.94 | 15.84 | 15.76 | -5.58 | 5.09 |
| Vanguard International Value | 33.78 | 7.31 | -14.59 | 20.18 | 22.16 | -6.68 | 7.74 |
| **Excess / Loss** | -1.79 | 6.92 | 1.65 | -4.34 | -6.40 | 1.10 | -2.65 |

Average taken for Class Period

90.    The loss suffered by the participants during the Class Period was substantial, as shown by the following table comparing the cumulative returns of the funds:

49

***Figure 15.*** *Cumulative Returns of Thornburg International Value Fund (TGVIX); v Vanguard International Value Fund (VTRIX)*



| BBVA Fund | Thornton International Value Fund (TGVIX) |
|---|---|
| Index | MSCI EAFE |
| Benchmark | Vanguard International Value Fund (VTRIX) |
| Period | Jan '13 - Dec '14 |
| Fund Return | 23.03% |
| Benchmark Return | 29.15% |
| Relative Performance | -6.12% |

91.      A competent, careful, and diligent fiduciary, reading the prospectus, would have realized that the high cost of such a fund was not justified and removed the fund from the plan, or, at the very least, offered participants the choice of a low-cost index fund alternative.  No prudent fiduciary would force participants seeking equity exposure to the mid-cap value asset class to invest in such as fund, as the plan's sole international equity option.

### d.  Invesco International Growth (IGFRX).

92.      To make matters worse when BBVA removed the underperforming Thornburg International Value Fund, BBVA replaced it with another

50

underperforming fund, the Invesco International Growth Fund (IGFRX).  The Plan's investment in IGFRX ranged from $61.8 million in 2015 to $63.6 million in 2018.

93.     The fund was an actively-managed stock picking type fund that, because of its use of derivatives and its exposure to international markets, was risky and volatile. The fund had an expense ratio of .90% to .93%, which is 3 to 10 times the expense ratio of reasonable low-cost index fund benchmarks, with turnover ratio of about 25%.  To justify the cost of such an expensive and risky fund the fund had to demonstrate an ability to generate substantial excess returns.

94.     The fund designated in its prospectus the MSCI All Country Worldex-U.S. Growth Index as its primary benchmark. The fund, according to its own prospectuses, underperformed its benchmark index, before and during the Class Period.  The performance of the fund also was inferior to the performance of lower-cost index fund alternatives, such as the Vanguard International Growth Fund (VWILX).

95.     The fund's consistent underperformance is clearly shown in the following chart, which compares the performance of the fund to the low-cost index fund benchmark prior to and during the Class Period:

***Figure 16.*** *Calendar Returns of Invesco International Growth Fund (IGFRX)*
*and Vanguard International Growth Fund (VWILX)*



returns: Yahoo Finance

| Fund                                              Year | *2013* | *2014* | 2015 | 2016 | 2017 | 2018 | Average |
|---|---|---|---|---|---|---|---|
| Invesco International Growth Fund (IGFRX) | *19.17* | *0.28* | -2.24 | -0.46 | 23.17 | -15.13 | 1.33 |
| Vanguard International Growth Fund (VWILX) | *23.11* | *-5.5* | -0.56 | 1.84 | 43.17 | -12.58 | 7.97 |
| **Excess / Loss** | *-3.94* | *5.78* | *-1.68* | *-2.30* | *-20.00* | *-2.55* | *-6.64* |

96.     The loss borne by the participants during the Class Period was
substantial, as shown by the following table comparing the cumulative returns of the
funds:

52

*Figure 17.*  *Cumulative Returns of Invesco International Growth Fund (IGFRX)*
*and Vanguard International Growth Fund (VWILX)*

**BBVA Fund v Benchmark**
Growth of $1 from Jan 2013 to Dec 2014

| | |
|---|---|
| BBVA Fund | Invesco International Growth Fund (IGFRX) |
| Index | MSCI All Country World ex-US |
| Benchmark | Vanguard International Growth Fund (VWILX) |
| Period | Jan '15 - Dec '18 |
| Fund Return | 27.83% |
| Benchmark Return | 58.39% |
| Relative Performance | -30.56% |

97.     In the years before and during the Class Period the Invesco International Growth Fund demonstrated significant risk and no ability to generate returns in excess of the market on a consistent basis.  A competent, careful, and diligent fiduciary, reading the prospectus, would have realized that the high cost of such a fund was not justified and removed the fund from the plan.  A competent, diligent fiduciary with a prudent process would, at the very least, offer participants the choice of a low-cost index fund alternative.  No prudent fiduciary would force participants seeking equity exposure to the mid-cap value asset class to invest in such as fund, as the plan's sole international equity option.

53

### e.  The Principal Target Date Funds.

98.    BBVA breached its fiduciary duties to Plan participants by failing to monitor a series of high-fee underperforming Principal target date funds.

