FILED

2021 Mar-15  PM 01:37
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| GLORIA FERGUSON and )<br>CASSANDRA McCLINTON, )<br>individually and on behalf of )<br>others similarly situated, )<br> )<br>    Plaintiffs, )<br> )<br>vs. )<br> )<br> )<br>BBVA COMPASS )<br>BANCSHARES, INC., )<br>COMPASS BANCSHARES, INC., )<br>BBVA USA BANCSHARES, INC., )<br>as named fiduciary, ROSILYN )<br>HOUSTON, SHANE CLANTON, )<br>JAVIER HERNANDEZ, KIRK )<br>PRESLEY, CELIA NIEHAUS, )<br>JOE CARTEE, JIM HESLOP, )<br>ANGEL REGLERO, individually and )<br>as members of the Investment )<br>Committee, ENVESTNET )<br>ASSET MANAGEMENT, INC. )<br>as investment fiduciary, )<br> )<br> )<br>    Defendants. ) | COMPLAINT<br>CLASS ACTION<br><br>Case No. 2:19-CV-01135-MHH |

**SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................................... 2

II.  JURISDICTION AND VENUE ................................................................................................. 4

III. THE PLAN AND THE PARTIES ............................................................................................. 5

    A.   THE PLAN .......................................................................................................................... 5

    B.   THE PARTIES...................................................................................................................... 5

        1. The Plan Sponsor ........................................................................................................ 5

        2. The Investment Committee .......................................................................................... 5

        3. The Fiduciary Investment Advisor ............................................................................... 6

    C.   STATUTORY "PARTIES-IN-INTEREST" ................................................................................. 7

    D.   PLAINTIFFS AND STANDING................................................................ **ERROR! BOOKMARK NOT DEFINED.**

IV.  FIDUCIARY DUTIES ............................................................................................................... 8

    A.   FUNDAMENTAL FIDUCIARY PRINCIPLES ............................................................................. 8

    B.   SPECIFIC FIDUCIARY DUTIES .............................................................................................. 9

V.   THE INVESTMENTS ............................................................................................................. 17

    A.   THE INVESTMENT MENU ................................................................................................... 17

    B.   THE INVESTMENT POLICY STATEMENT ............................................................................. 17

V.   THE FIDUCIARY BREACHES ............................................................................................. 20

    A.   STABLE VALUE AND SHORT-TERM BONDS ...................................................................... 21

        1. BBVA Winds Down Its Stable Value Fund ................................................................. 24

        2. BBVA and Envestnet Failed to Monitor the Performance of the Stable Value Asset Class .................... 25

        3. BBVA Was Told There Was A Problem ...................................................................... 29

        4. Participants Suffer A Substantial Loss ....................................................................... 30

    B.   BBVA ACTIVE MANAGEMENT STRATEGY WAS IMPRUDENT ........................................... 31

        1. Expense Ratios Are The Best Way To Understand Investment Management Fees and Costs .............. 32

        2. High Expense Ratios Were Red Flags, but BBVA Ignored Them .................................. 34

        3. Imprudent Fee Benchmarks ....................................................................................... 37

        4. Fees Chasing Excess Returns .................................................................................... 40

        5. Transaction Costs...................................................................................................... 42

        6. Active Management Was A Bad Bet In The Designated Asset Classes ......................... 43

        7. BBVA and Envestnet Did Not Justify The Costs And ................................................... 46

        Risks Of Their Investment Strategy ............................................................................. 46

        8.   A Prudent Fiduciary Would Have Considered Replacing The High-Cost Actively, Managed Funds With Index Funds ........................... 50

        9. Investment Vehicles .................................................................................................. 53

        10. Investment Performance ........................................................................................... 54

        11. Target Date Fund Example ....................................................................................... 55

VI.  COVER UP, TERMINATION AND CORRECTION............................................................. 60

    A.   THE COVER UP ................................................................................................................ 60

B. The Termination ............................................................................................................63

C. The Correction .............................................................................................................64

VII. THE PRICE PARTICIPANTS PAID ...........................................................**ERROR! BOOKMARK NOT DEFINED.**

VIII. BBVA'S ADMINISTRATIVE PROCESS ............................................................................69

A. BBVA's Administrative Process Was Nothing More Than A Kangaroo Court .................70

B. BBVA's Administrative Process Violates ERISA Section 404(A)(1)..................................75

C. BBVA's Administrative Process Violates ERISA Section 406(B)(2)..................................76

E. BBVA's Administrative Process Fails to Provide Adequate Discovery.............................78

IX. CLASS ACTION ALLEGATIONS ...................................................................................79

X. PLAN WIDE RELIEF ...................................................................................................83

COUNT ONE: BREACH OF FIDUCIARY DUTY .....................................**ERROR! BOOKMARK NOT DEFINED.**

COUNT TWO: RELIEF PURSUANT TO 29 U.S.C. § 1132 ..............................................................86

COUNT THREE: BREACH OF DUTY OF LOYALTY AND ENGAGING IN PROHIBITED TRANSACTIONS ............................88

PRAYER FOR RELIEF..............................................................................**ERROR! BOOKMARK NOT DEFINED.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| GLORIA FERGUSON and | ) | |
| CASSANDRA McCLINTON, | ) | |
| individually and on behalf of | ) | |
| others similarly situated, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| vs. | ) | COMPLAINT |
| | ) | CLASS ACTION |
| | ) | |
| BBVA COMPASS | ) | |
| BANCSHARES, INC., | ) | Case No. 2:19-CV-01135-MHH |
| COMPASS BANCSHARES, INC., | ) | |
| BBVA USA BANCSHARES, INC., | ) | |
| as named fiduciary, ROSILYN | ) | |
| HOUSTON, SHANE CLANTON, | ) | |
| JAVIER HERNANDEZ, KIRK | ) | |
| PRESLEY, CELIA NIEHAUS, | ) | |
| JOE CARTEE, JIM HESLOP, | ) | |
| ANGEL REGLERO, individually and | ) | |
| as members of the Investment | ) | |
| Committee, ENVESTNET | ) | |
| ASSET MANAGEMENT, INC. | ) | |
| as investment fiduciary. | ) | |
| | ) | |
| | ) | |
|     Defendants. | ) | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Gloria Ferguson and Cassandra McClinton, individually and as representatives of a class of participants in and beneficiaries of the Compass SmartInvestor 401(k) Plan (the "Plan"), pursuant to 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), states their

Second Amended Class Action Complaint against Defendants BBVA Compass Bancshares, Inc. ("BBVA"),[1] as plan sponsor, plan administrator and a named fiduciary; Rosilyn Houston, Shane Clanton, Javier Hernandez, Kirk Presley, Celia Niehaus, Joe Cartee, Jim Heslop, and Angel Reglero, individually and as members of the Plan's retirement committee (the "Committee" or "Retirement Committee"); and Envestnet Asset Management, Inc., f/k/a Prima Capital Management, Inc. ("Envestnet"), the Plan's investment advisor, for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001-1461.   BBVA and the Retirement Committee are referred to herein collectively as "BBVA" or the "BBVA Defendants" and, together with Envestnet, as "Defendants."

## I.      INTRODUCTION

1.       Plaintiff's have been participants in an ERISA defined contribution plan sponsored by their employer, BBVA.  As of December 31, 2019, the Plan had approximately $1.1 billion in assets and 15,000 participants with account balances.

2.       Defined contribution plans have become America's primary means of saving for retirement.  This is the result of a shift from traditional, defined benefit "pension" plans to defined contribution plans.  The United States Supreme Court explained the difference in *Thole v. U.S. Bank, N.A.*, 140 S. Ct. 1615 (2020):

> [i]n a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions.   By contrast, in a defined-

---

[1] Reference is hereby made to the Form 5500 Reports filed by the Plan with the U.S. Department of Labor for the plan years ending December 31, 2010 through December 31, 2019. BBVA has filed inconsistent documents with the U.S. Dept. of Labor naming both "BBVA Compass Bancshares, Inc." and "Compass Bancshares, Inc." as the plan sponsor.  BBVA describes the same entity as BBVA USA Bancshares, Inc. in filings with the Alabama Secretary of State. All do business as "BBVA".

contribution plan, such as a 401(k) or 403(b) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions.

*Id.* at 1618. Thus, in a defined contribution plan, the participants – and not their employer – bear the risks of the employer's imprudent investment decisions.

3.      Additionally, employers have the option to make plan participants responsible for paying both the plan's investment and administrative expenses. Many employers, including BBVA, do this. In such instances, the plan participants bear not only the investment risk of their employer's decisions, but also the costs of any excessive investment and administrative expenses as well.

4.      As the statutory plan sponsor and administrator, and named fiduciary of the Plan, BBVA had the fiduciary duty to manage the Plan prudently and not waste participants' money. BBVA, acting through the Committee based on the advice and recommendations of Envestnet, failed in its duties from start to finish by (i) failing to replace the Plan's stable value fund, in violation of the Plan's stated investment policy and performance guidelines; (ii) making bad bets on mutual funds that incurred additional fees with unrealistic expectation of beating the market; (iii) failing to follow its own guidelines for monitoring the fees and the performance of investment options; and (iv) failing to adequately disclose to participants the information they needed to make informed investment decisions.

5.      Plaintiffs are not merely second-guessing Defendants' investment decisions with the benefit of hindsight. The information Defendants needed to make informed and prudent decisions was readily available to them when the decisions were made. There was information readily available to Defendants that the investments they chose and continued to choose did not satisfy the requirements of their own investment policies and their duty to

prudently monitor the Plan's investments.   Defendants ignored evidence that their investment policy was failing and, worse, attempted to cover it up.   As a result, Defendants needlessly wasted tens of millions of participants' retirement savings.

6.     Each dollar Defendants wasted was one less dollar in participants' accounts, dollars that would have generated returns and built retirement savings.   Those lost returns compound over time so each wasted dollar matters greatly.   The United States Department of Labor, which oversees ERISA, estimates that over thirty-five years, a 1% increase in fees and expenses can reduce a participant's account balance by 28%.[2]

7.     Here, for the period beginning July 17, 2013 and ending December 31, 2020, Plan participants lost an estimated **$42 to $67 million**, for which Defendants are liable as a result of Defendants' breaches of their fiduciary duties.[3]

## II.     JURISDICTION AND VENUE

8.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

9.     This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district and division in which the Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

---

[2] *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *A Look at 410(k) Plan Fees*, 1-2 (Aug. 2013), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[3] Plaintiffs reserve the right to update the loss calculations in due course.

### III.   THE PLAN AND THE PARTIES

**A.   The Plan**

10.     The Plan is a defined contribution, individual account, employee benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).  The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a).

11.     The Plan provides for the retirement savings and income of employees of BBVA.  The retirement savings and income of the employees participating in the Plan depend upon contributions made by or on behalf of each employee, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of the investment management fees and administrative expenses charged to the participants' individual accounts.

**B.   The Parties**

**1.   The Plan Sponsor**

12.     Defendant BBVA, an Alabama corporation domiciled in Alabama, is the Plan Administrator under 29 U.S.C. § 1002 (16)(A)(i) and is a named fiduciary under the Plan and 29 U.S.C. § 1102(a).  As such, BBVA has fiduciary responsibility for the Plan's investments and administrative expenses.

**2.   The Investment Committee**

13.     Defendants Rosilyn Houston, Shane Clanton, Javier Hernandez, Kirk Presley, Celia Niehaus, Joe Cartee, Jim Heslop, and Angel Reglero, were fiduciaries to the Plan that served as members of the Plan's Retirement Committee. The members of the Committee were directly responsible for making fiduciary decisions regarding the management of the

Plan and its investment options.  The activities of the members of the Committee were recorded in the Committee Meeting Minutes.[4]

### 3.    The Fiduciary Investment Advisor

14.    Defendant Envestnet, a Delaware corporation headquartered in Chicago, Illinois, was the Plan's ERISA 3(21) investment advisor, and thus a fiduciary to the Plan, from September 30, 2005 through on or about September 30, 2015.[5]  Envestnet was the architect of the Plan's investment policy and was responsible for providing the advice and making the recommendations on which the successful implementation of the investment policy depended.  Specifically, the scope of Envestnet's services included: (i) the design, evaluation and review of investment policies, objectives, and guidelines; (ii) recommending and monitoring of the Plan's investment options; and, (iii) monitoring the Plan's investment options and recommending changes to the Committee on a quarterly basis.

15.    Envestnet was an ERISA 3(21) investment advisor, not an ERISA 3(38) investment manager; BBVA retained and the Committee exercised the discretionary authority to make investment management decision. Thus, BBVA is liable both for Envestnet's breaches of fiduciary duty in giving investment advice and making recommendations and for the decisions the Committee made based on Envestnet's advice

---

[4] Reference is hereby made to the Minutes of the Investment Committee which met quarterly. Regrettably, the minutes furnished by BBVA were heavily redacted in key places. (*See, e.g.,* Exhibits A through C, the Minutes of the February 14, 2014, May 23, 2014, and August 13, 2014 Investment Committee meeting). The details relating to many of the decisions made in a fiduciary capacity are unknown to Plaintiffs.

[5] BBVA engaged Prima Capital Management, Inc., as its fiduciary investment advisor, in 2005. Prima was acquired by Envestnet in 2012 and continued to do business as "Envestnet/PMC." Envestnet was terminated in or around September of 2015. The exact date of Envestnet's termination is not known to Plaintiffs.

and recommendations.

### C.    Statutory "Parties-In-Interest"

16.    Non-party Fidelity Management Trust Company ("FMTC") holds the assets of the Plan, as trustee, in accordance with 29 U.S.C. § 1103.  FMTC affiliate and non-party Fidelity Investments Institutional provided recordkeeping services and maintained the Plan's investment platform.[6]  FMTC and Fidelity Investments Institutional, collectively, are referred to as "Fidelity").  Fidelity is a party-in-interest to the Plan whose compensation BBVA had a duty to monitor under ERISA § 408(b)(2).

### D.    Plaintiffs and Standing

17.    Plaintiffs Gloria Ferguson and Cassandra McClinton resides in Birmingham, Alabama and have been participant in the Plan under 29 U.S.C. § 1002(7) during the class period because they and their beneficiaries were eligible to receive benefits under the Plan.

18.    Plaintiffs were invested in each of the large-cap, mid-cap, small-cap, international, fixed-income, and target date asset classes which are the subject of this Complaint.

19.    Plaintiffs have both constitutional and statutory standing. As to statutory standing, 29 U.S.C. § 1132 (a)(1)-(3) confers standing on a plan "participant" to bring claims for ERISA violations, including claims under 29 U.S.C. § 1109 (a) for breach of fiduciary duty. Claims pursuant to 29 U.S.C. § 1109(a) are brought in a representative capacity on behalf of the Plan.  Plaintiffs were, during the class period,[7]  "participants" in the Plan as defined in 29

---

[6] An investment platform is an online service that allows investors to access their account information and manage their investments.

[7] Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the

U.S.C. § 1002(7).  Plaintiffs thus have statutory standing.  As to constitutional standing (or, "Article III standing"), Plaintiffs personally suffered concrete and particularized injuries.  During the class period, Plaintiffs were invested in the funds that charged excessive fees charged to their individual retirement accounts.  That is sufficient to confer constitutional standing.  Thus, Plaintiffs have standing to bring claims individually and in their representative capacity on behalf of the Plan and the participants in the Plan.

## IV.   FIDUCIARY DUTIES

20.    Defendants BBVA, the members of the Committee, and Envestnet were fiduciaries to the Plan and the participants under ERISA.

### A.   Fundamental Fiduciary Principles

21.    The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (*citing* Restatement (Second) of Trusts § 2 cmt. b (1959)).

22.    ERISA's statutory standard of care encompasses the traditional fiduciary duties of prudence and loyalty.  *See, e.g., Pledger v. Reliance Trust Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017).  Under ERISA, a plan fiduciary must:

> discharge his duties . . . *solely* in the interest of the <u>participants</u> and beneficiaries and
>
> (A) for the *exclusive* purpose of: (i) providing benefits to <u>participants</u> and their beneficiaries; and (ii) defraying reasonable expenses of administering the <u>plan</u>; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

---

latest date on which the fiduciary could have cured the breach or violation . . . ."  29 U.S.C. § 1113.  *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015),

> capacity and familiar with such matters would use in the
> conduct of an enterprise of a like character and with like aims
> . . . .

29 U.S.C. § 1104 (emphasis added).

23.     The fiduciary duties imposed by ERISA are "derived from the law of trusts" and "[i]n determining the contours of an ERISA's fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (internal citations omitted). In particular, the Supreme Court has instructed lower courts to look to the Restatement (Third) of Trusts (Am. Law Inst. 2007), the Uniform Prudent Investor Act (1995) ("UPIA"), and leading trust law treatises, among other authorities. *Id.*

24.     The Uniform Prudent Investor Act summarizes a key aspect of fiduciary duty plainly, ` "Wasting beneficiaries' money is imprudent." UPIA at § 7 cmt.

25.     In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on:

> whether the fiduciary engaged in a reasoned decision-making process,
> consistent with that of a prudent man acting in a like capacity. . . . ERISA
> requires fiduciaries to employ appropriate methods to investigate the merits
> of the investment and to structure the investment as well as to engage in a
> reasoned decision-making process, consistent with that of a prudent man
> acting in a like capacity.

*Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014) (internal punctuation and citation omitted).