99.    The Plan's investment in these funds ranged from about $80 million in 2013 to about $230 million in 2016-17.

100.    A target date fund typically is a "fund-of-funds" comprised of equity and fixed income mutual funds with an investment allocation that becomes more conservative as the fund's target retirement date approaches.  A fund's investment allocation over time is referred to as its *glide path*.  Target date funds are offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the participant to choose the target date that aligns with his or her estimated retirement date.

101.    Target date funds such as the Principal LifeTime funds typically do not invest in individual stocks, but in other mutual funds.  In this case, Principal chose to invest, almost exclusively, in its own mutual funds.  To justify retaining the higher-cost fund, a fiduciary with a prudent process would have had to examine, not just the fees and performance of the target date funds, but also the fees and performance of the underlying funds in which the Principal LifeTime and Hybrid invested.

102.    During the Class Period, the target date funds for the BBVA Plan consisted of twelve funds: nine options with a target dates ranging from 2015 to 2050

54

(2015, 2020, 2025, . . . , 2050), and an option called Principal LifeTime Income Fund designed for investors "who have reached their investment time horizon."

103.   The target date funds were a constellation of funds offered to retirement plans only as a single package.  Target date funds are not a "mix and match" product; participants in the Plan had only Principal Target date funds from which to choose. While the "glide path" of the individual funds varied, they constituted a single investment option and entity.  The funds are managed by one entity, Principal, and invest in the same series of underlying mutual funds, with the same managers and sub-managers.  The (excessive) fee structure is uniform and was paid to the same entity, Principal.  Thus, BBVA's failure to monitor the Principal target date series affected all Plan participants with investments in that series.

104.   The fees of the Principal target date funds were excessive.  Principal target date funds had expense ratios ranging from .60% to .95%, 5-6 times the expense ratio of low-cost index fund benchmark, and consistently higher even than other funds using actively-managed strategies.  Moreover, Principal charged a "fund-of-funds" management fee, *in addition* to the management fees of the underlying funds which other funds did not charge.  These fees were unreasonable, as there was nothing distinctive about the funds.  Principal continued to pad the funds with this

additional layer of fees for several years after similarly situated providers eliminated such fees.[45]

105.    There was no justification for such high-fees based upon the performance of the Principal target date funds.  Indeed, the Principal target funds consistently underperformed both their benchmarks and readily available low-cost index fund alternatives.  The funds' consistent underperformance is clearly shown in the following chart, which compares the performance of the 2040 Principal target date funds to the low-cost index fund alternative Vanguard Target Retirement 2040 over the Class Period:

---

[45] For this reason, one commentator at Bloomberg gave the series a "negative" price rating. *Jeff Hold*, "A pricey target date series with an unexceptional underlying lineup", Bloomberg Analyst Report Archive (2019). Available with subscription at: https://www.morningstar.com/

**Figure 18.** *Calendar Returns of Principal LifeTime 2040 Fund I (PTDIX) and Vanguard Target Retirement Fund (VFORX)*



| Fund \ Year | *2011* | *2012* | 2013 | 2014 | 2015 | 2016 | Average |
|---|---|---|---|---|---|---|---|
| Principal LifeTime 2040 Institutional (PTDIX) | *-3.38* | *16.66* | 22.36 | 6.11 | -0.79 | 5.45 | 8.28 |
| Vanguard Target Retirement 2040 Investor (VFORX) | *-2.55* | *15.56* | 24.37 | 7.15 | -1.59 | 8.73 | 9.67 |
| **Excess Return** | *-0.83* | *1.1* | -2.01 | -1.04 | 0.8 | -3.28 | -1.39 |

106.    The loss borne by the participants during the Class Period was

substantial, as shown by the following table comparing the cumulative returns of the

funds:

*Figure 19. Cumulative Returns of Principal LifeTime 2040 Fund I (PTDIX) and Vanguard Target Retirement Fund (VFORX)*



| | |
|---|---|
| BBVA Fund | Principal LifeTime 2040 Fund I (PTDIX) |
| Index | Vanguard Target Retirement 2040 (VFORX) |
| Benchmark | S&P Target Date 2040 |
| Period | Jan '13 - Jun '17 |
| Fund Return | 49.28% |
| Benchmark Return | 56.90% |
| Relative Performance | -7.61% |

107.    The other Principal target date funds underperformed their Vanguard benchmarks in the same manner.  The Principal target date funds, as a portfolio, also underperformed their benchmarks.[46]

108.    In 2014 there was a massive exodus of funds from the Principal target date funds as other retirement plans, unlike BBVA, that were monitoring the performance of the funds, removed the Principal funds from their plans.  This is clearly shown on the following fund flow chart for the Principal 2040 Fund:

---

[46] The underperformance of these funds is clearly shown in Figure 8.  The references to the target date funds and their benchmarks are by ticker symbol.

*Figure 20.* *Net Fund Flows for Principal LifeTime 2040 I (PTDIX)*



* BrightScope's primary source for fund flow data is the SEC Form N-SAR filing.