### B.     Specific Fiduciary Duties

26.     **The duty of competence.**  A principal duty of an ERISA fiduciary is to be competent.  *See* 29 U.S.C. § 1104 (a fiduciary shall discharge his duties with "care, skill, prudence, and diligence").  "A trustee's lack of familiarity with investments is no excuse:

under an objective standard trustees are to be judged according to the standards of others 'acting in a like capacity and familiar with such matters.'" *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (applying ERISA).   Where the trustee lacks the requisite knowledge and experience, the trustee may engage professional advisors.  *See, e.g.,* Restatement (Third) of Trusts § 90 cmt. d.

27.   **The duty of prudent delegation.** A trustee is not required personally to perform all aspects of the investment function but must not abdicate its responsibilities and must not delegate unreasonably. *See* Restatement (Third) of Trusts § 90  cmt. j.

> As in other matters of delegation, the trustee must not abuse the discretion to delegate. . . .  In deciding what as well as whether to delegate and in selecting, instructing, and supervising or monitoring agents, the trustee has a duty to the beneficiaries to act as a prudent investor would act under the circumstances. The trustee must exercise care, skill, and caution in establishing the scope and specific terms of any delegation, and must keep reasonably informed in order to monitor the execution of investment decisions or plans.

*Id.*

28.   Here, BBVA engaged Envestnet as a 3(21) ERISA fiduciary to provide investment advice and recommendations.  BBVA did not delegate responsibility to Envestnet to manage the assets of the Plan under ERISA 3(38).  *BBVA is and remains liable for any breach of fiduciary duty by Envestnet.*

29.   **The continuing duty to monitor investments and to remove or replace imprudent investments.**  The United States Supreme Court held in *Tibble*: "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." 135 S. Ct. at 1828.  "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate."  *Id.*  Thus, to discharge

10

this duty, BBVA and Envestnet had to have a prudent process and method for selecting, monitoring and retaining prudent, cost-effective investments for the Plan, and for removing imprudent investments.

30.    Here, BBVA and Envestnet did not follow the requirements of their own investment policy in monitoring the performance of its investment options.

31.    **The duty to justify high-cost active management strategies.**  The Plan was invested primarily in "actively managed" funds.  Active managers try to identify and exploit market inefficiencies.[8]  *See* Restatement (Third) of Trusts § 90 cmt. h(2) (active management involves "searching for advantageous segments of a market, or for individual bargains in the form of underpriced securities.").  Active managed funds try to beat the market.  The search for potential market inefficiencies requires research and analysis, which increases investment management costs.  *See id.*

32.    While prudent investment principles allow for active management strategies in appropriate circumstances, the additional risks and costs involved "must be justified by realistically evaluated return expectations."  *Id.*  Additionally, "[a] trustee's approach to investing must be reasonably supported in concept and must be implemented with proper care, skill and caution."  Restatement (Third) of Trusts cmt. f.  Thus, in deciding whether to pursue an active management strategy, a fiduciary should determine that "gains from the course of action in question can reasonably be expected to compensate for its additional

---

[8] In "efficient" markets, "available information is rapidly digested and reflected in the market prices of securities." *See* Restatement (Third) of Trusts § 90 General Note on Comments e through h. There is an academic debate as to how efficient certain markets really are. The Restatement takes no position on this. Trust law is concerned only with the practical question whether an asset classes consistently provides a reasonable opportunity for active mutual fund managers to generate excess returns over time. As a matter of procedural prudence, this can be evaluated by comparing the track records of the fund managers.

costs and risks." *Id.* at cmt. h(2). The burden is on the investment fiduciary to prove these things, not on the plan participant to disprove them. Controlling costs is a primary responsibility of an ERISA fiduciary, who has the burden of proving that higher costs are justified.

33.     In the context of an ERISA defined contribution plan, prudence requires a fiduciary to have a realistic expectation that an active management strategy will generate net returns equal to or greater than reasonable alternatives, such as investing in low-cost index funds[9] (a "passive" strategy).[10]

34.     In sum, before deciding to pursue an active management strategy, especially one that seeks to find bargains in markets where active managers do not have a good track record, a prudent fiduciary must determine that:

   a)     gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks;

   b)     the course of action to be undertaken is reasonable in terms of its economic rationale and its role within the trust portfolio; and

   c)     there is a credible basis for concluding that the trustee – or the manager of a particular activity – possesses or has access to the competence necessary to carry out the program and, when delegation is involved, that its terms and supervision are appropriate.

---

[9] An index fund is a portfolio of stocks or bonds designed to mimic the composition and performance of a financial market index (e.g. S&P 500). U.S. Sec. Exch. Comm'n, *Index Funds*, INTRODUCTION TO INVESTING, https://www.investor.gov/introduction-investing/investing-basics/investment-products/mutual-funds-and-exchange-traded-4 (last visited Sept. 18, 2020).

[10] A passive management strategy "aim[s] to maximize returns over the long run by not buying and selling securities very often. In contrast, an actively managed fund often seeks to outperform a market (usually measured by some kind of index) by doing more frequent purchases and sales." U.S. Sec. and Exch. Comm'n, *Investor Bulletin: Index Funds* (Aug. 6, 2018).

Restatement (Third) of Trusts § 90 cmt. h(2).[11]

35.     Here, Defendants failed to perform the due diligence necessary to implement an actively managed strategy successfully. Defendants consistently bet on high-fee actively managed funds in asset classes where the funds were low percentage bets. When faced with overwhelming evidence that the funds chosen violated Defendants' own performance criteria, Defendants tried to cover their tracks by changing the performance standards.

36.     **The duty to delegate to competent professionals.**  Plan sponsors often hire investment advisors to advise them on investment strategy and to recommend mutual funds for the plan's investment menu.  Here, BBVA hired Envestnet, which in turn recommended the mutual funds and fund managers chosen by BBVA.  When a plan sponsor chooses to engage an advisor and pursue an active management strategy, the sponsor must determine "there is a credible basis for concluding that [the advisor] possesses or has access to the competence necessary to carry out the program and, when delegation is involved, that its terms and supervision are appropriate." *Id.*

37.     Numerous studies have concluded that only a small number of actively managed funds are able to beat the market consistently.  *See id.* ("fiduciaries and other investors are confronted with potent evidence that . . .  efforts to 'beat the market' . . . ordinarily promises little or no payoff, in fact, often a negative payoff").

38.     As S&P Global (formerly, Standard and Poor's) reports:

[R]esearch tells us that relatively few active managers are able to outperform passive managers over any given time period, either short-term or long-term.

_____

[11]  The theoretical question of active versus passive strategies is not at issue here.  The question here is whether as a practical matter BBVA and Envestnet acted prudently by paying the high fees charged by actively managed funds in light of the expected returns of those funds. A prudent fiduciary should avoid any investment that is not reasonably expected to generate returns sufficient to cover its costs.

> But the true measure of successful active management is whether a manager or strategy can deliver above-average returns consistently over multiple periods. Demonstrating the ability to outperform repeatedly is the only proven way to differentiate a manager's skill from luck. Through research published in our Persistence Scorecards, we show that relatively few funds can consistently stay at the top.[12]

Similarly, a comprehensive study published in the *Journal of Finance* surveyed investment advisors having a 91% share of the U.S. consulting market and found "no evidence" that the advisors' recommendations of funds added value, "suggesting that the search of winners, encouraged and guided by investment consultants, is fruitless."[13]

39.     While it may be prudent under certain circumstances for a plan sponsor to engage investment professionals to pursue an active management strategy, prudence requires the sponsor to determine that the professionals are competent to do so successfully. Retirement plans are not hedge funds that pool money from wealthy, sophisticated investors to pursue short-term, high-risk high-cost strategies.  Their purpose is to pool the retirement savings of everyday workers in cost-efficient, long-term investment vehicles.  Before committing the life savings of workers to a high-cost, high-risk strategy, a prudent sponsor

---

[12]  S&P Dow Jones Indices, SPIVA Statistics & Reports (June 30, 2020), https://www.spindices.com/spiva/#/reports/regions.

[13]  Tim Jenkinson *et al.*, *Picking Winners? Investment Consultants' Recommendations of Fund Managers*, 71 The Journal of Finance 2333, 2333 (October 2016).  For the purpose of the Complaint, it matters only that picking winners is difficult (which is beyond dispute) and that BBVA and Envestnet were unable to execute such a strategy in a prudent manner.

must at a minimum confirm that the Plan's investment advisor has a track record of choosing actively managed funds that justify their costs and outperform low cost low risk alternatives.

40.     Here, BBVA's reliance on Envestnet was blind.   BBVA never asked and Envestnet never provided a track record demonstrating that Envestnet had the ability to pick mutual funds that generated excess returns consistently.

41.     **The duty to defray reasonable administrative expenses.**  The day-to-day operation of an ERISA plan requires certain basic administrative functions, such as recordkeeping and accounting, and other discretionary services, such as providing customer service representatives, online account management, and educational programs.[14]  The fees for these services, as well as the fees charged by investment advisors to the plan, are components of administrative expenses.  ERISA specifically requires a plan sponsor to defray reasonable administration expenses.  *See* 29 U.S.C. § 1104(A)(ii).    The Uniform Prudent Investor Act provides, "[i]n investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable . . . ."  UPIA at § 7.    Thus, "[i]n devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  *Id*. at cmt.

42.     **The duty not to engage in or to allow prohibited transactions.**  ERISA prohibits certain transactions, including service contracts, between a plan and a party-in-interest.   *See* 29 U.S.C. § 1106.   Plan fiduciaries shall not cause the plan to enter into a prohibited transaction.  *Id.* at § 1106(a)(1)(C).  Certain exemptions are made where the party-in-interest is paid "no more than reasonable compensation," 29 U.S.C. § 1108(b)(2), but "an

---

[14] *A Look at 401(k) Plan Fees, supra,* at 3.

ERISA plaintiff need not plead the absence of exemptions to prohibited transactions. It is the defendant who bears the burden of proving a section 408 exemption. . . ." *Allen v. GreatBanc Trust Co*., 835 F. 3d 670, 676 (7th Cir. 2016) (citations omitted).

43.     Here, when accused of mismanaging the Plan, the Committee convened a kangaroo court (the "Kangaroo Court")[15] in which the members of the Committee that served as investment fiduciaries purported to judge themselves and determine that they were not liable.

44.     **The duty to disclose information to participants.** Plan administrators have a duty to provide participants with material information respecting the plan, investment options and fees and expenses, on a regular basis. The Eleventh Circuit held in *Jones v. American General Life and Accident Insurance Co.*, 370 F.3d 1065 (11th Cir. 2004) "that an ERISA participant has a right to accurate information, and that an ERISA administrator's withholding of information may give rise to a cause of action for breach of fiduciary duty." *Id.* at 1072 (citation omitted).[16] Plan participants are due to be informed, for example, when investments do not meet the criteria of the plan's investment policy, when ab investment is not accurately described in the investment menu, or when the benchmark chosen to measure the investment is wrong.

---

[15] *See Rideau v. Louisiana*, 373 U.S. 723 (1963) (finding violation of due process in trial by a "kangaroo court" where accused was denied basic minimal rights, including, right to counsel, right to plead not guilty, and trial in courtroom presided over by a judge).

[16] *See also Brannen v. First Citizen Bankshares Inc. ESOP Plan*, No. 6:15-cv-30 (S.D. Ga. Aug. 26, 2016), at 20 ("Courts have concluded that ERISA plan participants may state a cause of action for breach of fiduciary duty based on a failure to disclose information to plan participants" though they are "reluctant to require disclosure in cases based on inside information."). Plaintiffs do not allege that BBVA or Envestnet withheld non-public, "inside," information. Rather, Plaintiffs allege BBVA and Envestnet failed to disclose and, indeed, tried to cover up, the excessive fees being charged participants, as well as its own imprudent practices and methodology in administering the Plan.

45.     BBVA not only failed to disclose what was happening to participants but attempted to cover its own tracks. Envestnet/BBVA attempted to remove the objective performance criteria they were unable to satisfy.  *To this day, BBVA has not come clean about what happened in the Investment Committee meetings.  The minutes of the meetings that BBVA did produce in which critical decisions were made are heavily redacted.* (*See* Exhibits A-C).

## V.     THE INVESTMENTS

### A.     The Investment Menu

46.     The Plan is structured as a cafeteria type plan in which participants chose from investment options selected and maintained by BBVA.  Participants could choose the asset classes[17] in which they were invested but had no control over the cost or performance of the funds selected by BBVA for each asset class.  This was a "cafeteria" plan in which BBVA set the menu.  Participants were captive investors whose choices within each asset class were limited by the investment decisions made by BBVA.  The value of their individual accounts depended in large measure upon the decisions the Committee, acting on the advice and recommendations of Envestnet, made as investment fiduciary to the Plan.

### B.     The Investment Policy Statement

47.     BBVA's investment objectives, guidelines and performance standards for the Plan's investments were described in a formal, written Statement of Investment Policy ("IPS") dated September 19, 2008.  The IPS was signed by Envestnet and each member of the Committee. The IPS purportedly was amended in December of 2014 to implement changes

---

[17] An "asset class" is a grouping of similar investment vehicles; for example, equities (stocks), fixed income (bonds) or cash.  Equities are often sub-divided according to market capitalization (small-cap, mid-cap, or large cap), or other criteria.

requested by Envestnet, but the amendment apparently was never signed. The IPS was amended again in 2018 when, following Envestnet's departure, BBVA's new investment advisor Willis Towers Watson began cleaning up the Plan.

48.    The purpose of the IPS was to establish *objective* investment criteria for the Plan's investment options *in advance.* These criteria established in advance are then used to select and monitor the Plan's investment options for compliance with the stated investment policy.

49.    The IPS stated that the responsibilities of the Committee included "[d]eveloping an investment program that offers a diversified range of funds" and "[i]dentifying investment options (i.e., types of funds) which it deems appropriate and prudent to make available to plan participants . . . ."

50.    The IPS stated that "the primary investment objectives" of the Plan included offering a menu of investment options such that, among other objectives: (i) "[s]ufficient options are offered to allow participants to build portfolios consistent with their investment risk/return," and (ii) "[e]ach option is adequately diversified . . . ."

51.    The IPS for the Plan established the following asset classes of investments: (i) Money Market; (ii) Stable Value; (iii) Fixed Income ("core bond"); (iv) Domestic Large Capitalization Value Equity ("large-cap value"); (v) Domestic Large Capitalization Growth Equity ("large-cap growth"); (vi) Domestic Large Capitalization Equity Index ("large-cap"); (vii) Domestic Mid Capitalization Equity ("mid-cap"); (viii) Domestic Small Capitalization ("small-cap"); (ix) International Equity ("international stock"); and, (x) company stock.

52.    **Schedule A** to the Appendix to this Complaint describes the investment options for the Plan recommended by Envestnet and adopted by BBVA. Specifically, **Schedule**

A lists (i) each fund offered by the Plan, (ii) that fund's average annual expense ratio[18] and (iii) its designated benchmark index (which the mutual fund is required to designate by the securities exchange commission).[19] The schedule then lists (iv) the corresponding Vanguard index fund benchmark and (v) its average annual expense ratio.[20] The schedule also identifies the excessive fees the BBVA and Envestnet investment options charged to participants' individual accounts.

53.  The IPS also required BBVA and Envestnet to monitor each of these investments to verify that the fees were reasonable and that they satisfied BBVA's performance standards.

54.  The primary performance standard was a risk adjusted performance standard, the Sharpe ratio.[21] The IPS required that the risk-adjusted performance of the Plan's investments exceed that of the benchmark indices over 5-year rolling periods (a full market cycle) and over 3-year rolling periods (less than a full market cycle).

55.  The risk adjusted performance standard, known as the "Sharpe ratio," is one of the most widely recognized industry standards. The Sharpe ratio was named for Nobel Prize winner William F. Sharpe. *See, e.g.*, William F. Sharpe, *Investors and Markets: Portfolio Choices, Asset Prices, and Investment Advice* (Princeton University Press, 2007). The Sharpe ratio is

---

[18] See discussion of expense ratios below.

[19] In most cases the appropriate benchmark index is the primary index designated by the fund manager. Sometimes, a different index is more appropriate, as where the style of the fund has changed (e.g., from international core to international growth) and the fund manager's secondary designated benchmark more closely matches the style of the fund.

[20] Schedule A identifies the Period during which the Plan maintained an investment in the funds. The shaded entries relate to the funds BBVA selected, after terminating Envestnet, to clean up the Plan's investment menu.

[21] This is confirmed by the discussion of Sharpe ratios in the Committee Meeting Minutes.

the ratio obtained by dividing: (1) the mutual fund portfolio's expected excess return over the riskless rate of interest by (2) the standard deviation of its excess return. All other things being equal, an actively managed fund that has a higher Sharpe ratio than its benchmark index net of fees is a good investment that generates *excess risk adjusted returns*.  Such a fund will outperform a passively managed fund invested in the index on a risk adjusted basis.

56.     The IPS also required that the risk-adjusted performance of the investment options exceed the risk adjusted performance of the peer group over most 3-Year rolling periods and all 5-Year rolling periods.

57.     In addition, the IPS required that each of the investment options, "[h]ave an expense ratio comparable to other vehicles within the peer group."