109.    In 2014 alone, there was a nearly $400 million flow of investments out of the 2040 fund.  As target date funds are sold as a package, there were corresponding outflows from the other Principal target date funds.

110.    In 2015 Principal itself began offering a new constellation of target date funds, the Principal LifeTime Hybrid target date funds, that provided substantially the same asset class exposure as the Principal LifeTime target date funds, but at a lower cost. For example, for the 2040 glide path, Principal issued the Principal LifeTime Hybrid 2040 (PLTQX), a lower cost version of the Principal LifeTime 2040 Fund (PTDIX).  The funds have the same benchmark, asset class exposure, strategy, and

glide path.  The Hybrid fund is approximately 24 basis point cheaper because it makes use of low-cost index funds.

111.    As an ERISA fiduciary, BBVA had an obligation to consider selecting a substantially identical lower cost fund from the same provider.  *See, e.g., Tibble*, 843 F.3d at 1198 ("[] a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected.").  BBVA failed to offer the lower-cost alternatives.

112.    The difference in cost between the LifeTime and LifeTime Hybrid funds is dramatic:

*Figure 21.* *Lower Cost Funds From Same Provider.*

| Fund Name | BBVA | ER | Hybrid | ER | Difference | Assets ('13 - '17)* | Excess Fees |
|---|---|---|---|---|---|---|---|
| Principal Mid Cap Value Fund | PVMIX | 0.93% | PVUIX | 0.68% | 0.25% | 113,349,579 | 297,664 |
| Principal Lifetime 2015 Fund | LTINX | 0.69% | PHTMX | 0.45% | 0.24% | 35,122,248 | 42,930 |
| Principal Lifetime 2020 Fund | PLWIX | 0.71% | PHTTX | 0.46% | 0.25% | 60,825,100 | 99,167 |
| Principal Lifetime 2025 Fund | LTSTX | 0.73% | PHTQX | 0.48% | 0.25% | 78,459,086 | 126,872 |
| Principal Lifetime 2030 Fund | PMTIX | 0.74% | PHTNX | 0.48% | 0.26% | 85,911,429 | 156,846 |
| Principal Lifetime 2035 Fund | LTIUX | 0.74% | PHTJX | 0.50% | 0.24% | 79,066,114 | 132,084 |
| Principal Lifetime 2040 Fund | PTDIX | 0.75% | PLTQX | 0.49% | 0.26% | 85,859,075 | 162,544 |
| Principal Lifetime 2045 Fund | LTRIX | 0.76% | PHTYX | 0.51% | 0.25% | 66,259,499 | 113,421 |
| Principal Lifetime 2055 Fund | LTFIX | 0.80% | PLTNX | 0.51% | 0.29% | 13,601,992 | 28,275 |
| Principal Lifetime 2050 Fund | PPLIX | 0.76% | PHTUX | 0.51% | 0.25% | 41,106,065 | 74,500 |
| Principal Lifetime Strategic Income Fund | PLSIX | 0.63% | PLTYX | 0.45% | 0.18% | 11,643,318 | 4,141 |
| | | | | | | **Total** | **$ 1,238,445** |

*The Hybrid funds were available from 2015 to mid-2017, when BBVA switched to Vanguard funds. Mid-year information is not currently available. A further adjustment will need to be made once mid-year asset information is available.

**The principal Mid-Cap Value fund was in the plan from 2013 to 2017.

113.     BBVA had an obligation to consider such lower cost investments, whether BBVA actually was aware of them or not.  "A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged according to the standards of others 'acting in a like capacity and familiar with such matters.'"  *Katsaros*, 744 F.2d at 279 (interpreting 29 U.S.C. § 1104(a)(1)(B)).  A competent, diligent fiduciary would have been aware of the issuance of a lower-cost

version issued by the same investment provider.[47]  Instead, BBVA wasted

$1,238,445.00 of Plan participants retirement money.

114.   Had BBVA reviewed the Hybrid target date funds, BBVA would have

realized that the lower-cost Hybrid funds performed better than the higher-cost funds

in the Plan.  The difference,[48] as shown on the following chart, is as follows:

*Figure 22.* *Annualized Total Returns (Asset Weighted) of Principal LifeTime and Hybrid Target Date Funds (in percent)*