58.     The problem with the peer group criteria is that the peer groups that Envestnet/BBVA relied on were *proprietary* to Envestnet.  The "Prima Capital" peer groups are "Prima Capital / Envestnet" peer groups.[22] Peer groups standards established by independent, third-party research firms such as Morningstar or S&P often provide useful information. Indeed, the Sharpe ratio standard was based on broad market indices published independently by reputable institutions. Envestnet's peer group criteria are based on funds selected by Envestnet. Envestnet was setting its own standards.[23]

## V.     THE FIDUCIARY BREACHES

59.     There were two major fiduciary breaches during the class period that relate to the Plan's investments. First, BBVA failed to replace a poorly performing stable value fund

---

[22] Here, after Envestnet acquired Prima Capital, Envestnet is doing business as Envestnet/Prima Capital.

[23] Due to the lack of discovery in the proceedings in the Kangaroo Court, Plaintiffs are not able to identify the members of the Envestnet peer groups.

with another stable value fund, as required by the IPS and prudent investment practice. This resulted in BBVA channeling retirement savings from the abandoned stable value fund into a money market account.   With money market returns at historical lows, this was the retirement plan equivalent of "stuffing cash into a mattress."

60.     Second, BBVA and Envestnet failed to prudently monitor the Plan's high-fee, actively managed funds.   BBVA failed to replace these funds despite the fact that they consistently failed to satisfy the performance criteria established by the IPS and severely underperformed compared to readily available index fund alternatives.

### A.    Stable Value and Short-Term Bonds

61.     At the beginning of the class period, the Plan offered the three fixed income options the IPS required: (i) a money market fund (the ultra-short term bond option); (ii) a stable value fund (the short-term bond option), and (iii) a fixed income (core bond) product.[24]

62.     The IPS describes the purpose, benchmarks, and peer groups for the three asset classes in detail:

**[REMAINDER OF PAGE LEFT BLANK]**

---

[24] The core bond asset class is labelled "fixed income" in the IPS. The term core bond is synonymous with exposure to the securities that constitute the Bloomberg Barclays U.S. Aggregate Bond Index. For purposes of clarity, the "fixed income" asset class defined by the IPS will be referred to as the core bond asset class, to distinguish the core bond fund from stable value, money market, and other fixed income asset classes.

**Money Market**

The fund will invest in a variety of interest-bearing instruments – such as commercial paper, U.S. Treasury Bills and CDs from large banks – that mature in 13 months or less. The objective of this option is to provide maximum current income consistent with liquidity and stability of principal.

> **Fund:** Goldman Sachs Financial Square Prime Obligations
> **Benchmark:** T-bills – 3 Months
> **Peer Group:** N/A

**Stable Value**

This portfolio will be invested in high-grade short term fixed income securities and cash equivalents, and/or well-diversified guaranteed investment contracts and bank deposit investment contracts of varying maturity, size and yield. The objective of this option is to provide stability of principal while providing a competitive rate of return versus other stable value funds.

> **Fund:** SEI Stable Asset Fund
> **Benchmark:** T-bills – 3 months
> **Peer Group:** Prima Capital Taxable Short-term Mutual Fund Universe

**Fixed Income**

This option will be represented by a diversified portfolio comprised primarily of corporate, government, mortgage backed and asset backed fixed income securities. The portfolio will be actively managed and will generally invest in high quality credits rated investment grade by Standard & Poor's or Moody's. The portfolio should be benchmark aware relative to sector exposure and duration

> **Fund:** Goldman Sachs Core Fixed Income Institutional Fund
> **Benchmark:** Lehman Brothers Aggregate Index
> **Peer Group:** Prima Capital Intermediate Taxable High Quality Mutual Fund Universe

(2008 IPS).

63.     Each of these asset classes served a different purpose. *Money market funds*[25] are the checking accounts of retirement plans.  They invest in securities with ultra-short durations.[26]  The benchmark index for the asset class is the 90-Day T-Bill.  The funds are liquid, but interest rates are very low.  Like checking accounts, they provide liquidity and capital preservation, but are not an appropriate investment vehicle for retirement saving.

64.     This is precisely how BBVA used money market funds in BBVA's defined benefit pension plan. The BBVA pension plan had a money market fund, which served the same

---

[25]  U.S. Sec. Exch. Comm'n, *Index Funds*, INTRODUCTION TO INVESTING, https://www.investor.gov/introduction-investing/investing-basics/glossary/money-market-fund (last visited February 20, 2021)

[26]  The Plan's money market fund portfolio had an average duration of approximately 60 days.

purpose as a checking account. But BBVA did not keep a significant portion of its pension assets in the money market fund (in most case, less than 1%). Funds from the liquidation of other investments were deposited into the money market fund, then transferred to investment vehicles with greater yields, including short to medium term bonds. Regrettably, the Investment Committee failed to implement the same practice in the defined contribution Plan.

65.     *Core bond funds* are intermediate term investments. The benchmark index for the asset class is an aggregate bond index and the peer group is comprised of intermediate bond funds.  The expected return on an intermediate bond fund is greater than the expected returns on both a money market fund and a stable value fund.  But core bond funds are longer term investments than money market fund, the returns are sensitive changes in interest rates and may even be negative for periods of time.

66.     *Stable value funds*[27] are the middle ground. Stable value funds are a special type of short-term bond fund. Stable value funds typically invest in securities with an average duration of 3-4 years.  The expected returns are superior to those of money market funds but lower than the returns of core bond funds. The returns are more stable than the returns of core bond funds as a result of a guarantee from the stable value fund provider. The funds also come with a capital preservation guarantee that the fund will not lose money and that the interest rate (referred to as the "crediting rate") will not drop below a guaranteed minimum. Stable value funds are appropriate for investors that want to generate income but cannot

---

[27] *See* Karen Wallace, *Unpacking Stable-Value Funds*, MORNINGSTAR (Aug. 12, 2015), https://www.morningstar.com/articles/710877/unpacking-stable-value-funds.

tolerate the volatility of bond funds. They serve the same purpose as short-term bond funds, which are a suitable stable value fund alternative.  Large, well-run plans nearly always have at least one stable value or short-term bond option, or both.

67.     Significantly, the benchmark BBVA and Envestnet chose for the Stable Value asset class – the 90-day T-Bill – was inappropriate, both in terms of credit quality and duration.  It did not match an investment in a short term taxable bond peer group, which is the appropriate peer group for stable value funds.  Stable value funds invest in securities that are riskier and of longer duration than T-Bills and the expected returns are greater. BBVA and Envestnet chose not to adopt the Heuler stabler value index or any other well regarded and widely-adopted stable value fund benchmark.  The use of the 90-day T-bill as a benchmark artificially lowered the expected return for the stable value asset class and masked the poor performance of the asset class.

### 1.     BBVA Winds Down Its Stable Value Fund

68.     Prior to 2011, the stable value option for the Plan was the SEI Stable Asset Fund recommended by Envestnet.  The SEI fund did not perform well during the financial crisis of 2007-2009, and SEI decided to wind the fund down over a 12-month period.

69.     The SEI fund that was wound down held about $100 million of BBVA participants' retirement savings.  Finding a replacement for the stable value/short-term bond asset class was critically important because of the amount of money and percentage of participants' retirement savings involved.  Suitable high-quality products were available from any number of providers over the entire class period.

70.     Stable value funds are more difficult to replace than mutual funds. Replacement requires more time and effort on the part of the plan sponsor and its investment

advisors.  This is time and effort, however, that BBVA was obligated to spend.

71.    Indeed, the numerous other retirement plans that had invested in the SEI stable value fund were willing to spend the time and effort to fund suitable placements.[28]

72.    Plaintiffs are aware of no plan sponsor other than BBVA that neglected to find a suitable replacement.

73.    BBVA deposited the proceeds into the Plan's existing money market account, where they remained over the entire class period, in violation of the IPS and ERISA's prudent investor standard. BBVA and Envestnet simply left proceeds from the liquidation of the SEI stable value fund in the money market fund and did nothing.

### 2.   BBVA and Envestnet Failed to Monitor the Performance of the Stable Value Asset Class

74.    In *Tibble*, the United States Supreme Court unanimously held that, "Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." 135 S. Ct. at 1828.  "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Id.*

75.    BBVA and Envestnet had a duty to monitor its investment options to make sure they were adequate.  The Plan's investment policy required the use of both a money market fund and a stable value/short-term bond option. Had BBVA and Envestnet monitored the performance of the money market fund, they would have realized that the money market fund did not satisfy the requirements of the stated investment policy or participants financial

---

[28] This allegation is based on information about how other plan sponsors reacted to the winding down of the SEI stable value fund.

needs.

76.     The money market fund option satisfied the requirements of the money market asset class but did not satisfy the requirements of the stable value/short-term bond asset class.  IPS imposed specific monitoring requirements for the stable value/short-term bond asset class. In defining the asset class, the IPS states: "This portfolio will be invested in high-grade short term fixed income securities and cash equivalents, and/or well-diversified guaranteed investment contracts and bank deposit investment contracts of varying maturity, size and yield." With regard to monitoring the asset class, the IPS states "The stable value option will also be monitored for stability in return and average weighted quality of the portfolio." The money market fund did not satisfy these requirements nor did BBVA perform any of the required monitoring functions.

77.     The performance of the money market fund over the class period was not consistent with the requirements of the IPS or standard prudent investment practices.  For the six years preceding the filing of this lawsuit, the Plan's money market funds returned 0.01% or less per year, close to nothing.  Indeed, accounting for inflation, participants invested in the market option actually lost money.  This is not consistent with the returns of the stable value or short-term taxable bond asset class.

78.     Information regarding prevailing interest rates was made available to the Committee at regular intervals during the class period in the yield curve reports,  showing the difference in ultra-short, short, medium, and long-term treasury obligations,  including  the following report from 2012 at the beginning of the class period:



*Fixed Income Summary[5]*

(Chart from 2012 Envesnet Report). The same information, showing significant differences in returns from the short to the long end of the yield curve, was made available to BBVA on a quarterly basis during the class period.[29]

79.     The difference in performance between the short-end of the yield curve (3-month Bill: 0%) in which the money market fund was invested and the mid to long end of the yield curve (3-year Note: 0.5%, 5-year Note: 1.0%) in which stable value funds invest is readily apparent.

80.     Trustees have an obligation to generate income from trust assets and may not hoard cash in the name of capital preservation.  As the First Circuit Court of Appeals observed in *Brotherston*, **"a trustee who decides to stuff cash in a mattress cannot assure that there is no loss merely by holding onto the mattress."**  907 F.3d at 31 (emphasis added).

81.     Here, the returns on money market funds, like checking accounts, were near zero.  This was inconsistent with BBVA's duty as an investment fiduciary to "produce income

---

[29] The yield curve is not static. It changes over time in response to market conditions.

that is reasonably appropriate to the purposes of the trust and to the diverse present and future interests of its beneficiaries." Restatement (Third) of Trust § 79.

82.     The following chart shows the 2013-2020 returns of a few readily available short-term bond alternatives:

**[REMAINDER OF PAGE LEFT BLANK]**

**Figure 1:**     Cumulative Returns of Stable Value and Short-Term Bond Funds



The charge compares the relative performance of three short-term Vanguard funds, the Hueler index of stable value fund returns, and the Vanguard money market fund. As shown here, there were any number of short-term bond funds, in addition to stable value funds, that

would have been suitable for the stable value (short-term bond) asset class. All were superior to money market funds.

83.     The benchmark that BBVA and Envestnet designated to monitor the performance of the stable value asset class only exacerbated the problem. BBVA needed a short-term to medium-term bond index or a stable value index such as the Hueler index to evaluate the performance of the asset class.  The 90-day T-Bill benchmark artificially lowered return expectations and made the money market fund with returns of near zero to appear to perform adequately as a substitute for the stable value fund. The short-term bond peer group designated by the IPS would have made the failings of the money market fund apparent, had BBVA or Envestnet been paying attention.

84.     The participants with more than $100 million invested in the stable value/short term bond asset class had no way of knowing that they were losing money as compared to the investment returns available from stable value funds mandated by the IPS. *BBVA and Envestnet misrepresented the benchmark for the funds in which they were invested.* Even the participants who knew there was a problem could do nothing about it because BBVA and Envestnet controlled the investment menu and did not make an appropriate stable value fund available.

85.     *Upon information and belief, there is no large, well-run retirement plan in the United States that relied solely on a money market fund as its only short-term fixed income option as BBVA did in this case.*

### 3.     BBVA Was Told There Was A Problem

86.     BBVA was told at the end of 2015 that the participants invested in the money market fund were losing money. Mercer Specialty Consulting ("Mercer"), one of the

investment advisors from which BBVA solicited proposals,[30] pointed out that the money market funds were **"Low yielding; near 0% yields over 6 years."**

87.    Mercer advised the Committee, in fairly blunt terms, that the Plan needed a stable value fund option, **"Mercer believes that Stable Value can provide participants with a better principal protection option."**

### 4.    Participants Suffer A Substantial Loss

88.    Plan participants lost millions of dollars as a result of BBVA and Envestnet's failure to replace the stable value fund.

89.    *Figure 2* compares the returns of the Plan's money market fund to the most widely used stable value benchmark:

**[REMAINDER OF PAGE LEFT BLANK]**

**Figure 2.**    Calendar Year Losses of BBVA Money Market Fund and Benchmark (in percent)

---

[30] "Mercer" is the trade name



| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Money Market Fund (in %) | 0.06 | 0.05 | 0.11 | 0.55 | 1.08 | 2.01 | 2.29 | 0.98 | |
| Hueler Index (in %) | 1.84 | 1.69 | 1.77 | 1.79 | 1.96 | 2.23 | 2.45 | 2.31 | |
| **Excess (in %)** | **-1.78** | **-1.64** | **-1.66** | **-1.24** | **-0.88** | **-0.22** | **-0.16** | **-1.33** | |
| Loss (in millions) | -2.17 | -1.78 | -1.62 | -1.26 | -0.77 | -0.23 | -0.18 | -1.53 | -9.55 $ US Million |

As shown in **Figure 2** above, year after year, returns from stable value products were significantly higher than those of the Plan's money market fund. The resulting loss suffered by participants, before compounding, is approximately **$9.55 million** through the end of 2020.

### B.    BBVA Active Management Strategy Was Imprudent

90.    With the exception of company stock and the stable value fund, the investment options for each of the Plan's asset classes were mutual funds.[31]   The fees charged by the mutual funds were asset-based, i.e., a percentage fee based on the funds' total assets.   The

---

[31] A mutual fund is a managed investment fund that pools money from investors to purchase securities. In later years, BBVA and Willis Towers Watson made use of low cost CIT investment vehicles.

fees were deducted from investment returns. Save for a small handful of exceptions, the investment options in each of the Plan's asset classes consisted of actively managed mutual funds. *This was as a matter of investment policy.* The IPS not only *permitted* but *required* the use of actively managed funds for the fixed income (core bond), large-cap value, large cap growth, mid-cap, small cap, and international asset classes. Passive management was permitted only for the large-cap domestic asset class. This policy was in effect from the beginning of the class period until Envestnet's termination in 2015.

### 1.  Expense Ratios Are The Best Way To Understand Investment Management Fees and Costs

91.     Actively managed funds typically charge higher fees than passively managed funds.[32]  These costs are significant.  As the Department of Labor reports, investment management fees are "by far the largest component" of all ERISA plan fees and expenses.[33]

92.     To determine whether reasonably expected returns justified the costs of its active management strategy, BBVA and Envestnet had to understand those costs.  The best tool for that is the "expense ratio" of the mutual funds.  Expense ratios are strong predictors of performance.

93.     In addition to requiring mutual funds to designate a benchmark index, the SEC also requires mutual funds to disclose certain of the fund's fees and expenses, which are typically expressed as a percentage of assets known as an "expense ratio."  A mutual fund's annual expense ratio is calculated by dividing the fund's operating expenses by the average

---

[32]  *See A Look at 401(k) Plan Fees*, supra, at 7.

[33]  *See id.* at 2.

dollar value of its assets.  The SEC requires every mutual fund to disclose its expense ratio in a standardized format in the fund's prospectus.

94.     In order to manage operating expenses, a plan sponsor must understand and continually evaluate the plan's expenses, fees and service providers.  The Department of Labor advises:

> As the sponsor of a retirement plan . . . you, or someone you appoint, will be responsible for making important decisions about the plan's management. Your decisionmaking will include selecting plan investments or investment options and plan service providers.  Many of your decisions will require you to understand and evaluate the costs to the plan. . . .  Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable. . . .  As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing.[34]

95.     The leading mutual fund investment research and services firm, Morningstar, emphasizes the effect of expenses on fund performance and advises investors to rely on expense ratios when choosing mutual funds:

> If there's anything in the whole world of mutual funds that you can take to the bank, it's that expense ratios help you make a better decision.  In every single time period and data point tested, low-cost funds beat high-cost funds. . . . Expense ratios are strong predictors of performance. . . .  Investors should

---

[34] U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *Understanding Retirement Plan Fees and Expenses,* 1-2 (Dec. 2011).

make expense ratios a primary test in fund selection.  They are still the most dependable predictor of performance.[35]

96.    One of the first things BBVA did after terminating Envestnet was to make expense ratios a primary factor in fund selection.  It abandoned the policy of requiring the use of high-fee actively managed funds and appropriately paid more attention to expense ratios.

### 2.    High Expense Ratios Were Red Flags, but BBVA Ignored Them

97.    The average annual expense ratios[36] for the Plan's funds were *six times higher* than the average expense ratios for lower-cost Vanguard index funds invested in the very same asset classes ("Vanguard comparables").[37]  This information was readily available to BBVA and Envestnet; every mutual fund's expense ratio is published at the front of its prospectus.