| Fund Family | Plan | Hybrid | 2015 | | | 2016 | | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Hybrid | Excess | Plan | Hybrid | Excess |
| Principal LifeTime 2015 | LTINX | PHTMX | -1.20% | -0.48% | -0.72% | 5.55% | 6.37% | -0.82% |
| Principal LifeTime 2020 | PLWIX | PHTTX | -1.18 | -0.23 | -0.95 | 5.83 | 7.01 | -1.18 |
| Principal LifeTime 2025 | LTSTX | PHTQX | -1.17 | -0.17 | -1.00 | 6.02 | 7.51 | -1.49 |
| Principal LifeTime 2030 | PMTIX | PHTNX | -0.94 | -0.18 | -0.76 | 5.86 | 7.89 | -2.03 |
| Principal LifeTime 2035 | LTIUX | PHTJX | -0.78 | -0.19 | -0.59 | 5.34 | 8.29 | -2.95 |
| Principal LifeTime 2040 | PTDIX | PLTQX | -0.78 | -0.10 | -0.68 | 5.46 | 8.64 | -3.18 |
| Principal LifeTime 2045 | LTRIX | PHTYX | -0.82 | -0.40 | -0.42 | 5.58 | 9.05 | -3.47 |
| Principal LifeTime 2050 | PPLIX | PHTUX | -0.74 | -0.11 | -0.63 | 5.58 | 9.28 | -3.70 |
| Principal LifeTime 2055 | LTFIX | PLTNX | -0.76 | -0.22 | -0.54 | 5.73 | 9.42 | -3.69 |
| Principal Lifetime Strategic Income | PLSIX | PLTYX | -0.45 | -0.15 | -0.30 | 4.78 | 4.8 | -0.02 |

115.   A competent, careful, and diligent fiduciary would have conducted a

thorough review of the fund and realized that higher cost funds in which the original

[47] This assumes *arguendo* that a competent fiduciary would not already have removed the funds from the Plan.

[48] The returns are shown on an asset weighted basis, to demonstrate the impact that the returns would have had on the participants in $U.S.

LifeTime target date funds invested did not generate excess returns.  Upon

determining that the performance of the higher-fee funds did not justify the additional

cost, a prudent fiduciary would have switched to the lower-cost LifeTime Hybrid

funds or removed them from the plan altogether.

116.   BBVA's breach of its duty cost Plan participants in excess of $4 million.

The loss could easily have been avoided had BBVA implemented a prudent process

for monitoring the performance of the target date funds.

117.   In 2017 BBVA finally realized that it had made a mistake and removed

the Principal LifeTime target date funds from the Plan.  BBVA replaced the high-cost

Principal funds with a low-cost Vanguard Target Retirement index fund alternative.

Upon the elimination of the excess fees, the performance of the Plan's target date

funds improved substantially, but not before a substantial amount of money was

unnecessarily wasted on high-fee funds whose performance did not justify the

additional cost.

### 7.  The Price Participants Paid.

118.   BBVA made a massive bet on an actively-managed investment strategy

with participants' money, then breached its fiduciary duty to participants by failing to

monitor and remove from the Plan's investment menu a series of high-fee funds

when they failed to meet, must less beat, their benchmarks: the Aston/TAMRO Small

Cap I;  Principal Mid-Cap Value; Principal LifeTime Funds; Invesco International Growth Fund; and, Thornburg International Value funds.

119.   When the funds underperformed their benchmarks, the participants suffered a massive loss.  The loss was the natural and proximate result of the expense ratios, transaction costs, and other costs of the high-fee mutual funds that BBVA maintained during the course of the Class Period.  The impact of these costs and fees was magnified by the effect of compounding.

120.   The standard for determining the impact of underperforming mutual funds is the comparison of the investment performance of the assets of the Plan invested in high-fee funds in the plan to the investment performance that assets of the Plan would have had if invested in low-cost index funds. *Brotherston v. Putnam Invs., L.L.C.*, 907 F.3d 17 (1st Cir. 2018).  This can be estimated by taking the weighted average of the mutual funds from the plan's investment menu and using publicly available data on mutual fund returns.

121.   The loss cannot be calculated with certainty based upon the information available to Plaintiffs at this time.  But, from the information that is available, the following table is a reasonable estimate:



**Figure 23.** *Cumulative Loss from Underperforming Mutual Funds.*

| Year | BBVA Fund Returns | Benchmark Returns | Difference | Assets | Loss | Cumulative Loss |
|------|-------------------|-------------------|------------|--------|------|-----------------|
| 2013 | 21.2% | 26.4% | -5.2% | 202.2 | -10.4 | -10.4 |
| 2014 | 2.1% | 3.7% | -1.6% | 241.6 | -3.9 | -14.4 |
| 2015 | -3.0% | -1.2% | -1.8% | 276.8 | -5.0 | -19.3 |
| 2016 | 5.2% | 7.4% | -2.3% | 284.2 | -6.4 | -25.7 |
| 2017 | 21.0% | 36.4% | -15.4% | 86.0 | -13.3 | -39.0 |
| 2018 | -14.1% | -12.5% | -1.5% | 86.0 | -1.3 | **$ -40.3 m** |

122.   The differences in return accumulate over time.  After six years, the result—lost appreciation of some 25%—is dramatic.  BBVA wasted over $40 million of Plan participants' retirement money chasing excess returns.

123.    The loss could have been avoided by implementing a prudent process for monitoring and removing high-fee funds with no realistic prospect of generating excess returns.