98.    The use of Vanguard comparables to estimate the cost of investing in a designated broad market index without incurring substantial additional fees is reasonable and appropriate.[38]

99.    **Schedule A** to the Appendix compares the expense ratios of the Plan funds

---

[35] Russel Kinnel, *How Expense Ratios and Star Ratings Predict Success* (Aug.  9, 2010) (emphasis added), https://www.morningstar.com/articles/347327/how-expense-ratios-and-star-ratings-predict-success.

[36]  This refers to the asset weighted average of the expense ratios.

[37] A mutual fund's benchmark is an index, not a fund.  Index returns do not take fees and costs into account and are not directly investable.  Index *fund* returns, on the other hand, account for fees and costs.  Thus, to gauge a mutual fund's performance net of fees, it is necessary to identify a comparable product, another mutual fund invested in the same or substantially the same assets.   Plaintiffs have chosen Vanguard index funds for this comparison. Vanguard funds often are used as comparables in ERISA cases.  There are many reputable, competitively priced index fund providers but because Vanguard is the largest index fund provider, Vanguard products are readily available in the vast majority of the asset classes in which retirement plans invest.

[38]  *See* Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 The Journal of Finance, 1915, 1942-43 (Oct. 2010).

with the expense ratios of their Vanguard comparables.  Specifically, the schedule lists (i) each fund offered by the Plan, (ii) that fund's average annual expense ratio ("ER") and (iii) its benchmark. The schedule then lists (iv) the corresponding Vanguard comparable and (v) its average annual expense ratio.  For each fund, the schedule shows (vi) the difference between the two expense ratios.

100.    The data compiled in Schedule A is summarized in Figure 3, below.

**[REMAINDER OF PAGE LEFT BLANK]**

**Figure 3:**   Average Expense Ratios of Plan and Vanguard Benchmarks at the Beginning of the Class Period

| BBVA Fund | Weighted Avg ER | Benchmark Fund | Weighted Avg ER |
|---|---|---|---|
| **TARGET DATE** | | | |
| Principal Lifetime 2015 | 0.69 | Vanguard Target Retirement 2015 | 0.09 |
| Principal Lifetime 2020 | 0.71 | Vanguard Target Retirement 2020 | 0.09 |
| Principal Lifetime 2025 | 0.73 | Vanguard Target Retirement 2025 | 0.09 |
| Principal Lifetime 2030 | 0.74 | Vanguard Target Retirement 2030 | 0.09 |
| Principal Lifetime 2035 | 0.76 | Vanguard Target Retirement 2035 | 0.09 |
| Principal Lifetime 2040 | 0.77 | Vanguard Target Retirement 2040 | 0.09 |
| Principal Lifetime 2045 | 0.78 | Vanguard Target Retirement 2045 | 0.09 |
| Principal Lifetime 2050 | 0.78 | Vanguard Target Retirement 2050 | 0.09 |
| Principal Lifetime 2055 | 0.81 | Vanguard Target Retirement 2055 | 0.09 |
| Principal Lifetime Strategic Income | 0.62 | Vanguard Equity-Income | 0.28 |
| **EQUITY** | | | |
| Large Cap | | | |
| Vanguard Institutional Index | 0.05 | Vanguard Inst'l Plus Index Fund | 0.02 |
| Dodge & Cox | 0.59 | Vanguard Mega Cap Value Index Inst'l | 0.07 |
| Harbor Funds Cap Appreciation | 0.77 | Vanguard Russell 1000 Growth Index I | 0.09 |
| Mid Cap | | | |
| JP Morgan Mid Cap Growth | 0.90 | Vanguard Mid-Cap Growth Index Fund | 0.09 |
| Principal Mid Cap Value | 1.01 | Vanguard Mid-Cap Value Index Fund | 0.09 |
| Small Cap | | | |
| Aston/TAMRO Small Cap | 1.05 | Vanguard Small Cap Growth Admiral | 0.09 |
| International | | | |
| Thornburg International Value | 0.87 | Vanguard International Value | 0.42 |
| Invesco International Growth | 1.09 | Vanguard International Growth | 0.40 |
| **FIXED INCOME** | | | |
| Am Cen Div Bond | 0.45 | Vanguard Total Bond Market Index Admi | 0.19 |
| Stable Value Fund | - | | |
| Money Market Fund | - | | |
| **AVERAGE** | **0.75** | | **0.12** |

*Figure 3* compares the average annual expense ratios (ER) over the Class Period of the Plan's funds to the average annual expense ratios of corresponding Vanguard index fund benchmarks over the same period for the same asset classes. The weighted average expense

ratio of each fund over the class period is compared to the weighted average of the Vanguard fund alternative. The "bottom line" of **Schedule A** shows that the weighted average annual expense ratio for all funds in the Plan was 0.76% versus 0.12% for the benchmark funds, a difference of .57%. The plan funds were six times more expensive than readily low-cost alternatives from Vanguard.

101.    For example, the Plan's "Principal LifeTime 2040" fund had an expense ratio of 0.77% and the corresponding index fund benchmark has an expense ratio of 0.09%,[39] for a difference, or "excess" of 0.59% (this may also be reported in basis points (bps) – with 1 basis point equal to 1/100th of a percent).

102.    Had BBVA simply compared the expense ratios of the Plan's funds with the expense ratios of the Vanguard index fund benchmarks, it would have known that it could have invested in essentially the same underlying assets simply by choosing low-cost Vanguard index funds (or similar index funds) and thereby saved the Plan participants millions of dollars.

103.    After terminating Envestnet, BBVA began to look at the high expense ratios of the Plan's investment options and began transitioning to index funds.

### 3.    Imprudent Fee Benchmarks

104.    To assess fees and expenses one must measure them. The industry term is *benchmarking.* BBVA and Envestnet had to compare the cost of the Plan's investment options relative to other actively managed funds and index funds. To benchmark cost accurately,

---

[39] This is the retail share class of the Vanguard fund. The same fund was made available for institutions such as BBVA at a cost of 0.09%. After terminating Envestnet, BBVA replaced the high-cost Principal target date funds with low-cost Vanguard target date funds.

BBVA and Envestnet had to identify a peer group appropriate for institutional investors such as BBVA.

105.    The peer groups Envestnet identified were not accurate because they included both institutional funds and non-institutional funds held by "mom and pop" investors that were more expensive than the funds available to institutional investors such as BBVA. By manipulating the peer groups, Envestnet made the BBVA funds appear to cost less than their peer group when they actually cost more. Based on these artificial comparisons Envestnet consistently advised in committee meetings "that expense ratios for the funds in the 401(k) Plan [were] lower than the peer averages."

106.    For example, in the June 13, 2013, Envestnet provided BBVA with a chart that purported to demonstrate that BBVA was saving money by investing in the funds recommended by Envestnet:

## Fund Fees
### Annual Report Net Expense Ratio vs. Peer Group Average

- Expense ratios for funds in the plan are all lower than the peer average

| Fund Name | Annual Report Net Expense Ratio | Morningstar Category Average | Discount to Category Average |
|---|---|---|---|
| Dodge & Cox Stock (DODGX) | 0.52% | 1.14% | 54% |
| Vanguard Institutional Index I (VINIX) | 0.04% | 1.09% | 96% |
| Harbor Capital Appreciation Instl (HACAX) | 0.65% | 1.20% | 46% |
| Principal MidCap Value I Inst (PVMIX) | 0.94% | 1.24% | 24% |
| JPMorgan Mid Cap Growth R6 (JMGMX) | 0.74% | 1.31% | 44% |
| ASTON/TAMRO Small Cap I (ATSIX) | 1.06% | 1.38% | 23% |
| Thornburg International Value R6 (TGIRX) | 0.73% | 1.38% | 47% |
| Am Cent Diversified Bond Instl (ACBPX) | 0.40% | 0.87% | 54% |
| Vanguard Prime Money Market Instl (VMRXX) | 0.10% | 0.13% | 23% |
| Principal LifeTime Fund Series – Inst Shares | 0.75%* | 0.83%** | 10% |

*Asset-weighted average cost across institutional shares of the Principal LifeTime fund series.
**Asset-weighted average cost for target retirement date fund series across the industry.



© 2015 Envestnet Asset Management, Inc. All rights reserved. For home office and advisor use only.

BBVA Compass SmartInvestor 401(k) Plan Q1 2015 Review     June 22, 2015     8

This report is typical of the reports that BBVA made throughout the class period.

107.    The representations made in this report are misleading at best. As demonstrated in the fee report dated September 30, 2015 from Willis Towers Watson, many of the mutual funds were actually more expensive not less expensive than their peers:

BBVA Compass Bank SmartInvestor 401(k) Plan                                           As of September 30, 2015

**Fee Analysis**

| Fund Name | Net Expense Ratio (%) | Investment Mandate | Universe Fees Median (%) |
|---|---|---|---|
| **Fixed Income Funds** | | | |
| Vanguard Prime Money Market | 0.10% | Money Market | 0.22% |
| American Century Diversified Bond | 0.40% | Core Fixed Income | 0.53% |
| **Equity Funds** | | | |
| Vanguard Institutional Index | 0.04% | US Passive Large Cap Equity | 0.16% |
| Dodge & Cox Stock Fund | 0.52% | US Large Cap Value Equity | 0.81% |
| Harbor Capital Appreciation | 0.65% | US Large Cap Growth Equity | 0.86% |
| JP Morgan Mid Cap Growth | 0.73% | US Mid Cap Growth Equity | 1.03% |
| Principal Mid Cap Value | 0.94% | US Mid Cap Value Equity | 0.84% |
| ASTON/TAMRO Small Cap | 1.06% | US Small Cap Equity | 1.00% |
| Invesco International Growth | 0.90% | International Equity | 1.04% |
| **Target Date Funds**\*\* | | | |
| Principal LifeTime Strategic Income | 0.64% | Target Date Fund | 0.61% |
| Principal LifeTime 2015 | 0.70% | Target Date Fund | 0.59% |
| Principal LifeTime 2020 | 0.73% | Target Date Fund | 0.67% |
| Principal LifeTime 2025 | 0.75% | Target Date Fund | 0.65% |
| Principal LifeTime 2030 | 0.77% | Target Date Fund | 0.73% |
| Principal LifeTime 2035 | 0.78% | Target Date Fund | 0.70% |
| Principal LifeTime 2040 | 0.79% | Target Date Fund | 0.76% |
| Principal LifeTime 2045 | 0.80% | Target Date Fund | 0.74% |
| Principal LifeTime 2050 | 0.80% | Target Date Fund | 0.75% |
| Principal LifeTime 2055 | 0.83% | Target Date Fund | 0.75% |

\*Net Expense Ratios from Morningstar.

\*\*Universe Fee Median shown for Institutional Mutual Funds from Morningstar.

108.    For example, as to the Vanguard Institutional Index Fund, Envestnet advised to BBVA that the Vanguard fund at 4 bps was 105 bps less expensive than its peers (a 96% discount). The Willis Towers Watson report, which compares the Vanguard fees at 4bps to the fees of institutional index funds at 18bps, shows a much smaller savings.

### 4.    Fees Chasing Excess Returns

109.    The largest part of the funds' additional costs were the investment management fees assessed by the managers of the Plan's actively managed funds.

110.    The dollar cost to the Plan's participants of BBVA and Envestnet's decision to pursue an active investment strategy, compared to what the cost could have been to make essentially the same investment with Vanguard index funds, is shown in ***Figure 4***:

**Figure 4.**   Fees Wasted Chasing Excess Returns (estimate in $ US millions).



| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|---|---|
| BBVA Funds | 3.4 | 3.5 | 3.8 | 3.6 | 2.6 | 2.9 | 3.0 | 3.0 | 25.8 |
| Benchmark | 0.8 | 0.8 | 0.8 | 0.8 | 0.7 | 0.9 | 0.9 | 0.9 | 6.6 |
| Excess Fees | 2.6 | 2.7 | 3.0 | 2.8 | 1.9 | 2.0 | 2.1 | 2.1 | $19.1 million |

111.   As *Figure 4* shows, during the class period[40] the active fund managers selected by BBVA charged approximately **$19.1 million** more in investment management fees than Vanguard would have to make essentially the same investments. The $19.1 million figure does not take compounding into account.

---

[40] The class period is defined as: from July 17, 2013 through the date of judgment; thus, Plaintiffs will update all damage calculations in due course.

112.   There was a dramatic reduction in fees in 2017 when, after terminating Envestnet, BBVA/Willis Towers Watson replaced the high-fee Principal funds with low-fee Vanguard target date CITs. This resulted in significant savings and serves to highlight the mistakes made in the selection and retention of other high-fee funds.

### 5.   Transaction Costs

113.   Actively managed funds also incur substantial additional transaction costs, including commissions, bid-ask spread, market impact costs, opportunity cost, and cash drag.[41] With the exception of "cash drag," these transaction costs are defined in Paragraph II.A of "Concept Release:   Request for Comments on Measures to Improve Disclosure of Mutual Fund Transaction Costs" issued by the Securities and Exchange Commission in 2003.[42]  "Cash drag" is explained by John C. Bogle in his 2014 article in the Financial Analysts Journal, "The Arithmetic of 'All-In' Investment Expenses"[43] and, as applied to a mutual fund is a diminution of return caused by holding a cash position.  Bogle "conservatively" estimates average transaction costs incurred by active managers, in addition to costs included in calculating the expense ratio, at 0.65% inclusive of "cash drag" but excluding "market impact" and "opportunity cost."  Other observers believe that "market impact" and "opportunity cost" are real and measurable.  In any event, investment fiduciaries have the duty to monitor all costs and to avoid those costs that are unnecessary.  The costs to be monitored and managed include those included in the expense ratio plus transaction costs.  Since all-in costs are likely

---

[41] John C. Bogle (2014), *The Arithmetic of "All-In" Investment Expenses*, Financial Analysts Journal, 70:1, 13-21 https://doi.org/10.2469/faj.v70.n1.1.

[42] Investment Company Act Release No. 26313 (Dec. 18, 2003) [68FR 74280 (Dec. 24, 2003).

[43] Bogle, John C. "The Arithmetic of 'All-In' Investment Expenses." *Financial Analysts Journal,* vol 70, no. 1 (January/February 2014).

to be higher for actively managed funds than index funds, the out-performance of active managers has to make up for the higher costs in order to be competitive with index funds.

114.    Transaction costs are a function of trading; the more trading, the higher the costs. The SEC requires mutual funds to disclose their annual "turnover ratio," the percentage of the fund's holdings that have changed over the year.  It is a measure of trading activity. Turnover ratios vary widely but generally are between 0% and 100%.

115.    The turnover ratios of the funds in the Plan were high. *See* **Schedule C** of the Appendix.[44]

116.    Imprudent active management is not made better by doing it more actively.  It only increases transaction costs unnecessarily.  The high turnover ratio of the Plan funds thus reflects additional needless costs to participants.

### 6.    Active Management Was A Bad Bet In The Designated Asset Classes

117.    While it is not imprudent *per se* to pursue an active management investment strategy, the clear consensus is that active management is a low percentage bet in domestic U.S. markets and the markets of developed foreign countries.[45]

118.    BBVA's investment policy and standard principles of prudent investment management required that the performance of the investment to be competitive relative to their peers in the same asset class. This criterion is appropriate if the investment fiduciary establishes that the peer group (as a whole) generates excess returns relative to passive

---

[44] As discussed herein, the Principal Lifetime target date funds were fund-of-funds. The underlying funds in which they invested also had high turnover ratios, adding to the costs. (*See* **Schedule E.9.**)

[45] *See* Mark M. Carhart (1997), *On Persistence in Mutual Fund Performance*, The Journal of Finance, Vol. 52, No. 1. (Mar., 1997), pp. 57-82.

index funds. If the peer group for the market loses money compared to lower cost index funds, the peer group standard is not appropriate.[46]

119. There are systemic reasons why some markets are suitable for active management and others are not. Active management relies on exploiting market inefficiencies (*e.g.*, identifying an undervalued stock), but many of the major capital markets in which mutual funds invest are highly efficient. In these asset classes, there are few, if any, inefficiencies to exploit. As explained in the Restatement:

> Economic evidence shows that, from a typical investment perspective, the major capital markets of this country are highly efficient, in the sense that available information is rapidly digested and reflected in the market prices of securities. . . . Empirical research supporting the theory of efficient markets reveals that in such markets skilled professionals have rarely been able to identify underpriced securities (that is, to outguess the market with respect to future return) with any regularity. In fact, evidence shows that there is little correlation between fund managers' earlier successes and their ability to produce above-market returns in subsequent periods.

Restatement (Third) of Trusts § 90 General Note on Comments e through h.

Readily available empirical data demonstrates that, over time and across market sectors, the majority of actively managed funds consistently fail to outperform the market.