### E. THE COST OF BBVA'S IMPRUDENT PROCESS TO PLAN PARTICIPANTS.

124.    Based upon the information presently available, Plaintiffs estimate that the Plan participants' lost approximately $47,000,000 of their retirement money as a result of BBVA's mismanagement of the money market and mutual funds.  The loss can be estimated by comparing the performance of the Plan had it been properly invested.

125.    The total estimated loss[49] through December 31, 2018 is:

---

[49] The estimate assumes that the Form 5500s are accurate as to the plan investments and that the contributions to and deductions from the funds were made monthly and were uniform.  The estimate assumes that the contributions in 2018 were the same as in 2017. Plaintiffs reserve the right to refine the loss estimate once additional information is made available.

***Figure 24.*** *Total Loss Over Class Period (in $U.S. millions).*



| Funds          Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019* |
|---------------------|------|------|------|------|------|------|-------|
| BBVA Funds | 537.6 | 648.4 | 678.7 | 699.1 | 749.6 | 886.0 | - |
| Benchmark | 537.6 | 657.0 | 693.0 | 720.7 | 784.9 | 921.0 | - |
| Cumulative Loss | - | -8.6 | -14.3 | -21.7 | -35.3 | -35.0 | $47.0m |

*Year 2018-19 values are projections.

126.   The $47 million loss cannot be explained by standard pricing models

taking risk and return into account. The average BBVA mutual fund was riskier than

the average index fund benchmark, which means that the Plan returns adjusted for

risk are even worse than the returns shown.[50]  Nor can the loss be attributed to any other commonly accepted risk and return factors.[51]  Simply put, the losses were the result of excessive fees, not bad luck.

127.    With respect to mutual funds, the loss was primarily the result BBVA's selection and retention, month after month, quarter after quarter, year after year, of funds that paid excessive fees to investment managers whose cost were not justified by any realistic prospect of generating excess returns.  The fees resulting in the loss included both fees such as investment management fees and "hidden" fees such as transaction costs resulting from turnover ratio. BBVA would have been aware of this and should have removed the funds, had BBVA monitored the cost of the funds and their performance net of costs.

128.    The loss with respect to the money market fund resulted from a total failure by BBVA to manage the Plan's short-term bond fund investments.  A plan fiduciary that has engaged in the investment equivalent of stuffing money into a

---

[50] *See, e.g.*, *Modigliani, Franco*, "Risk-Adjusted Performance", *Journal of Portfolio Management* (Winter 1997): 45–54 (portfolio's excess return adjusted based on the portfolio's relative riskiness with respect to that of the benchmark portfolio).  Modigliani is the recipient of the 1985 Nobel Prize in Economics.  The riskier—in technical terms, higher beta—BBVA funds put participants at greater risk in the event of a market downturn.

[51] This would include the application of the Fama / French factors discussed by *Fama / French* and *Carhart, supra.*

mattress cannot claim that a loss was avoided merely because it held onto the mattress.

## IV.  CLASS ACTION ALLEGATIONS

129.  29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

130.  Plaintiffs seek to certify a class action on behalf of all participants and beneficiaries of the plan. Gloria Ferguson and Cassandra McClinton ("Named Plaintiffs") seeks to certify and to be appointed as representatives of the following Class:

> All persons, other than Defendant, who were participants as of July 18, 2013 in Plan, including (i) beneficiaries of deceased participants who, as of July 18, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future, and (ii) alternate payees under a Qualified Domestic Relations Order who, as of July 18, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future; and (b) all persons, other than BBVA, who have been participants or beneficiaries in either the Plan and had account balances in the Plan at any time between July 18, 2013 through the date of judgment.

131.  Named Plaintiffs are members of the Class. Excluded from the Class are (a) any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of any BBVA or is or was a partner, officer, director, or controlling

69

person of BBVA; (b) the spouse or children of any individual who is an officer,

director or owner of 5% or more of the equity of BBVA; (c) Plaintiffs' counsel; (d)

sitting magistrates, judges and justices, and their current spouse and children; and, (e)

the legal representatives, heirs, successors and assigns of any such excluded person.

132.   This action meets the requirements of Fed. R. Civ. P., Rule 23 and is

certifiable as a class action for the following reasons:

a.   While the precise number of Class Members is unknown to Plaintiffs at this time and can only be finally ascertained from books and records under the exclusive control of and maintained by BBVA and/or its agents, Named Plaintiffs believe after inquiry that there are over 12,000 members of the Class located throughout the United States and that joinder of all members is impracticable; and,

b.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because BBVA owed fiduciary duties to the Plan and to all participants and beneficiaries, and took actions and omissions alleged herein as to the Plan, and not as to any individual participant; thus, there are effectively no individual issues. The common questions of law and fact include, without limitation:

i.   who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109 (a);

ii.   whether the fiduciaries of the Plan discharged their duties with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use;

iii.   whether or not the fiduciaries, prior to the time they engaged in the transactions described herein, had policies and procedures to

investigate the merits of the investments and to structure the investments;