120. *The markets in which the BBVA / Envestnet peer groups invested were markets in which active management was a low percentage bet. Requiring the use of actively managed funds on the assumption that funds competitive within their peer groups would outperform the market was imprudent.*

121. S&P Global research shows that, as of June 30, 2020, 63% of actively managed U.S. large-cap funds underperformed the S&P 500 index annually, 71% underperformed on a

---

[46] For example, if the data shows that only 10% of the peer group is expected to outperform index funds, to beat the market a plan sponsor will need to select actively managed funds expected outperform 90% of their peers.

three-year basis and 78% underperformed on a five-year basis.[47]   Those numbers reflect fund performance on an aggregated basis; the results for individual funds in these peer groups are worse.  S&P Global reports that of the top half of domestic equity funds in 2015, only 3.84% maintained that status annually through 2019, significantly below what random chance would predict.  Of the top quarter of those funds in 2015, a mere 0.18% maintained that performance over the next four years, again below random chance.[48]

122.     S&P Global data (*see* **Schedule B-1 and B-2)** also shows that, both before and during the class period, actively managed funds in the peer groups designated by BBVA and Envestnet consistently underperformed their own chosen benchmarks.[49]   Schedule B-2 compares, year by year, the performance of actively managed funds to their passively managed counterparts (represented by the index). Schedule B-1 shows the performance over one-to -fifteen-year periods as of December 31, 2019.[50]  As is readily apparent from Schedules B-1 and B-2, while some active fund managers in some asset classes and peer groups outperform their benchmarks sometimes, the large majority fail (*see* Schedule B-1, "Percentage Underperforming" column).   Only a very few in these peer groups are consistently successful.

123.     For example, in the Mid-Cap Value asset class, 97% of the average actively, managed funds underperformed the benchmark index and index fund alternatives over a 15-

---

[47] SPIVA, *supra*, at https://www.spindices.com/spiva/#/reports/regions.

[48] *Id.* (at Persistence Scorecard tab).

[49] Mutual funds are regulated by SEC, which requires mutual funds to designate a broad market index against which the fund's performance may be measured.  An index so designated by a mutual fund is commonly referred to as the fund's "benchmark" or "benchmark index."

[50] The data shown in Schedules C-1 and C-2 covers the entire class period and, in the case of the 10-Yr and 15-Yr data, the years leading up to the class period.

year period. To generate excess returns, a fund would need to be in the top 3%. Merely being competitive, the BBVA and Envestnet standard, all but guaranteed wasting money. As it turned out, the mid-cap fund that BBVA designated was competitive in its peer group but lost money by comparison to index funds.

124.     Faced with this data, BBVA and Envestnet should have proceeded with great caution, knowing that an active management strategy was a high-stakes, low-percentage bet for the funds in the designated peer groups and asset classes.

125.     One of the first things BBVA did after terminating Envestnet was to replace the line-up of high-fee actively managed funds with low-cost passively managed index funds. This is a clear admission that BBVA knew that spending money on active managers chasing excess returns was a mistake.  It was many years late in coming to this conclusion.

### 7.     BBVA and Envestnet Did Not Justify The Costs And Risks Of Their Investment Strategy

126.     BBVA and Envestnet both had a fiduciary duty to determine that the fees charged by the managers of the Plans' mutual funds were justified by realistic evaluations of returns generated by the funds.  Such a determination had to be made and re-evaluated at regular intervals on a fund-by-fund basis.

127.     Envestnet used two different performance standards for monitoring the performance of its investment options: (i) a peer group comparison; and, (ii) a risk-adjusted Sharpe ratio standard.

128.     The peer group standard was not appropriate for measuring investment performance in the asset classes in which the Plan was invested.  The Sharpe ratio standard was a valid performance measure because it relied on *objective* criteria, broad market indices

established by independent market research providers.   Had BBVA followed a prudent process for removing and replacing funds that did not satisfy the Sharpe ratio standard BBVA's investment policy would not have failed.

129.    Here, the funds BBVA and Envestnet chose consistently failed under the objective Sharpe ratio criteria. The funds performed worse than their benchmarks on a risk adjusted basis.   There Sharpe ratios were predominantly negative over the entire class period.  Over trailing five-year periods almost all of BBVA's funds underperformed both their benchmarks and index-fund alternatives.

130.    **Figure 5**, supported by **Schedule F**, shows the risk-adjusted performance of BBVA and Envestnet's actively managed funds compared to their indices and Vanguard benchmarks over the class period:

**[REMAINDER OF PAGE LEFT BLANK]**

**Figure 5:**     Risk-Adjusted Performance (Sharpe Ratio) of BBVA Funds Compared to Benchmark Indices[51]

| Fund Names | 3 YEAR AVG v INDEX | 5 YEAR AVG v INDEX |
|---|---|---|
| Aston/TAMRO Small Cap I | -0.23 | -0.19 |
| Dodge & Cox Stock | -0.17 | -0.18 |
| American Century Diversified Bond | -0.34 | -0.39 |
| Principal Mid Cap Value Fund | -0.10 | -0.10 |
| Principal Lifetime 2015 Fund | -0.06 | -0.07 |
| Principal Lifetime 2020 Fund | -0.07 | -0.06 |
| Principal Lifetime 2025 Fund | -0.05 | -0.05 |
| Principal Lifetime 2030 Fund | -0.04 | -0.03 |
| Principal Lifetime 2035 Fund | -0.03 | -0.03 |
| Principal Lifetime 2040 Fund | -0.04 | -0.03 |
| Principal Lifetime 2045 Fund | -0.04 | -0.03 |
| Principal Lifetime 2055 Fund | -0.05 | -0.05 |
| Principal Lifetime 2050 Fund | -0.04 | -0.04 |
| Principal Lifetime Strategic Income | -0.04 | -0.01 |
| Thornburg International Value | -0.05 | 0.00 |
| JP Morgan Mid Cap Growth | -0.06 | -0.08 |
| Harbor Funds Capital Appreciation | -0.17 | -0.15 |
| Invesco International Growth | -0.31 | -0.32 |

Figure 5 and Schedule F compares the risk adjusted performance of BBVA's funds to the risk adjusted performance of the benchmark indices over the class period. The negative numbers (in red) show that the Sharpe ratios of the plan funds were consistently lower than the Sharpe ratios of their benchmark indices. The failure to satisfy the Sharpe ratio criteria was widespread and persistent over the entire class period.

131.     By December 31, 2014, it had become clear that BBVA's methodology for

---

[51] *Figure 5* is a summary of information contained in **Schedules F.1. through F.18 . Schedule F** paints a picture, in black and red, of a failed investment strategy.

selecting and monitoring the performance of the mutual fund investment options was a disaster. The scorecard from December 31, 2014 showed that all but one of the BBVA funds failed to satisfy the 3-Yr and 5-Yr Sharpe Ratio criteria:

### Scorecard Summary

as of December 31, 2014

| BBVA Compass 401(k) Fixed Income | Product History | Product Assets | Performance 1 Yr | Performance 3 Yr | Performance 5 Yr | Sharpe 3 Yr | Sharpe 5 Yr | Peer Group 3 Yr | Peer Group 5 Yr | Avg Credit Quality | Std Dev 3 Yr | Std Dev 5 Yr | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Century Investments - American Century Diversified Bond Instl (ACBPX) | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 8 |
| Vanguard - Vanguard Prime Money Market Instl (VMRXX) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | n/a | 1 | 1 | | 11 |

| BBVA Compass 401(k) Equity | Product History | Product Assets | Performance 1 Yr | Performance 3 Yr | Performance 5 Yr | Sharpe 3 Yr | Sharpe 5 Yr | Peer Group 3 Yr | Peer Group 5 Yr | Sector Diversification | Std Dev 3 Yr | Std Dev 5 Yr | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aston - ASTON/TAMRO Small Cap I (ATSIX) | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 5 |
| Company Stock - BBVA | 1 | n/a | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Dodge & Cox - Dodge & Cox Stock (DODGX) | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 9 |
| Harbor - Harbor Capital Appreciation Instl (HACAX) | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 6 |
| JPMorgan - JPMorgan Mid Cap Growth R6 (JMGMX) † | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 6 |
| Principal Funds - Principal LifeTime 2015 Instl (LTINX) | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 9 |
| Principal Funds - Principal LifeTime 2020 Instl (PLWIX) | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 9 |
| Principal Funds - Principal LifeTime 2025 Instl (LTSTX) | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 10 |
| Principal Funds - Principal LifeTime 2030 Instl (PMTIX) | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 11 |
| Principal Funds - Principal LifeTime 2035 Instl (LTIUX) | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 11 |
| Principal Funds - Principal LifeTime 2040 Instl (PTDIX) | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 11 |
| Principal Funds - Principal LifeTime 2045 Instl (LTRIX) | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 11 |
| Principal Funds - Principal LifeTime 2050 Instl (PPLIX) | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 11 |
| Principal Funds - Principal LifeTime 2055 Instl (LTFIX) | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 8 |
| Principal Funds - Principal LifeTime Strategic Inc Instl (PLSIX) | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 1 | 1 | 1 | 9 |
| Principal Funds - Principal MidCap Value I Inst (PVMIX) | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 7 |
| Thornburg - Thornburg International Value R6 (TGIRX) † | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 1 | 5 |
| Vanguard - Vanguard Institutional Index I (VINIX) | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 7 |

The red box (emphasis added) highlights the 3-Yr and 5-Yr Sharpe ratio criteria.  The green box (emphasis added) highlights the peer group criteria.   The ones in the boxes indicate compliance with the IPS.  The zeros indicate noncompliance.[52]

---

[52] The performance history and standard deviations are shown as separate criteria. They are however components of the Sharpe and peer group criteria (which are the ratio of the fund, index, and peer groups returns by their standard deviations).

132.     In this chart, the *objective* Sharpe ratio criteria outlined in red demonstrative conclusively that the BBVA funds consistently underperformed their benchmarks over a 3-Yr Period (with only 8 of 20 passing) and dramatically over a 5-Yr period (with only 4 of 20 passing).

133.     The *subjective* peer group criteria outlined in green fashioned by Envestnet tell a different, misleading story.  16 out of 20 BBVA funds outperform their peer group over 3-Yy and 5-Yr rolling periods.

134.     BBVA and Envestnet were using the *artificial* peer group criteria to cover up the inability to satisfy the *objective* Sharpe ratio criteria.

### 8.     A Prudent Fiduciary Would Have Considered Replacing The High-Cost Actively, Managed Funds With Index Funds

135.     Under these circumstances, a prudent plan sponsor[53] would have given careful consideration to index funds. The logic is simple: when the funds in your plan are six times the cost of index funds and you cannot expect to beat the market, you are better off buying into it. This results in lower fees *and* better performance.

136.     While expense ratios are not the only consideration a plan sponsor may take into account when making investment decisions, a prudent plan sponsor would have considered index funds in asset classes where the track record of index funds is superior to the track record of actively managed funds.   Plan sponsors are not required to select index

---

[53] Assuming arguendo that a prudent plan sponsor would have picked these funds to begin with.

funds but must consider index funds in determining the style of management that is appropriate for each of the investment options.

137.    Index funds allow investment in efficient broad markets without incurring unnecessary fees.  According to Morningstar research, in 2019, the asset-weighted average expense ratio for actively managed U.S. mutual funds was 0.66%, while the asset-weighted average expense ratio for passive funds was one-fifth of that, 0.13%.[54]

138.    The index fund approach to investing and controlling costs is fundamentally sound from a trust law perspective.  *See* Restatement (Third) of Trusts § 90 Reporter's General Note on Comments e through h (research supports the use of passive strategies such as index funds); *see also id.* at cmt. h(1) ("Investing in index funds that track major stock exchanges or widely published listings of publicly traded stocks is illustrative of an essentially passive but practical investment alternative to be considered by trustees seeking to include corporate equity in their portfolios.").

139.    Consideration of index funds is particularly appropriate in markets where active managers have greater difficulty in generating excess returns. Thus, the Restatement notes, "[c]urrent assessments of the degree of efficiency support the adoption of various forms of passive strategies by trustees, such as reliance on index funds." *Id.*

140.    Here, it is beyond debate that the Plan's investments did not comply with the Sharpe ratio criteria of the IPS. The risk adjusted performance of the plan funds and index fund alternatives is addressed in detail in **Figure 6:**

---

[54] Morningstar Manager Research, *2019 U.S. Fund Fee Study*, 1 (June 2020), https://www.morningstar.com/lp/annual-us-fund-fee-study.

[REMAINDER OF PAGE LEFT BLANK]

**Figure 6:**     Risk-Adjusted Performance (Sharpe Ratio) of BBVA Funds Compared to Index Fund Benchmarks[55]

| Fund Names | 3 YEAR AVG v VANGUARD | 5 YEAR AVG v VANGUARD |
|---|---|---|
| Aston/TAMRO Small Cap I | -0.32 | -0.32 |
| Dodge & Cox Stock | -0.10 | -0.11 |
| American Century Diversified Bond | -0.30 | -0.35 |
| Principal Mid Cap Value Fund | -0.13 | -0.13 |
| Principal Lifetime 2015 Fund | -0.14 | -0.13 |
| Principal Lifetime 2020 Fund | -0.13 | -0.11 |
| Principal Lifetime 2025 Fund | -0.10 | -0.09 |
| Principal Lifetime 2030 Fund | -0.08 | -0.07 |
| Principal Lifetime 2035 Fund | -0.06 | -0.05 |
| Principal Lifetime 2040 Fund | -0.05 | -0.04 |
| Principal Lifetime 2045 Fund | -0.06 | -0.05 |
| Principal Lifetime 2055 Fund | -0.07 | -0.06 |
| Principal Lifetime 2050 Fund | -0.06 | -0.06 |
| Principal Lifetime Strategic Income | -0.14 | -0.04 |
| Thornburg International Value | -0.02 | 0.05 |
| JP Morgan Mid Cap Growth | 0.01 | 0.00 |
| Harbor Funds Capital Appreciation | -0.16 | -0.16 |
| Invesco International Growth | -0.23 | -0.23 |

**Figure 6** is supported by **Schedule G.**  In virtually all asset class over the most time periods, the 3-Yr and 5-Yr risk adjusted performance of the Plan funds is inferior to the risk adjusted performance of Vanguard index funds in the same asset class.

141.     BBVA and Envestnet did not give appropriate consideration to the use of index

---

[55] **Figure 6** is a summary of information contained in **Schedules G.1. through G.18. Schedule G** paints a picture, in black and red, of how much better the the Plan's investment would have performed had BBVA and Envestnet replaced the high-fee plan funds with low-cost index funds.

fund alternatives.  Had BBVA and Envestnet made this comparison from the data available to them they would have realized that there really was no comparison. In the asset classes designated by the Plan using the Plan's own risk adjusted performance criteria, index funds were superior.

142.    One of the first things BBVA did after terminating Envestnet was to consider low-cost index fund alternatives to the high-cost actively managed funds. BBVA/Willis Towers Watson switched to a core line up of index funds, including index funds from Vanguard.

### 9.    Investment Vehicles

143.    Large plans such as the BBVA Plan have access to low-cost investment vehicles that are not available to individuals and smaller plans. These include institutional class mutual funds and low-cost investment vehicles such as separately managed accounts and collective investment trusts ("CITs").  These investment vehicles allow a plan to reduce the investment expenses of implementing both active and passive investment strategies. Plans comparable to the BBVA Plan have used them to reduce costs.  BBVA was obligated to consider them; BBVA did not.

144.    The advantage of CITs and separately managed accounts is that, for large plans, they provide more cost-effective vehicles than mutual funds.  For example, many of the best low-cost target date funds, such as the Vanguard target retirement trust, are CITs.  Many of the best stable value products are structured as CITs.  Many of the best active-management strategies can be implemented through separately managed accounts at a lower cost than through mutual funds.  By arbitrarily excluding these investment vehicles, the Committee

guaranteed that, in the selection of investment vehicles, many of the best, low-cost investment vehicles would not be considered.

145.    Here again, one of the first corrections BBVA made, after terminating Envestnet, was to introduce low-cost CIT investment vehicles including a series of low-cost Vanguard target date CITs.

### 10.    Investment Performance

146.    The overall performance of the Envestnet/BBVA investment options lagged the performance of the benchmark indices and index fund alternatives.   The consistent underperformance of the BBVA funds compared to index and index fund benchmarks is shown on **Schedule D.**  The bottom line is summarized in **Figure 7**:

[REMAINDER OF PAGE LEFT BLANK]

**Figure 7.**    Returns of Plan v Benchmark[56]

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Plan Funds (in %) | 21.70 | 5.68 | -0.05 | 6.80 | 18.88 | -4.87 | 23.18 | 14.42 |
| Benchmark Indices (in %) | 21.86 | 7.18 | 1.53 | 7.53 | 19.42 | -3.90 | 24.21 | 15.04 |
| Difference (in %) | -0.16 | -1.50 | -1.58 | -0.73 | -0.54 | -0.97 | -1.03 | -0.62 |
| Loss (in $ millions) | -1.04 | -10.18 | -11.05 | -5.47 | -4.78 | -8.44 | -11.21 | -6.75 |

147.    The BBVA funds underperformed their benchmark indices in each year during the Class Period from 2013 to 2020.  The underperformance was particularly severe during

---

[56] The asset weights for this calculation rely on the figures in BBVA's Form 5500s and do not take into account the reinvestment of the excessive fees. This is addressed in the total loss calculation below. The calculation is an estimate based on the information available to Plaintiffs at this time.

Envestnet's tenure from 2014 to 2016. Performance was better from 2017 to 2020 during Willis Towers Watson's tenure, but still far off the mark.

148.     **Schedule D** contains a fund-by-fund, year-by-year accounting of the performance of the plan funds and their relative performance compared to the index and Vanguard benchmarks. The risk adjusted performance is shown in **Schedule F**. As demonstrated by **Schedules D** and **F**, The failure of BBVA's investment strategy was persistent, severe, and plan wide.