iv.    whether or not the fiduciaries followed the policies and procedures to investigate the merits of the investments and to structure the investments prior to making such investments;

v.    whether or not the fiduciaries had policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to high cost funds as alleged herein;

vi.    whether or not the fiduciaries followed the policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to high cost funds as alleged herein;

vii.    whether or not the fiduciaries understood and evaluated the plan fees and expenses associated with the plan's investments;

viii.    whether or not the fiduciaries discharged their duties with respect to the plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administration of the plan;

ix.    whether or not any fiduciary knowingly participated in a breach of duty by another fiduciary;

x.    whether or not any fiduciary knowingly failed to cure a breach of duty by another fiduciary;

xi.    the losses to the Plan resulting from each breach of fiduciary duty; and,

xii.    what Plan-wide equitable and other relief should the Court impose in light of BBVA's breach of duty.

71

133.   Named Plaintiffs' claims are typical of the claims of the Class because Named Plaintiffs are or were participants in the Plan during the time-Period at issue in this action and all participants in the Plan were harmed in the same manner by BBVA's misconduct.  The legal theories upon which Plaintiffs are proceeding are typical as well.

134.   Named Plaintiffs are adequate representatives of the Class because they were and are participants in the Plan.  Plaintiffs and all the Class Members were the subject of the same pattern and practices of equitable and Class violations, and all sustained damages arising out of the same wrongful course of conduct. BBVA has acted or refused to act on grounds generally applicable to the Class. Named Plaintiffs have no interest in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

135.   Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for BBVA in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and

72

remedies for the Plans, as a practical matter, would be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

136. Therefore, this action should be certified as a class action under Fed. R. Civ. P., Rule 23(b)(1)(A) or (B).

137. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of over 12,000 participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be relatively small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class Member has an interest in individually controlling the prosecution of this matter, and Named Plaintiffs are unaware of any difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class action under Fed. R. Civ. P. Rule 23(b)(3), if it is not certified under Rule 23(b)(1)(A) or (B).

138. Plaintiffs' counsel, Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC; James White Firm, LLC; and, Lange Clark, P.C. will fairly and adequately represent the interests of the Class, have substantial experience in class action and complex

73

litigation, and are best able to represent the interests of the Class under Fed. R. Civ. P.

Rule 23(g).

## V.  PLAN WIDE RELIEF

139.    Additionally and alternatively, Plaintiffs bring this action as Plan

participants seeking Plan wide relief for breach of fiduciary duty on behalf of the Plan.

29 U.S.C. § 1132(a)(2).  BBVA's fiduciary duty was to the Plan and the Plan itself was

a victim of BBVA's breach of its fiduciary duty; thus, Plaintiffs demand that BBVA

make good to the Plan all losses to the Plan caused by its breach of its fiduciary duty.

11 U.S.C. § 1109.  The absent Plan participants are adequately represented and the

Plan participants are so numerous that the delay and expense of joining them would

be oppressive and burdensome.  Plaintiffs will take adequate steps to properly act in a

representative capacity on behalf of the Plan, will protect absent parties' interest as

well as the interest of the judicial proceedings.

## VI.  COUNT ONE

### Breach of Duties of Loyalty and Prudence

140.    Plaintiffs adopt by reference the factual allegations of paragraphs 10 to

127.

141.    This Count alleges breaches of the fiduciary duties of prudence and

loyalty against BBVA in that BBVA was not prudent or loyal in the selection and

maintenance of investment options for the Plan in which Plaintiffs and the putative class participated.

142.   The scope of the fiduciary duties and responsibilities of BBVA includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. (¶¶ 10-80 *supra*).  BBVA is directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.  (*Id.*)  In order to do so, BBVA must have a viable, documented process and methodology that improves the likelihood that participants' reach their retirement goals.

143.   As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S.Ct. at 1829. Thus, to state a claim upon which relief can be granted, "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.*  BBVA failed to implement a prudent process of the selection, monitoring, and retention or, as the case may be, removal of investment options.  ( ¶¶ 25, 32, 34, 60, 61, 68, 70, 72, 97,

101, 115, 122).  BBVA failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (*Id.*).  BBVA therefore breached its fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B). BBVA is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.  (*Figures* 1-4, 7, 21, 23, 24 )

144.    BBVA also knowingly participated in the breaches by other plan fiduciaries, knowing that such acts were breaches, enabling the other plan fiduciaries to commit the breaches by failing to lawfully discharge its own fiduciary duties, and failed to make any reasonable efforts under the circumstances to remedy the breaches. Thus, BBVA is liable for the losses caused by the breach of its co-fiduciaries under 29 U.S.C. § 1105(a).

145.    As a consequence of BBVA's actions, Named Plaintiffs and the Class Members were damaged, including without limitation, suffering monetary losses.

## VII.  JURY TRIAL DEMAND

146.    Pursuant to Fed. R. Civ. P. Rule 38 and the Constitution of the United States, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, demand a trial by jury.