### 11.     Target Date Fund Example

149.     During the class period, BBVA invested in a suite of "target date retirement funds" (or, "TDFs") managed by Principal Financial Group. The Plan's investment in these funds ranged from about $65 million at the end of 2013 to about $210 million at the end of 2016, representing approximately 15% to 30% of the Plan's assets during the relevant period. The target date funds were the Plan's default investment option in the absence of investment instructions from the individual participant.

150.     Unlike regular mutual funds, target date funds do not invest in individual securities. Rather, they are specialized "fund-of-funds" that invest in multiple equity and debt funds. The balance of growth-oriented (equity) and conservative (fixed income) assets within the target date fund is determined by its "glide path" – the mix of equity and debt investments. The glide path is chosen according to the target retirement date of the investor and rebalances to become more conservative as the retirement date approaches. The Department of Labor advises that, within this general framework, there are many differences

that "can significantly affect the way a TDF performs, [thus] it is important that fiduciaries understand these differences when selecting a TDF as an investment option for their plan."[57]

151.    Target date funds require considerable diligence on the part of the plan sponsor, and the Department of Labor has issued detailed guidance for plan sponsors to follow in choosing and maintaining these specialized funds.  Among other requirements, a plan fiduciary must establish a process for comparing and selecting target date funds; must understand the fund's investments and asset allocation; and must periodically review the fund's investment strategy and determine whether the fund's manager is effectively carrying out that strategy.  Because of the unique nature of target date funds, the plan fiduciary must monitor the fees and performance of target date funds not only at the fund-of-fund level, but at the underlying fund level as well.[58]   "TDF costs can vary significantly," and the plan fiduciary must "consider the fees for both the TDF and the underlying funds."[59]  For example, a plan sponsor should know whether the expense ratios of the component funds add up to the expense ratio for the target date fund, and if not, what expenses make up the difference, such as added expenses for asset allocation and rebalancing.[60]  A prudent plan sponsor does not invest in target date funds without knowing them inside and out.

152.    With the target date funds, BBVA committed practically all of the sins an investment fiduciary can commit. The most fundamental mistake BBVA made was that it failed to make expense ratios a primary factor in managing its investments. A prudent

[57] U.S. Dep't of Labor, Employee Benefits Security Administration, *Target Date Retirement Funds – TSIP for ERISA Plan Fiduciaries*, February 2013, available at dol.gov.

[58] *Id*.

[59] *Id*.

[60] *Id.*

fiduciary would have given careful consideration to low-cost target date index funds.  There were any number of low-cost index funds available in the target date (or "balanced") asset class, including Vanguard Target Retirement funds. *See* **Figure 1** and **Schedule E.1** (average annual ER of 0.74% for Plan's target date funds versus 0.09% ER for Vanguard benchmarks).[61] Ignoring first principals of fiduciary investment management, BBVA selected and retained high-cost Prudential target date funds when  far less expensive comparable products were available.

153.    In addition to pursuing an unnecessary, high-cost investment strategy for the target date funds, BBVA breached the fiduciary duty of competence.  BBVA itself was not competent to implement a high-cost, actively managed investment strategy, and failed to retain an investment advisor that had demonstrated the skill to implement the strategy effectively.

154.    If BBVA (or its investment advisor) had done its due diligence, as a competent fiduciary must, it would have known that the Principal LifeTime funds did not have a consistent track record of beating the market.  **Schedule E.2.** and **Schedule E.3.** of the Appendix shows the excess returns of the Principal funds compared to their benchmark S&P target date indices for the years *before and during* the Class Period.

155.    Additionally, also for the years preceding the Class Period, the *underlying* U.S equity funds in which the BBVA/Principal target date funds invested had also had high-expense ratios and transaction costs compared to low-cost index fund alternatives. (*See* **Schedules E.5** and **E.8)**.  The funds underperformed their benchmarks and failed to

---

[61] The Vanguard funds also are available as an institutional CIT with an average ER of 9 bps.

57

demonstrate any ability to generate excess returns. (*See* **Schedules E.6** and **E.7**). Nor does the information provided by BBVA to date indicated that BBVA conducted any analysis that would lead to the conclusion that the high cost of the Principal target date funds was justified by a reasonable expectation of excess returns.

156.    The most recent (2019) data from S&P Global confirm that domestic U.S. markets actively managed funds remained a low-percentage bet during the class period, with equity, debt, and fixed income funds underperforming their benchmarks on a risk adjusted basis net of fees. As of 2019, actively managed funds in this asset classes failed to meet their benchmarks 85.5%, 96.6, and 92.8% of the time over 5-Yr, 10-Yr and 15-Yr periods, respectively. Again, the same is true of the equity and fixed income fund asset classes in which the target date funds were invested. (*See* **Schedule B.1** and **B.2**). Active managers as a whole did not have good track records in the asset classes in which the Principal funds were invested. A prudent fiduciary would have known that; one merely need to examine the available data.

157.    BBVA and Envestnet did not make a determination that the additional costs of the actively managed funds were justified by a realistic prospect of excess returns. Having failed to conduct the required due diligence on the fees and performance of the funds at the fund-of-funds or underlying level, BBVA had no way of knowing whether there was a reasonable expectation that the managers of the target date funds would cover their costs. BBVA did not simply make a mistake, it had no idea what it was doing.

158.    BBVA also failed to consider that *Principal itself offered substantially similar target date funds at a lower cost.* In 2015, Principal began offering a new suite of target date funds, the Principal LifeTime Hybrid target date funds, that provided substantially the same asset class exposure as the Principal LifeTime target date funds, but at a lower cost. The

funds have the same benchmark, asset class exposure and strategy – but the LifeTime Hybrid product was far less expensive.  The total amount of additional fees incurred by participants as a result of BBVA's selecting the more expensive product, shown on **Schedule E.4,** was **$940,780** through the end of 2016.

159.    Predictably, BBVA's low percentage bet on the high-cost managers at Principal did not pay off. The BBVA funds, as they had prior to the class period, consistently failed to beat their benchmarks consistently over time.

**Figure 8.**     Relative Performance of Target Date Funds During Class Period Compared to Vanguard Benchmark (in percent)

| Principal Fund | Vanguard Fund | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Principal Lifetime 2015 | Vang'd Tgt Ret 2015 Inv | -0.03 | -0.16 | -0.06 | -0.08 |
| Principal Lifetime 2020 | Vang'd Tgt Ret 2020 Inv | 0.07 | -0.11 | -0.06 | -0.07 |
| Principal Lifetime 2025 | Vang'd Tgt Ret 2025 Inv | -0.14 | -0.14 | -0.03 | -0.15 |
| Principal Lifetime 2030 | Vang'd Tgt Ret 2030 Inv | 0.08 | -0.05 | 0.00 | -0.12 |
| Principal Lifetime 2035 | Vang'd Tgt Ret 2035 Inv | -0.25 | -0.12 | 0.05 | -0.30 |
| Principal Lifetime 2040 | Vang'd Tgt Ret 2040 Inv | -0.08 | -0.07 | 0.08 | -0.28 |
| Principal Lifetime 2045 | Vang'd Tgt Ret 2045 Inv | -0.22 | -0.10 | 0.08 | -0.33 |
| Principal Lifetime 2055 | Vang'd Tgt Ret 2055 Inv | -0.15 | -0.11 | 0.10 | -0.31 |
| Principal Lifetime 2050 | Vang'd Tgt Ret 2040 Inv | 0.04 | -0.05 | 0.08 | -0.27 |
| Principal Lifetime Strat Inc | Vang'd Equity-Income Inv | -2.65 | -0.85 | -0.17 | -1.32 |

160.    *None* of the target date funds outperformed the benchmark over the class period.  While a prudent plan sponsor never would have made the investment in the first place, a prudent plan sponsor, having made that mistake, would soon have removed and replaced the funds as an investment option.

161.    In 2017, BBVA finally realized it had made a mistake and removed the Principal LifeTime target date funds from the Plan.  BBVA replaced the high-cost Principal funds with a low-cost Vanguard Target Retirement index fund alternative. This dramatically reduced the average expense ratio of the target date suite, from 76bps down to 9bps.   Upon the

elimination of the excess fees, the performance of the Plan's target date funds improved substantially, but not before a substantial amount of participants' retirement savings was unnecessarily wasted on high fee funds whose performance did not justify the additional cost.

## VI.    COVER UP, TERMINATION AND CORRECTION

### A.    The Cover Up

162.    By February 2014, Envestnet knew that the investment options that Envestnet was recommending to BBVA did not satisfy the performance criteria of the IPS.  Envestnet, rather than accept responsibility for these failures, tried to cover them up by proposing amendments to the IPS.  Envestnet made this proposal in the February 14, 2014 Investment Committee meeting. The cover up extended to the stable value asset class, the Sharp ratio performance benchmark, the target date funds, and the selection of the Plan's investment vehicles.

163.    To cover the problems with the underperforming money market fund, Envestnet proposed *deleting* the stable value (short-term bond) asset class from the IPS as shown in the following excerpt from a redline of the 2014 version of the IPS:



**Stable Value**

~~This portfolio will be invested in high-grade short term fixed income securities and cash equivalents, and/or well-diversified guaranteed investment contracts and bank deposit investment contracts of varying maturity, size and yield. The objective of this option is to provide stability of principal while providing a competitive rate of return versus other stable value funds.~~

> ~~*Fund: SEI Stable Asset Fund*~~
> ~~*Benchmark: T-bills – 3 months*~~
> ~~*Peer Group: Prima Capital Taxable Short-term*~~ PrimaGuide Mutual Fund <u>Money Market Taxable</u> Universe

(unsigned 2014 IPS; emphasis in original). This meant that, as a matter of policy, BBVA and Envestnet would no longer offer any stable value or short-term bond options. In short, BBVA

had decided to replace the Plan's most popular fixed income option with the equivalent of a checking account.

164.    To cover the problems with the target date funds, Envestnet recommended removing the *objective* performance criteria in favor of *artificial* criteria:

**Target Retirement Date Funds**

Due to the inherent limitations in benchmarking target retirement date funds, several factors may take precedence over relative performance in determining the viability of target retirement date funds:

- The funds' asset allocation and glide path;

- Generally accepted investment theories and prevailing investment industry practices;

- The goals of the Plan and the needs of the participants and beneficiaries; and

- Asset class diversification and the desired relationship of risk (or volatility) and potential return.

(2014 IPS redline). This performance standard is so soft that it is not really a standard at all. It removes the requirement that BBVA and Envestnet compare the funds returns to the SEC mandated benchmarks and substitute subjective criteria that cannot be proven or disproven by reference to objective performance data.

165.    To cover up the problems with the underperforming mutual funds, Envestnet recommended that BBVA, **"Remove 3 and 5 year Sharpe ratio vs. index and peer median as performance criteria"** and "Replace with a quantitative process that better accounts for each fund's style and performance patterns."  The "quantitative process" was undefined – that is, it was a process to be "made up" by Envestnet. The adoption of subjective replacement criteria allowed Envestnet to report that the funds satisfied the performance criteria of the IPS and BBVA to remove the funds from the watch list.

166.     In 2014, the Committee and Envestnet,[62] without conducting any due diligence, also chose to limit the investment vehicles for the Plan to mutual funds.  The 2008 IPS permitted investment in mutual funds, CITs, and separately managed accounts. The amendments to the 2014 IPS deleted CITs and separately managed accounts from the list of permissible investment options:

> **Selection of Investment Options and/or Underlying Vehicles**
>
> ~~Compass Bancshares~~The Retirement Committee reserves the right to add, delete, or replace options or the vehicles representing each option based upon market conditions, consultant input, participant response, inability to meet performance guidelines outlined in this ~~Policy~~IPS, or other factors affecting the continuing viability of the overall investment program.
>
> ~~Either separately managed portfolios, commingled~~Mutual funds~~, or mutual funds may~~ will be used to represent the investment options. The ~~specific investment vehicles (typically~~ mutual funds~~)~~ chosen by the Retirement Committee must have appropriate investment characteristics and be managed by organizations, which, by their record and experience, have demonstrated their exercise of fiduciary responsibility and their investment expertise.

(2014 IPS redline).

167.     The purpose of an Investment Policy Statement is to establish investment criteria *in advance*, providing the discipline to the investment process the law requires of an investment fiduciary. Here, Envestnet removed discipline from the investment process – that is, it "moved the goalpost," by eliminating the investment criteria that it was unable to satisfy.

168.     On August 13, 2014 the Committee, on Envestnet's advice, decided to amend the Investment Policy Statement.[63] Although knowing the significance of the changes, BBVA and Envestnet characterized the changes as "administrative."

169.     It is not clear whether the IPS was ever signed but Envestnet/BBVA acted as if the amended IPS was in effect. Envestnet advised BBVA on the basis of the watered down IPS

---

[62] Although the 2014 Amendment apparently was never signed, some version of it was authorized by the Retirement Committee on the advice of Envestnet.  The 2014 amendment has a signature block for each of the members of the Committee and "Envestnet/PMC."

[63] Because no signed version of the 2014 Investment Policy Statement is presently available to Plaintiffs, the full extent of the changes made is unclear.

to remove underperforming funds from the *watch* list.  Specifically, at the December 14, 2014 Investment Committee Meeting, a series of underperforming Principal LifeTime target date funds, which were placed on the watch list in 2013 as a result of failing the 3- and 5-Year Sharpe ratio tests, were removed from the watch list "per the terms of the IPS".

### B.    The Termination

170.    Misrepresenting the performance problems was a short-term solution.  By June of 2015, BBVA was again reviewing the performance of the investment options, which was unsatisfactory.  Envestnet, on the theory that the underperforming funds would eventually recover, suggested relaxing the performance standards even further, by extending the performance period for the BBVA funds from 5 years to 10 years. In the December 5, 2014 Investment Committee Meeting "Mr. Mack [from Envestnet] presented a study of 10-year outperforming funds that considered how frequently do outstanding managers underperform their benchmark in order to examine the value of patience when selecting an asset manager."

171.    Waiting another 5 years to see whether the underperforming investment options would recover was a bridge too far even for BBVA. On June 26, 2015, the Committee voted to terminate Envestnet's contract. BBVA gave Envestnet's the required 60-day's notice and began a search for Envestnet's replacement. **BBVA has redacted substantial portions of the documentation of what happened at the time BBVA terminated Envestnet.**

172.    Upon terminating Envestnet, BBVA hired Willis Towers Watson as 3(21) investment fiduciary to the Plan.  Willis Towers Watson already served as an investment fiduciary to BBVA's defined benefit pension plan.

C. **The Correction**

173.     BBVA/Willis Towers Watson began correcting the mistakes that BBVA and Envestnet had made. It revised the IPS and proceeded methodically and deliberately to correct the mistakes made by BBVA and Envestnet. The result was an overhaul of the Plan's investment policy and menu options.

174.     BBVA/Willis Towers Watson retained and tightened the Sharpe ratio standard, requiring the funds selected to outperform their benchmark indices over 3 year periods. BBVA/Willis Towers Watson also introduced a performance consistency standard.

175.     In establishing appropriate peer groups, BBVA/Willis Towers Watson relied on peer groups established by an independent third-party, Morningstar.

176.     BBVA/Willis Towers Watson provided more accurate fee benchmarking, which demonstrated that the actively managed funds were more expensive, relative to their peers, than BBVA originally thought.

177.     Willis Towers Watson considered low-cost index fund alternatives to BBVA's high-cost actively managed funds. It explained the difficulties involved in pursuing active strategies as follows:

### Active vs. Passive Investing

- In passive investing everyone can win and the market can reward all investors
- Passive managers aim to perform in-line with the index that they track

- Active investing is a competitive, skill based activity
- Winners must be offset by losers
- This suggests that the average active return is zero (negative after costs)
  - This makes skillful manager selection imperative for success




 For active management to add value in a DC plan context, the committee must have the ability to identify skilled managers and resources to monitoring those managers and participants must have the ability to weather performance volatility relative benchmarks.

© 2016 Willis Towers Watson. All rights reserved. Proprietary and Confidential. For Willis Towers Watson and Willis Towers Watson client use only.

Willis Towers Watson |ı|'ı'ı|   18

CONFIDENTIAL

ADM-Ferguson 003383

The report warns that to implement an active strategy, "the committee must have the ability to identify skilled managers and resources [for] monitoring those managers and participants must have the ability to weather performance volatility relative [to] benchmarks." Because BBVA lacked this ability, Towers Watson decided to add a core lineup of index funds to the investment menu.

178.     BBVA/Willis Towers Watson also explored the benefits of low-cost investment vehicles such as CITs.

179.     The clearest example of BBVA/Willis Towers Watson's about-face in investment philosophy were the target date funds.  BBVA removed the high, cost actively managed Principal target date funds from the Plan and replaced them with a series of

passively managed target date funds from Vanguard. BBVA reintroduced an objective performance standard:  the performance of these funds again were measured against the benchmark index designated by the fund managers.  The funds fees and expenses were benchmarked to an appropriate peer group.  And, instead of mutual funds, BBVA made use of lower cost CITs. ***This directly contradicts the advice Envestnet gave that benchmarking target date funds was either too difficult or not possible.***

180.    With the glaring exception of the money market fund, BBVA has largely corrected its past mistakes. While it is appropriate that BBVA/Willis Towers Watson made these corrections, the corrections do constitute an admission that the BBVA and Envestnet plan was imprudently managed. It took BBVA several years to make the changes to its investment menu. Unfortunately, the damage from the use of high fee, underperforming funds over a nearly six-year period was already done, and the resulting losses are substantial.