## VIII.  PRAYER FOR RELIEF

147.    For these reasons, Named Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

      a.     Find and declare that BBVA has breached its fiduciary duties as described above;

      b.     Find and adjudge that BBVA and the other Plan fiduciaries are personally, jointly and severally liable to make good all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

      c.     Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated, including, without limitation, lost investment opportunity;

      d.     Order BBVA to provide an accounting necessary to determine the amounts BBVA must make good to the Plan under § 1109(a);

      e.     Surcharge against BBVA and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

      f.     Certify the Class, appoint Named Plaintiffs as class representative, and appoint Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC, James White Firm, LLC, and Lange Clark, P.C. as Class Counsel;

g.   Award to the Named Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

h.   Order the payment of interest to the extent it is allowed by law; and

i.   Grant other equitable, legal, to the extent available, or remedial relief as the Court deems appropriate.


/s/ D.G. Pantazis, Jr.
D. G. Pantazis, Jr.
Counsel for Plaintiffs


OF COUNSEL:

WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500
dgpjr@wigginschilds.com
cmalmat@wigginschilds.com


/s/ James H. White, IV
James H. White, IV
Counsel for Plaintiffs


OF COUNSEL:

JAMES WHITE FIRM, LLC
Landmark Center | STE 600
2100 1st Ave North
Birmingham, Alabama 35203
(205) 383-1812
james@whitefirmllc.com

/s/ Lange Clark
Lange Clark
Counsel for Plaintiffs

OF COUNSEL:

LAW OFFICE OF LANGE CLARK, P.C.
301 19th Street North
Suite 550
Birmingham, Alabama 35203
(205) 939-3933
langeclark@langeclark.com

## INDEX TO FIGURES

**Figure 1.** Cumulative Returns of Alternatives to Money Market Fund. ...................... 14

**Figure 2.** Returns BBVA Money Market Fund and  Readily Available Alternatives.  15

**Figure 3.** Calendar Year Returns of BBVA Money Market Fund and Benchmark (in percent) ................................................................................................................... 17

**Figure 4.** Loss Due to Mismanagement of Money Market Fund ................................ 19

**Figure 5.** Chart from SEC Bulletin, "How Fees and Expenses Affect Your Investment Portfolio" ....................................................................................... 21

**Figure 6.** Range of Expense Ratios of BBVA Funds and Benchmark Funds ............. 33

**Figure 7.**  Investment Management Fees Chasing Excess Returns ............................. 35

**Figure 8.**  Relative Performance of Underperforming BBVA Funds  Compared to Benchmarks (in basis points) ............................................................................... 38

**Figure 9.**  Calendar Year Total Returns of BBVA Fund (ATSIX) and Benchmark (VSGAX) ........................................................................................................... 42

**Figure 10.** Cumulative Returns of BBVA Fund (ATSIX) and Benchmark (VSGAX) ............................................................................................................................ 43

**Figure 11.**  Net Fund Flows Aston/TAMRO Small Cap I (ATSIX). ........................... 44

**Figure 12.** Calendar Returns for Principal Mid-Cap Value; R6 (PVMIX) v Vanguard Mid-Cap Value Index (VMVIX) (in percent) .................................................... 46

**Figure 13.**  Cumulative Returns of BBVA PVMIX v Vanguard VMVIX  ................. 47

**Figure 14.** Calendar Returns of Thornburg International Value Fund (TGVIX); v Vanguard International Value Fund (VTRIX) ................................................... 49

**Figure 15.**  Cumulative Returns of Thornburg International Value Fund (TGVIX); v Vanguard International Value Fund (VTRIX) ................................................... 50

80

**Figure 16.**  Calendar Returns of Invesco International Growth Fund (IGFRX) and Vanguard International Growth Fund (VWILX) ........................................................... 52

**Figure 17.**  Cumulative Returns of Invesco International Growth Fund (IGFRX) and Vanguard International Growth Fund (VWILX) ........................................................ 53

**Figure 18.**  Calendar Returns of Principal LifeTime 2040 Fund I (PTDIX) and Vanguard Target Retirement Fund (VFORX).................................................................. 57

**Figure 19.** Cumulative Returns of Principal LifeTime 2040 Fund I (PTDIX) and Vanguard Target Retirement Fund (VFORX)................................................................. 58

**Figure 20.** Net Fund Flows for Principal LifeTime 2040 I (PTDIX) ........................ 59

**Figure 21.**  Lower Cost Funds From Same Provider. .................................................... 61

**Figure 22.** Annualized Total Returns (Asset Weighted) of Principal LifeTime and Hybrid Target Date Funds (in percent) ............................................................................ 62

**Figure 23.** Cumulative Loss from Underperforming Mutual Funds. .......................... 65

**Figure 24.** Total Loss Over Class Period (in $U.S. millions). ...................................... 67

# TABLE OF AUTHORITIES

### CASES

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 599 (8th Cir. 2009) ------------------------ 32