181.    BBVA still has not added a stable value fund or other short-term bond options. The $1.5 million loss in 2020 is particularly regrettable. When the original complaint was filed in the *Ferguson* action, Plaintiffs warned BBVA that it needed to correct its overuse of the money market fund.  The original complaint, filed in 2019 stated, "Short term rates have risen in recent years, narrowing the gap between money market funds and other fixed income investments; however, if short-term rates fall again this gap will widen resulting in additional, unnecessary losses." In 2020 money market rates did fall, the gap widened again, and participants unnecessarily lost an additional $1.5 million.

## VII.    THE PRICE PARTICIPANTS PAID

182.    Losses to a plan from breaches of the duty of prudence may be ascertained by comparing the performance of the imprudent investments with the performance of a

prudently invested portfolio. *Brotherston v. Putnam Invs., L.L.C.*, 907 F.3d 17 (1st Cir. 2018). This can be estimated by comparing the weighted returns of the funds of the plan's investment menu and comparing them to the weighted returns of a portfolio of index funds invested in the same asset classes.  In calculating losses, it may be appropriate to "presume that the [plan's] funds would have been used in the most profitable" of any reasonable and alternative investment strategies.  *Tibble v. Edison Int'l*, No. CV 07-5359 SVW, at 21 (C.D. Cal. Aug. 16, 2017) (decision after remand) (quoting *Bierwirth*, 754 F.2d at 1056).

183.    Based upon the information presently available, Plaintiffs estimate that, to date, the Plan participants have lost an estimated **$42 to $67 million** of their retirement money as a result of BBVA's mismanagement of the money market and mutual funds.  The loss can be estimated by comparing the performance of the Plan had it been properly invested.

184.    The total estimated loss[64] through December 31, 2019 is:

**Figure 9.**        *Total Loss Over Class Period (in $U.S. millions).*

---

[64] The estimate assumes that the Form 5500s are accurate as to the plan investments and that the contributions to and deductions from the funds were made monthly and were uniform.  The estimate assumes that the contributions in 2018 were the same as in 2017. Plaintiffs reserve the right to refine the loss estimate once additional information is made available in discovery.



The total loss estimated is expressed as a range from a low of $42 million (Benchmark B) to a high of $62 million (Benchmark A). A more accurate calculation can be made with the benefit of discovery. The total resulting losses will vary over time from December 31, 2020 through the date of judgment based on returns in the boarder equity and debt markets.

185.    The $42 to $66 million loss cannot be explained by standard pricing models taking risk and return into account. The average BBVA mutual fund was riskier than the average index fund benchmark, which means that the Plan returns adjusted for risk are even worse than the returns shown.[65]   Nor can the loss be attributed to any other commonly

---

[65] *See, e.g.*, Modigliani, Franco, "Risk-Adjusted Performance", Journal of Portfolio Management (Winter 1997): 45–54 (portfolio's excess return adjusted based on the portfolio's relative riskiness with respect to that of the benchmark portfolio).  Modigliani is the recipient of the 1985 Nobel Prize in Economics.  The riskier—in technical terms, higher beta—BBVA funds put participants at greater risk in the event of a market downturn.

accepted risk and return factors.[66]  Simply put, the losses were the result of excessive fees, not bad luck.

186.    With respect to mutual funds, the loss was primarily the result of BBVA's selection and retention, month after month, quarter after quarter, year after year, of funds that paid excessive fees to investment managers whose fees were not justified by any realistic prospect of generating excess returns.  The fees resulting in the loss included both fees such as investment management fees and "hidden" fees such as transaction costs resulting from turnover ratio. BBVA should have been aware of this and should have removed the funds, had BBVA monitored the cost of the funds and their performance net of costs.

187.    The loss with respect to the money market fund resulted from a total failure by BBVA to manage the Plan's short-term bond fund investments.  A plan fiduciary that has engaged in the investment equivalent of stuffing money into a mattress cannot claim that a loss was avoided merely because it held onto the mattress.

188.    The resulting losses have and will continue to accrue until such time as the Plan is made whole. Were this a pension plan, BBVA would have had to pay for its own mistakes. Because this is a defined contribution plan, the losses have and will be borne by participants until and unless BBVA is required to make the Plan whole.

## VIII.   BBVA'S ADMINISTRATIVE PROCESS

189.    Plaintiffs Ferguson and McClinton are two of a number of participants that have made claims for breach of fiduciary duty against BBVA and Envestnet.

190.    The first participants to make such a claim were the Plaintiffs themselves,

---

[66] This would include the application of the Fama / French factors discussed by Fama / French and Carhart, supra.

Gloria Ferguson and Cassandra McClinton, who commenced a civil action for breach of fiduciary duty against BBVA in this case, on July 19, 2019 (the "Ferguson Action").  The second group of participants to make such a claim filed the lawsuit titled *Drake v. BBVA Compass Bancshares, Inc., et al.,* designated as Case: 2:20-cv-02076, on December 28, 2020 (the "Drake Action")[67]

### A.   BBVA's Administrative Process Was Nothing More Than A Kangaroo Court

191.   "On May 16, 2019, before filing suit, Ferguson's attorney sent a letter to Troy Farnlacher, BBVA's Plan Administrator, informing BBVA that Ferguson[1] 'ha[d] observed . . . that the costs and expenses of administering the Plan[] are outside a normal range' and indicating that Ferguson wanted to investigate whether the Plan 'had a prudent methodology for the selection of the investment options for the Plan menu . . . .'" (*See* Ferguson Action, Doc. 41, p. 9 – 10). "In that letter, Ferguson requested information about the BBVA Plan.  In addition to requesting several specific documents including the SPD and the Plan document, Ferguson's attorney stated that 'we are not aware of any provision in the plan documents that provides for grievances regarding the Plan. If there is such a process, please identify it with specificity in your response to this letter, and produce all documents related to the administrative process.'" (*Id.*, p. 10).

192.   "Mr. Farnlacher responded by letter dated May 24, 2019.  Mr. Farnlacher enclosed with his letter several documents including the Plan document and the 'Current SPD.' He stated that Ms. Ferguson's 'remaining information requests' were 'unclear, overly

---

[67] The claims made in the Ferguson Action are not merely similar or even identical to the claim made in Drake Action. *The claim brought on behalf of the Plan against the Defendants is the same claim.* For that reason, Plaintiffs have asked this case and the Drake Action are due to be consolidated.

broad, and do not appear to be within the scope of Section 1024(b)(4).'  He asked Ms. Ferguson's attorney to "refine" subsequent requests for information.  Mr. Farnlacher did not answer Ms. Ferguson's request that he identify, with specificity, the Plan's administrative process for grievances regarding the Plan." (*Id.*).

193.   "On June 18, 2019, Ferguson's attorney replied.  He stated that, '[i]n an effort to refine our requests' in his original letter, he was requesting additional documents.  Ferguson indicated that Fidelity might have several of the documents.  By letter dated July 19, 2019, Farnlacher refused to produce most of the documents that Ferguson's attorney requested, stating that "the items you have attempted to identify' and 'the categories of information are beyond those available under 29 U.S.C. §1024(b)(4).'  Farnlacher suggested that counsel for Ms. Ferguson "contact Fidelity directly" if he wanted to pursue "additional account level materials." (*Id.*, p. 10).

194.   "On July 18, 2019, Ms. Ferguson and Ms. McClinton sued BBVA, alleging 'that the Plan participants[] lost approximately $47,000,000 of their retirement money as a result of BBVA's mismanagement . . . .' In their complaint, the plaintiffs in the Ferguson Action stated that they had:

> exhausted all available administrative remedies pursuant to 29 U.S.C. §1133, prior to the filing of the Complaint (there are none). There are no provisions or procedures in the plan documents to make or appeal the decisions of the Defendant in regard to breach of fiduciary duty claims. The designated remedy for a breach of fiduciary duty claim is a suit filed in federal court. [Summary Plan Description (current)] at 19.
>
> Counsel for the named Plaintiffs requested access to any administrative procedures and none were provided. Thus, Named Plaintiffs exhausted all administrative remedies prior to filing, having confirmed there are none; to the extent Defendant alleges that some other procedure exists, based upon the information available to the Named Plaintiffs, it is clear such procedures and process are futile.

(*Id.* 11–12).

195.    "On September 19, 2019, BBVA moved to dismiss the [Ferguson] complaint for failure to exhaust administrative remedies.  In its brief in support of its motion to dismiss, BBVA stated that § 8.7 of the Plan 'establishes a claim and review procedure for aggrieved participants and beneficiaries' and that the Plan responded to Ferguson's pre-suit complaint for documents. BBVA did not mention the fact that Ferguson had expressly asked BBVA to identify with specificity the grievance procedure that she should use, and BBVA had not answered her question.  Instead, BBVA noted that the plaintiffs admitted in their complaint that they had not pursued administrative remedies before filing suit.  BBVA argued at length that the plaintiffs must exhaust their breach of fiduciary duty claim against BBVA pursuant to § 8.7 of the Plan.  BBVA also claimed that the Plan document gave the Retirement Committee 'absolute discretion' to 'make final, binding claims decisions.'" (*Id.* at p. 12-13).

196.    "In an affidavit in opposition to BBVA's motion to dismiss, counsel for Ferguson stated that he filed Ms. Ferguson's complaint on July 18, 2019 because BBVA had not responded to his request for identification of a griev[ance] process, and he recognized 'the statute of limitations was eliminating potential claims by the day . . .' authority 'creates an administrative remedy that must be exhausted.'" (*Id.*, at 12 FN 7).

197.    "A few weeks after BBVA filed its motion to dismiss, on October 2, 2019, counsel for the plaintiffs submitted to BBVA a letter in which the plaintiffs requested access to the Plan's administrative remedies. Counsel wrote:

> BBVA has taken the position that the Plan provides for an administrative remedy for the claims made in the civil action. In our opinion, BBVA's representation to the District Court that there is an administrative remedy for such claims is incorrect. Nonetheless, BBVA has taken the position that there

are administrative remedies and to the extent that there are appropriate remedies[,] the claimants submit this claim in an effort to take advantage of them.

Accordingly, a claim is hereby made by the claimants for the relief requested in the Civil Action - namely that BBVA shall refund to the Plan the sum of $47 million (plus interest, attorney's fees, and additional lost investment opportunity costs) together with the other relief requested in the civil action. Section 503 of ERISA, 29 U.S.C. § 1133, and 29 C.F.R. § 2560.503-1. Specifically, the claimants hereby make a claim on the Plan in that BBVA has misused the Plan funds and their individual funds, and invested the Plan funds and their individual funds in an imprudent manner as further outlined in the civil action referenced above.

(*Id.*, p. 13).

198.    "The plaintiffs asked BBVA to 'please advise of the availability of a qualified, impartial decision maker with the power to afford the relief requested by ERISA § 409.' On the same date, counsel for the plaintiffs submitted an identical request for administrative review from Drake [the named plaintiff in the parallel proceeding].  BBVA attached these

73

administrative claim letters to its reply brief in support of its motion to dismiss and cited the plaintiffs' letter in support of the motion." (*Id.*, p. 13–14; brackets added).

199.     While the motion to dismiss was pending, BBVA conducted its Kangaroo Court in which the Committee purported to consider and deny plaintiffs breach of fiduciary duty claims on their merits. As part of this process:

- BBVA did not appoint a neutral decision-maker with the authority to decide claims brought on behalf of the Plan.

- The members of the Committee, the very same Committee alleged to have engaged in breaches of fiduciary duty that cost the Plan more than $40 million, appointed themselves to decide a claim made against them.

- None of the members of the Committee recused themselves.

- There were no rules or procedures established for deciding a breach of fiduciary duty claim.

- Plaintiffs were denied access to the documents necessary to prove their case. BBVA did provide Plaintiffs with a set of documents, but withheld a number of key documents, including portions of the Committee Minutes, which were heavily redacted.

- Claimants did not have the right to issue third-party subpoenas.[68]

- Claimants were not given the opportunity to conduct discovery or to depose the fiduciaries that made the decisions that resulted in the losses to the Plan.

---

[68] For example, BBVA told claimants that Fidelity is in possession of some of the documentation requested. This is true. Fidelity is, under the ERISA § 408(b)(2) regulations, required to provide information regarding the Plan's recordkeeping and administrative expenses to BBVA. BBVA has access to the information; claimants do not. Nor did Plaintiffs have the ability to issue a subpoena to obtain the information in the administrative process. Plaintiffs, although required to pay for Fidelity to provide this information through the fees charged to their individual accounts, do not have access to the 408(b)(2) information.

- There was no hearing or trial on the merits at which claimants had the opportunity to question witnesses or argue their case.

200.    BBVA took every opportunity as part of the administrative process to delay the process.  BBVA twice extended the time for making a decision resulting in two delays of 90 days each.  BBVA did this with the intent of delaying the proceedings in this Court, as the decision itself was a foregone conclusion.

201.    While the administrative process was pending, the Court denied BBVA's motion to dismiss. *Id.*, p. 14. Claimants Ferguson and McClinton advised BBVA that they would proceed with their claims in court.  Ms. Drake continued her appeal for the purpose of exhausting her administrative remedies, however futile.

202.    On September 29, 2020 the Committee rendered its decision in which the Committee decided that the Committee itself had not breached any fiduciary duties to participants or the Plan.

203.    The outcome of BBVA's Kangaroo Court was never in doubt. It is entitled to no deference from anyone, much less this Court.

204.    BBVA filed a motion to reconsider the denial of its original motion to dismiss in the Ferguson Action. The motion was denied.

**B.     BBVA's Administrative Process Violates ERISA Section 404(a)(1).**

205.    ERISA Section 404(a)(1) provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries.

206.    The fiduciary obligations of plan administrators are to serve the interest of participants and beneficiaries. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142–43

(1985).  Among the principal statutory duties imposed on the trustees are to avoid conflicts

of interest.  *Id*.;  *Deak v. Masets, Mates and Pilots Pension Plan*, 821 F.2d 572, 580 (11th Cir. 1987).

207.    A fiduciary who votes not to sue himself or actively participates in the decision-

making process violates Section 404(a)(1) as a matter of law.  *Iron Workers Loc. No. 272 v.*

*Bowen*, 624 F.2d 1255, 1261 (5th Cir. 1980).  "Section 404(a)(1) and subsection (A) require a

fiduciary to act 'solely in the interest of the participants and beneficiaries' of a plan and 'for

the exclusive purpose, of providing them benefits at a reasonable cost.  We do not believe

that one who, in his capacity as a trustee, attempts to prevent a trust from suing him for

substantial damages can reasonably be said to do so 'solely in the interest' of or 'for the

exclusive purpose' of benefitting others." *Id.*

208.    Defendants violated Section 404(a)(1) by failing to discharge their duties solely

in the interests of the participants and beneficiaries and by voting and actively participating

in the decision-making process to deny relief to the Plan notwithstanding their conflicts of

interest.

### C.    BBVA's Administrative Process Violates ERISA Section 406(b)(2).

209.    ERISA Section 406(b)(2) provides:

(b)  Transactions between plan and fiduciary.  A fiduciary with respect to a
plan shall not -

(2)  in his individual or in any other capacity act in any  transaction involving
the plan on behalf of a party (or   represent a party) whose interests are
adverse to the interests  of the plan or the interests of its participants or
beneficiaries,

210.    "Section 406(b) prohibits a plan fiduciary from engaging in various forms of

self-dealing.  Its purpose is to 'prevent[ ] a fiduciary from being put in a position where he

has  dual  loyalties  and,  therefore,  he  cannot  act  exclusively  for  the  benefit  of  a  plan's

participants and beneficiaries.' . . . This provision is a blanket prohibition against a fiduciary's 'act[ing] on behalf of' or 'represent[ing]' a party with interests 'adverse to the interests of the plan' in relation to a transaction with the plan.   Thus, this provision, like the prohibited transaction provisions of section 406(a)(1), applies regardless of whether the transaction is 'fair' to the plan." *Reich v. Compton*, 57 F.3d 270, 287 - 288 (3d Cir. 1995), amended (Sept. 8, 1995) (internal citations omitted).

211.   At the heart of the fiduciary relationship is the duty of complete and undivided loyalty to the beneficiaries of the trust.  *Donovan v. Mazzola*, 716 F.2d 1226, 1238 (9th Cir. 1983).

212.   **A fiduciary who votes not to sue himself or actively participates in the decision-making process violates Section 406(b)(2) as a matter of law.**  *Iron Workers Loc. No. 272 v. Bowen*, 624 F.2d 1255, 1261 (5th Cir. 1980).  "Section 406(b)(2), moreover, forbids a fiduciary to 'act in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interest of the plan.'  Since we regard '(acting) on behalf of a party' to encompass acting on behalf of oneself and since we consider a desire not to be sued by a plan to be an interest 'adverse' to that of the plan, we would hold that active participation in a decision whether to bring suit against oneself that is directed toward thwarting such a suit constitutes a violation of the statute."  *Id*.

213.   Defendants violated Section 404(a)(1) by failing to discharge their duties solely in the interests of the participants and beneficiaries and by voting and actively participating in the decision-making process to deny relief to the Plan.