*Brotherston v. Putnam Investments, LLC*, 907 F.3d 17 (1st Cir. 2018)-------------2, 8, 12, 67

*Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982) ---------------------------------------------2

*Katsaros v. Cody*, 744 F.2d 270 (2nd Cir. 1984) ------------------------------------- 6, 7, 64

*Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998) -------------------------------------------7

*Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377 (6th Cir. 2015)----------------------------7

*SEC v. Chenery Corp.,* 318 U.S. 80 (1943)-----------------------------------------------------2

*Tibble v. Edison Intern.*, 135 S. Ct. 1823 (2015) ---------------------------------------passim

*Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) -------------------------------------------6

### STATUTES

28 U.S.C. § 1391 ------------------------------------------------------------------------------4

29 U.S.C. § 1102 ------------------------------------------------------------------------------3

29 U.S.C. § 1104 -------------------------------------------------------------------------passim

29 U.S.C. § 1132 --------------------------------------------------------------------4, 68, 76

### OTHER AUTHORITIES

*Alex Bryan and James Li,* "Performance Persistence Among U.S. Mutual Funds,"
  *Morningstar Manager Research* (January 2016)------------------------------------------ 28

*Alicia Haydock Munnell and Annika Sunden*, "Coming Up Short: The Challenge of
  401(k) plans", The Brookings Institution Press 2005------------------------------------8

*Chris Tobe*, CFA, "Do Money Market Funds Belong in 401k Plans," *MarketWatch* (August 30, 2013) ------------------------------------------------------------------- 10

*Investor Bulletin*, "How Fees and Expenses Affect Your Investment Portfolio," *U.S. Securities and Exchange Commission ("SEC") Office of Investor Education and Advocacy* -- 21, 78

*Jeff Hold*, "A pricey target date series with an unexceptional underlying lineup", Bloomberg Analyst Report Archive (2019) ------------------------------------------------ 55

*John C. Bogle,* "The Arithmetic of 'All-In' Investment Expenses," *Financial Analysts Journal* (2014)------------------------------------------------------------------------ 24

*Ken Kam*, "Top 3 Funds that Beat Their Benchmarks the Most Over a Decade," *Forbes* (Jul 5, 2019) ----------------------------------------------------------------------- 25

*Mark M. Carhart*, "On Persistence in Mutual Fund Performance," *The Journal of Finance* (March 1997) ------------------------------------------------------------------passim

*Roger Edelen, Richard Evans, and Gregory Kadlec*, "Shedding Light on 'Invisible' Costs: Trading Costs and Mutual Fund performance," *Financial Analysis Journal* 68:1 (CFA Institute 2013) ------------------------------------------------------------------------ 24

*Russell Kinnel,* "How Expenses and Stars Predict Success" (Morningstar 2010)-------- 27

S&P Indices Versus Active Funds (SPIVA) U.S. Scorecards (2013-2018) ------------ 26

*Securities and Exchange Commision*, "Concept Release: Request for Comments on Measures to Improve Disclosure of Mutual Fund Transaction Costs," Release Nos. 33-8349; 34-48952; IC-26313; File No. S7-29-03 --------------------------------------- 24

*See, e,g.,* *Modigliani, Franco*, "Risk-Adjusted Performance", *Journal of Portfolio Management* (Winter 1997) -------------------------------------------------------------------------- 67

*Thaler, R. H., & Sunstein*, C. R., *Nudge: Improving Decisions About Health, Wealth and Happiness* 130 (2008)------------------------------------------------------------------- 15

U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, 1-2 (Aug. 2013). ----------------------- 21

*Understanding Retirement Plan Fees and Expenses*, U.S. Department of Labor Employee Benefits Security Administration (December 2011) ------------------------------------- 20

*Warren Buffett*, 2014 - Berkshire Hathaway Shareholder Letter---------------------------- 28

*Warrenn Buffett*, 1996 - Berkshire Hathaway Shareholder Letter -------------------------- 22

*William F. Sharpe,* "The Arithmetic of Investment Management," *Fin. Anal. J.* (2013)27

<u>TREATISES</u>

*A. Hess, G. Bogert, & G. Bogert*, Law of Trusts and Trustees § 684, pp. 145–148 (3d ed. 2009) (Bogert 3d). ----------------------------------------------------------------------7

Restatement (Second) of Trusts § 2 ----------------------------------------------------------2

Restatement (Third) of Trust § 79-------------------------------------------------------- 6, 11

Restatement (Third) of Trusts § 90-------------------------------------------------------passim

## <u>SERVE DEFENDANTS VIA CERTIFIED MAIL AT:</u>

BBVA Compass Bancshares, Inc.
c/o Troy Farnlacher
Daniel Building
15 South 20th Street
Birmingham, AL 35233

Compass Bancshares, Inc.
c/o Jerry Powell, Registered Agent
15 South 20th Street
Birmingham, AL 35233

BBVA USA Bancshares, Inc.
c/o C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104