214.   A bedrock principal of our nation is that "There are acts which the Federal, or State, Legislature cannot do, without exceeding their authority.  There are certain vital principles in our free Republican governments, which will determine and over-rule an

apparent and flagrant abuse of legislative power; as to authorize manifest injustice by positive law . . . A few instances will suffice to explain what I mean . . .  A law that makes a man a Judge in his own cause . . ."  *Calder v. Bull*, 3 U.S. 386, 388 (1798).

215.     This principal has been affirmed by the United States Supreme Court time and again.  For example, almost two hundred years after *Calder*, the Supreme Court opined:

> Madison spoke precisely to the point:
> 'No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.  With equal, nay with greater reason, a body of men are unfit to be both judges and parties at the same time. . .' The Federalist No. 10, p. 79 (C. Rossiter ed. 1961).

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 428 (1995).

216.     BBVA's Kangaroo Court, where the members of the Committee decided they were not personally liable for their own breach of fiduciary duty, makes a mockery of bedrock principles of American jurisprudence.

**E.     BBVA's Administrative Process Fails to Provide Adequate Discovery.**

217.     It is axiomatic that "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). "If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of Defendant . . . the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." *Id.*  Thus, discovery is as important in an ERISA case –  if not more so – than any lawsuit.  For example, not only are most factual in the sole possession of defendants, the mere

*identity* of the individual defendants is not a matter of public record and can only be ascertained by discovery.

218.    Here, Plaintiffs have had virtually no discovery.   There have been no depositions, no interrogatories, no requests for production, and no third-party subpoenas. While BBVA did produce some documents, the critical Minutes of the Investment Committee Meetings were highly redacted.  (*See* Exhibits A-C). Moreover, as the Court found in the *Ferguson* case, "[BBVA] did not answer Ms. Ferguson's request that [BBVA] identify, with specificity, the Plan's administrative process for grievances regarding the Plan . . . If the participant asks the plan administrator to identify the plan provision that provides procedures for grievances, the plan administrator should not hide the ball."  (*Ferguson*, Doc. 41 at 10, 32).  Additionally, "[BBVA] refused to produce most of the documents that Ms. Ferguson's attorney requested . . ." (*Id.*, 11).

## IX.    CLASS ACTION ALLEGATIONS

219.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

220.    Plaintiffs seek to certify a class action on behalf of all participants and beneficiaries of the plan. Gloria Ferguson and Cassandra McClinton ("Named Plaintiffs") seek to certify and to be appointed as representatives of the following Class:

> All persons, other than Defendant(s), who were participants as of July 17, 2013 in Plan, including (i) beneficiaries of deceased participants who, as of July 17, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future, and (ii) alternate payees under a Qualified Domestic Relations Order who, as of July 17, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future; and (b) all persons, other than BBVA,

who have been participants or beneficiaries in either the Plan and had account balances in the Plan at any time between July 17, 2013 through the date of judgment.

221.    Named Plaintiffs are members of the Class.  Excluded from the Class are (a) any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of any BBVA or is or was a partner, officer, director, or controlling person of BBVA; (b) the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of BBVA; (c) Plaintiffs' counsel; (d) sitting magistrates, judges and justices, and their current spouse and children; and, (e) the legal representatives, heirs, successors and assigns of any such excluded person.

222.    This action meets the requirements of Fed. R. Civ. P., Rule 23 and is certifiable as a class action for the following reasons:

a.      While the precise number of Class Members is unknown to Plaintiffs at this time and can only be finally ascertained from books and records under the exclusive control of and maintained by BBVA and/or its agents, Named Plaintiffs believe after inquiry that there are over 15,000 members of the Class located throughout the United States and that joinder of all members is impracticable; and,

b.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because BBVA owed fiduciary duties to the Plan and to all participants and beneficiaries, and took actions and omissions alleged herein as to the Plan, and not as to any individual participant; thus, there are effectively no individual issues. The common questions of law and fact include, without limitation:

i.      who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109 (a);

ii.     whether the fiduciaries of the Plan discharged their duties with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use;

iii.    whether or not the fiduciaries, prior to the time they engaged in the transactions described herein, had policies and procedures to investigate the merits of the investments and to structure the investments;

iv.    whether or not the fiduciaries followed the policies and procedures to investigate the merits of the investments and to structure the investments prior to making such investments;

v.    whether or not the fiduciaries had policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to high-cost funds as alleged herein;

vi.    whether or not the fiduciaries followed the policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to high cost    funds as alleged herein;

vii.    whether or not the fiduciaries understood and evaluated the plan fees and expenses associated with the plan's investments;

viii.    whether or not the fiduciaries discharged their duties with respect to the plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administration of the plan;

ix.    whether the Committee exceeded its authority, violated their duties of loyalty, or engaged in a prohibited transaction in attempting to decide Plaintiffs' breach of fiduciary duties claims;

x.    whether or not any fiduciary knowingly participated in a breach of duty by another fiduciary;

xi.    whether or not any fiduciary knowingly failed to cure a breach of duty by another fiduciary;

xii.    the losses to the Plan resulting from each breach of fiduciary duty; and,

xiii.    what Plan-wide equitable and other relief should the Court impose in light of BBVA's breach of duty.

223.    Named Plaintiffs' claims are typical of the claims of the Class because Named Plaintiffs are or were participants in the Plan during the time-period at issue in this action and all participants in the Plan were harmed in the same manner by BBVA's misconduct.  The legal theories upon which Plaintiffs are proceeding are typical as well.

224.    Named Plaintiffs are adequate representatives of the Class because they were and are participants in the Plan.  Plaintiffs and all the Class Members were the subject of the same pattern and practices of equitable and Class violations, and all sustained damages arising out of the same wrongful course of conduct. BBVA has acted or refused to act on grounds generally applicable to the Class.  Named Plaintiffs have no interest in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

225.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for BBVA in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans, as a practical matter, would be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

226.    Therefore, this action should be certified as a class action under Fed. R. Civ. P., Rule 23(b)(1)(A) or (B).

227.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of over 15,000 participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be relatively small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class Member has an interest in individually controlling the prosecution of this matter, and Named Plaintiffs are unaware of any difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class action under Fed. R. Civ. P. Rule 23(b)(3), if it is not certified under Rule 23(b)(1)(A) or (B).

228.    Plaintiffs' counsel, Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC; James White Firm, LLC; and, Lange Clark, P.C. will fairly and adequately represent the interests of the Class, have substantial experience in class action and complex litigation, and are best able to represent the interests of the Class under Fed. R. Civ. P. Rule 23(g).

## X. PLAN WIDE RELIEF

229.    Additionally and alternatively, Plaintiffs bring this action as Plan participants seeking Plan wide relief for breach of fiduciary duty on behalf of the Plan. 29 U.S.C. § 1132(a)(2).  Defendants' fiduciary duties were to the Plan and the Plan itself was a victim of Defendants' breach of their fiduciary duties; thus, Plaintiffs demand that Defendants make good to the Plan all losses to the Plan caused by their breach of their fiduciary duties. 11 U.S.C. § 1109.  The absent Plan participants are adequately represented and the Plan participants are so numerous that the delay and expense of joining them would be oppressive and burdensome.  Plaintiffs will take adequate steps to properly act in a representative capacity

on behalf of the Plan, will protect absent parties' interest as well as the interest of the judicial proceedings.

## COUNT ONE: Breach of Fiduciary Duty

230.    Plaintiffs adopt by reference the factual allegations of paragraphs 1 through 229.

231.    This Count alleges breach of the fiduciary duty by Defendants in the selection and maintenance of the investment options for the Plan. This count is stated against BBVA, as named fiduciary; each of the members of the Committee, as plan fiduciaries; and, Envestnet, as 3(21) investment advice fiduciary. Because Envestnet is a ERISA 3(21) investment advice fiduciary, not an ERISA 3(38) investment management fiduciary, BBVA retained discretionary investment authority and is liable for the losses resulting from Envestnet's breaches of fiduciary duty.

232.    The scope of the fiduciary duties and responsibilities of Defendants include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.  In order to do so, Defendants had to have a viable, documented process and methodology that improves the likelihood that participants' reach their retirement goals.

233.    As the Supreme Court held, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]"  *See Tibble*, 135 S. Ct. at 1829. Thus, to state a claim upon which relief can be granted, "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.*  Defendants failed to implement a prudent process of the selection, monitoring, and retention or, as the case may be, removal of investment options.  Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (*Id.*).  Defendants therefore breached their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B). Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan all losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

234.    Defendants also knowingly participated in the breaches by other plan fiduciaries, knowing that such acts were breaches, enabling the other plan fiduciaries to commit the breaches by failing to lawfully discharge their own fiduciary duties, and failed to make any reasonable efforts under the circumstances to remedy the breaches. Thus, Defendants are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a).

235.   As a consequence of Defendants' actions, Named Plaintiffs and the Class Members were damaged, including without limitation, suffering monetary losses.

## COUNT TWO: Relief Pursuant to 29 U.S.C. § 1132

236.   Paragraphs 1 through 229 above are incorporated herein by reference.

237.   Plaintiffs are authorized pursuant to 29 U.S.C. § 1132 (a) (1) to bring a civil action "to enforce [their] rights under the terms of the plan" and (a)(3) to enjoin, or to obtain "other appropriate equitable relief" respecting "any act or practice which violates . . . the terms of the plan," or "to enforce . . . the terms of the plan."  Plaintiffs also are entitled pursuant to 29 U.S.C. § 1132 (g) to an award of reasonable attorney's fees and costs.

238.   Neither the Plan nor the SDP provides an administrative process for reviewing and deciding claims such as those pled in the Drake Action or in the present action, including without limitation claims for breach of fiduciary duty.

239.   The SDP expressly provides, "[I]f plan fiduciaries misuse the plan's assets . . . assistance may be sought from the U.S. Department of Labor, or suit may be filed in federal court."

240.   BBVA and the Retirement Committee are not authorized under the terms of the Plan and the SDP to review and determine claims for anything other than "benefits."

241.   BBVA and the Retirement Committee are not authorized under the terms of the Plan and the SDP to review and determine claims such as those pled in the Drake Action or in the present action, including without limitation claims for breach of fiduciary duty.

242.   In purporting to administratively review and determine the claims of Ms. Ferguson and Ms. McClinton (and Ms. Drake and, effectively, all Plan participants), BBVA and the Retirement Committee acted outside the scope of their authority under the Plan and the

SPD, in violation of the terms of the Plan and the SDP, and in contravention of the rights of Ms. Ferguson and Ms. McClinton (and Ms. Drake and, effectively, all Plan participants).

243.    Plaintiffs, for themselves and on behalf of the Plan and the Plan participants, demands that an injunction issue requiring BBVA and the Retirement Committee to cease and desist from conducting from reviewing and deciding claims brought under 29 U.S.C. §§ 1106 (prohibited transactions) and 1132, including without limitation claims for misuse of plan assets and for breach of fiduciary duty in connection with the administration, oversight or management of the Plan's investments (collectively, "Fiduciary Claims").

244.    Plaintiffs, for themselves and on behalf of the Plan and the Plan participants, demands that BBVA and the Retirement Committee be directed to allow participants asserting Fiduciary Claims to present those claims directly to the U.S. Department of Labor or the federal courts, as provided by the Plan and SDP and authorized under federal law, and without first submitting such claims to the Retirement Committee or any other administrative process established by BBVA.

245.    Plaintiffs, for themselves and on behalf of the Plan and the Plan participants, demand such other equitable relief as the Court may find necessary or appropriate.

246.    Plaintiffs, for themselves and on behalf of the Plan and the Plan participants, demand an Order declaring the decisions by the Retirement Committee and/or BBVA denying the claims presented by the Named Plaintiffs in this case and/or in the Drake

Complaint to be outside the scope of their authority under the Plan, the SPD and federal law, and therefore, to be void *ab initio*.

247.    Plaintiffs demand an award of reasonable attorney's fees and costs incurred in connection with the relief sought by this Count.

### COUNT THREE: Breach of Duty of Loyalty and Engaging in Prohibited Transactions

248.    Paragraphs 1 to 229 above are incorporated herein by reference.

249.    "No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity."  The Federalist Papers, No. 10 (James Madison).   But that is precisely what happened here.  The Retirement Committee – the very people who breached their fiduciary duties to the Plan and participants – purported to decide whether the Plaintiffs were entitled to recover for losses resulting from those breaches, losses for which the members of the committee are *personally liable* under ERISA.  Conflicted corporate directors would exit the boardroom without voting, and judges would recuse themselves.  But the members of the Retirement Committee, in flagrant disregard of their fiduciary duties to the Plan and participants and their personal conflicts of interest, judged their own cause in their favor and voted against the Plaintiffs, the Plan and the other participants.

250.    ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan.

251.    ERISA fiduciaries must scrupulously adhere to the duty of loyalty.  *See, e.g.,*

*DeFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 418 (4th Cir. 2007).

252.    ERISA Section 406(b)(2), 29 U.S.C. § 1106 (b)(2), prohibits a fiduciary from acting "in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan."

253.    Acting in one's own interests constitutes acting "on behalf of a party" within the meaning of the statute.  *See Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1261 (1980).

254.    As a matter of law, a plan fiduciary who, in that capacity, "vote[s] not to sue himself" or even "actively participate[s] in the decisionmaking process" violates Section 406 (b)(2).  *Id*.

255.    In purporting to decide the claims of Ms. Ferguson and Ms. McClinton (and Ms. Drake and, effectively, the Plan and all participants), the Retirement Committee acted in its own interests, and not for the exclusive purpose of benefitting the Plan and participants, in violation of both Sections 404(a)(1) [duty of loyalty] and 406(b)(2) [prohibited transactions].

256.    Plaintiffs, for themselves and on behalf of the Plan and the Plan participants, demands an Order declaring the decisions by the Retirement Committee and/or BBVA denying the claims presented by Ms. Ferguson and Ms. McClinton and/or in the Drake Complaint to violate Sections 404(a)(1) and 406(b)(2) and therefore, to be void *ab initio*.

257.    Plaintiffs demand an award of reasonable attorney's fees and costs incurred in connection with the relief sought by this Count.

**PRAYER FOR RELIEF**

258.    For these reasons, Named Plaintiffs on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

a.    Find and declare that Defendants have breached their fiduciary duties as described above;

b.    Find and adjudge that Defendants are personally, jointly and severally liable to make good all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

c.    Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated, including, without limitation, investment losses;

d.    Order BBVA to provide an accounting necessary to determine the amounts BBVA must make good to the Plan under § 1109(a);

e.    Surcharge against BBVA and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

f.    Certify the Class, appoint Named Plaintiffs as class representative, and appoint Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC, James White Firm, LLC, and Lange Clark, P.C. as Class Counsel;

g.    Void the Committee's administrative decision and enjoin BBVA from using the administrative process to hear or determine claims for breach of fiduciary duty;

h.    Award to the Named Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

i.    Order the payment of interest and the restoration of all investment losses by the Plan and its participants to the extent allowed by law; and

j.    Grant other equitable, legal, to the extent available, or remedial relief as the Court deems appropriate.

Respectfully submitted on this the 15th day of March, 2021.

/s/ James H. White IV
James H. White, IV
Counsel for Plaintiffs


OF COUNSEL:

JAMES WHITE FIRM, LLC
Landmark Center | STE 600
2100 1st Ave North
Birmingham, Alabama 35203
(205) 383-1812
james@whitefirmllc.com

/s/ D. G. Pantazis, Jr.
Counsel for Plaintiffs


OF COUNSEL:

WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500
dgpjr@wigginschilds.com
cmalmat@wigginschilds.com

/s/ Lange Clark
Lange Clark
Counsel for Plaintiffs


OF COUNSEL:

LAW OFFICE OF LANGE CLARK, P.C.
301 19th Street North
Suite 550
Birmingham, Alabama 35203
(205) 939-3933
langeclark@langeclark.com

**<u>Served via the Court CM/ECF System to:</u>**

Leigh Anne Hodge, Esquire
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Lhodge@babc.com

Michael J Clemmer, Esquire
BBVA COMPASS
Office of the General Counsel 15
20th Street South Suite 1802
Birmingham, AL 35233-2000
Michael.Clemmer@bbva.com

Scott B Smith, Esquire
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue Suite 900
Huntsville, AL 35801
Ssmith@bradley.com

*Counsel for Defendants BBVA Compass Bancshares, Inc. and Compass Bancshares, Inc.*

**<u>Served via Email to:</u>**

Nancy G. Ross
Richard E. Nowak
Samuel P. Myler
MAYER BROWN LLP
71 S. Wacker Driver
Chicago, IL 60606
Nross@mayerbrown.com
Rnowak@mayerbrown.com
Smyler@mayerbrown.com

Harlan Irby Prater, IV
Brooke Layton Messina
LIGHTFOOT FRANKLIN & WHITE LLC
400 20th Street North
Birmingham, AL 35203
hprater@lightfootlaw.com
bmessina@lightfootlaw.com

*Counsel for Envestnet Asset management, Inc. (Has Agreed to Accept Service)*

**<u>Served via Email to:</u>**

Emily S Costin
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Emily.Costin@alston.com

Sharon D Stuart
CHRISTIAN & SMALL LLP
505 North 20th Street, Suite 1800
Birmingham, AL 35203-2696
Sdstuart@csattorneys.com

*Counsel for Rosilyn Houston, Shane Clanton, Javier Hernandez, Kirk Presley, Celia Niehaus, Joe Cartee, and Jim Heslop (Acceptance of Service Has Not Been Confirmed)*